**AMAN LAW, LLC**
DAVID AMAN
14705 SW Millikan Way
Beaverton, Oregon 97003
Telephone: 503.810.0850
david@amanlawpdx.com

*Court-Appointed Local Counsel*

**JOHNSON FISTEL, PLLP**
MICHAEL I. FISTEL, JR.
40 Powder Springs Street
Marietta, Georgia 30064
Telephone: 470.632.6000
michaelf@johnsonfistel.com

*Court-Appointed Lead Counsel*

[Additional counsel listed on signature page]

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| FREDERICK ULLOM, Individually and On Behalf of a Class of Similarly Situated Individuals,<br><br>Plaintiffs,<br><br>v.<br><br>DIGIMARC CORPORATION, RILEY MCCORMACK, and CHARLES BECK,<br><br>Defendants. | Case No. 3:25-cv-00779-JR<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE SECURITIES LAWS AND JURY DEMAND** |

# TABLE OF CONTENTS

**Page**


I. SUMMARY OF ALLEGATIONS .......... 1

II. JURISDICTION AND VENUE .......... 4

III. PARTIES .......... 5

IV. FACTUAL BACKGROUND .......... 6

A. Digimarc's Business .......... 6

B. Annual Recurring Revenue (ARR) .......... 8

C. Defendants Continually Promote Digimarc's Relationship with Walmart, Driving the Company's Stock Price Higher .......... 12

D. Defendants Promote New Walmart "Developments" Without Disclosing that the Walmart Illuminate Contract Had Lapsed Six Weeks Earlier .......... 17

E. The Truth Gradually Makes Its Way into the Market Despite Defendants' Efforts to Create Unwarranted Market Excitement to Counteract Their Prior Misleading Statements and Omissions .......... 19

F. Ocho Investments LLC, a Large Digimarc Shareholder, Challenges McCormack's Misleading Statements to Investors and the Company's "Curious, at Best" Decision to Alter 2024 Executive Incentive Compensation .......... 26

V. DEFENDANTS VIOLATED SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 .......... 30

A. August 13, 2024: Defendants Announce Digimarc's Q2 2024 Financial Results and an Important Business Update Regarding Walmart While Failing to Disclose the Walmart Illuminate Contract Expiration .......... 30

B. November 14, 2024: Defendants Announce Digimarc's Disappointing Q3 2024 Financial Results on the Walmart Illuminate Contract Expiration; Assure Investors That the Upcoming Walmart Renewal Will Be Transformational .......... 39

C. January 2025: Defendants Had a Duty to Provide an Update Regarding the Changed Status of the "Transformative" Walmart Deal Negotiations .......... 48

VI. ADDITIONAL SCIENTER ALLEGATIONS .......... 49

VII. LOSS CAUSATION/ECONOMIC LOSS .......... 52

VIII. PRESUMPTION OF RELIANCE ........ 54

IX. CLASS ACTION ALLEGATIONS ........ 55

X. CAUSES OF ACTION ........ 57

XI. PRAYER FOR RELIEF ........ 61

XII. JURY DEMAND ........ 61

Lead Plaintiff Diamond Head Capital International Fund, L.P. and plaintiff Frederick Ullom (together, "Plaintiffs") allege the following based upon personal knowledge as to allegations concerning themselves and, as to all other matters, upon the investigation of counsel, which included among other things, a review and analysis of U.S. Securities and Exchange Commission ("SEC") filings by or concerning Digimarc Corporation ("Digimarc" or the "Company"), conference call transcripts, securities analyst reports, press releases, interviews with former employees, and other public statements and news reports issued by, or about, the Company.

## I. SUMMARY OF ALLEGATIONS

1. This securities class action is brought on behalf of a class ("Class") consisting of those who purchased or otherwise acquired Digimarc securities between August 14, 2024 and February 26, 2025, inclusive (the "Class Period"), seeking to pursue remedies against defendants Digimarc, Riley McCormack ("McCormack"), and Charles Beck (together, "Defendants") under the Securities Exchange Act of 1934 (the "Exchange Act").

2. This case concerns Defendants' scheme to cover up the lapse of Digimarc's multiyear contract with its largest commercial customer, Walmart, and their reckless gamble that the Company would be able to replace the expired contract with a more significant one before investors punished Digimarc's stock price as a result.

3. On August 13, 2024, Digimarc announced its Q2 2024[1] results, including annual recurring revenue ("ARR") as of June 30, 2024 of $23.9 million compared to $16.7 million a year earlier. ARR is "the aggregation of annualized subscription fees from all of [Digimarc's]

[1] "Q# 202#" references the Company's quarter (or "FY," fiscal year) and year, that is, Q2 2024 is second quarter of 2024. Unless noted, all emphasis is added to the Complaint's quotations.

commercial contracts as of the measurement date" and, according to Defendants, "is the best leading indicator for future commercial subscription revenue growth." At the same time, Defendants announced "exciting developments likely to have a profound impact on the second half of this year and beyond," including that Walmart "now understands that the more items in their stores that are digitized with our technology, including items produced by national brands, the more profound the improvement to their in-store operations will be." Defendants repeatedly emphasized that "it is difficult to overstate the importance of these developments."

4. What Defendants failed to disclose, however, was that the Company's primary contract with Walmart, a multiyear deal representing $5.8 million of the reported ARR, had lapsed six weeks earlier. Consequently, halfway through Q3 2024, no revenues had been earned on the contract. As one of Digimarc's largest shareholders later explained in an SEC proxy solicitation filing, "[f]or over four months, [] McCormack failed to disclose to shareholders the loss of Digimarc's largest commercial customer" and "[l]egally, because [] McCormack discussed the future opportunities he envisioned with this customer on that same August 2024 call, he was required to disclose the loss of this contract at the same time[.]" The proxy solicitation called the omission was "a clear case of securities fraud."

5. It was not until November 14, 2024—nineteen weeks after expiration—that Defendants were forced to admit the contract's lapse when they reported disappointing Q3 2024 financial results due to the lost Walmart revenue. In connection with this admission, however, Defendants brazenly doubled down on their scheme. Aiming to avoid liability for any investor losses caused by their earlier nondisclosures, they worked to artificially sustain Digimarc's share price and soften the market's reaction to the June 2024 lapse, while wagering that the execution of a new Walmart agreement might ultimately drive the stock higher. Defendants did this by

overselling the status of the Walmart negotiations, overstating the likelihood of a near-term contract execution, and masking the nature and magnitude of real risk to the potential new contract and the Company's relationship with Walmart. Indeed, Defendants misleadingly told investors that the expired Walmart contract would soon be "renewed" and that the Q3 2024 short fall was due to a "delay" in "re-signing" that particular contract. They further teased that the "contract renewal was expected to include a large upsell," which they characterized as "transformational." Moreover, they told investors not to worry about the delay in closing the contract since "we're focused on a long term" and will "always trade time to close" for a contract with a "broader scope."

6. Not really. There was no "delay" in the "renewal" of the old contract. Instead, the parties were negotiating a different deal that was not merely an "upsell" to the original contract which just required "re-signing." Thus, any additional revenue from Walmart now depended entirely on obtaining a new, much broader agreement, making such future revenue—at least in the near term—effectively an all-or-nothing proposition. This shift created a material and undisclosed risk to Digimarc's relationship with Walmart, the magnitude of which was hidden from investors. Nor were Defendants really committed to extended negotiations given the potential scope of the deal, as they assured investors. Within weeks, Defendants had brought in a top-tier consulting firm to set a surprisingly quick deadline for Walmart's acceptance of the deal, after which Digimarc would walk away. Still, Defendants failed to update investors about their critical about-face.

7. After markets closed on February 26, 2025, Digimarc announced that it had walked away from the "transformational" Walmart deal and would layoff ninety employees by the end of March. Going forward, it would narrow the focus of its business on other areas. The Company further told analysts and investors that it had hired Goldman Sachs to consider "strategic

alternatives," a term companies use when they put themselves up for sale. Digimarc also said it would consider "a full range of potential options," including the possibility of taking the Company private.

8. On this news, which one analyst characterized as "shocking," Digimarc's stock price fell $11.65 per share, or 43%, to close at $15.39 per share on February 27, 2025, further injuring investors.

## II. JURISDICTION AND VENUE

9. The claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5. This Court has jurisdiction over the subject matter of this action under § 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States of America.

10. Venue is proper in this District under § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b)-(d). Digimarc is headquartered in this district, and many of the acts charged herein, including the dissemination of materially false and misleading information, occurred in substantial part in this district.

11. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, without limitation, interstate telephone and other electronic communications, and the facilities of a national securities exchange.

## III. PARTIES

12. Lead Plaintiff Diamond Head Capital International Fund, L.P., as set forth in the previously filed certification (ECF 25-2), and incorporated by reference herein, purchased Digimarc common stock during the Class Period and has been damaged thereby.

13. Plaintiff Frederick Ullom, as set forth in the previously filed certification (ECF 1), and incorporated by reference herein, purchased Digimarc common stock during the Class Period and has been damaged thereby.

14. Defendant Digimarc is incorporated under the laws of Oregon with its principal executive offices located in Beaverton, Oregon. Digimarc's common stock trades on the NASDAQ exchange under the symbol "DMRC." As of December 31, 2024, the Company had 215 full-time employees, including 109 in research, development and engineering; 70 in sales, marketing, product, operations and customer support; and 36 in finance, administration, information technology, intellectual property and legal. As of April 2025, Digimarc had an estimated 125 employees.

15. Defendant McCormack is the Company's Chief Executive Officer ("CEO") and President at all relevant times, having been first appointed to those positions in April 2021. For 2024, McCormack was paid $2,127,797, including $318,720 in non-equity incentive compensation (of the $332,000 target amount). For 2023, McCormack was paid $2,350,618, including $600,000 in non-equity incentive compensation (double the $300,000 target amount). As of March 12, 2025, McCormack beneficially owned 17.7% (3,804,899 shares) of Digimarc's outstanding common stock.

16. Defendant Charles Beck ("Beck") is the Company's Chief Financial Officer ("CFO"), Treasurer, and Executive Vice President ("EVP") at all relevant times, having been first

appointed to those positions in November 2013. Before joining Digimarc, Beck, a licensed Certified Public Accountant, was a senior manager at KPMG LLP. For 2024, Beck was paid $970,050, including $144,000 in non-equity incentive compensation (of the $150,000 target amount). For 2023, Beck was paid $1,086,449, including $284,000 in non-equity incentive compensation (double the $142,000 target amount).

17. McCormack and Beck are collectively referred to as the "Individual Defendants." The Individual Defendants and Digimarc are collectively the "Defendants."

18. As officers and controlling persons of a publicly held company whose securities are registered with the SEC pursuant to the Exchange Act and trade on the NASDAQ, which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's business, operations, and prospects. In addition, the Individual Defendants each had a duty to update and correct any previously issued statements that had become materially misleading or untrue, so that investors were provided with accurate and complete information. Defendants' false and misleading statements, misrepresentations, and omissions during the Class Period violated these specific requirements and obligations.

## IV. FACTUAL BACKGROUND

### A. Digimarc's Business

19. Digimarc provides digital watermarking solutions in the United States and internationally. The Company's digital watermarking intellectual property has been deployed in solutions built upon one or both of the following two things: the identification and the authentication of physical and digital items, often at massive scale, and often where other methods of identification or authentication are insufficient.

20. Among its products, Digimarc offers a proprietary method for imperceptibly enhancing packaging, print, images, thermal labels, audio and other objects with data that are detected by enabled devices, such as barcode scanners, machine-vision equipment, smart phones, and computers. In January 2014, Digimarc introduced "Digimarc Barcodes" for use in consumer product packaging. These barcodes can contain the same or even more information found in traditional universal product codes (UPCs).

21. Digimarc's "barcodes" embed UPC data in an almost invisible form that is repeated across the entire package surface, allowing products to be scanned more quickly and conveniently. (See graphic below). The watermarking technology enables scanning from virtually any angle, removing the need to locate a visible barcode. In addition, the embedded data is highly durable—remaining intact through printing, copying, and normal handling—while continuing to provide reliable product identification, pricing, and inventory tracking functionality.




22. The Digimarc Illuminate platform is a product digitization platform that enables businesses to digitize every product and package by creating digital twins, that is, cloud-based

records connected to physical items that contain intelligence about products' paths, attributes, and interactions. Much of the Digimarc product suite is built on top of the Digimarc Illuminate platform and includes the Digimarc Retail Experience, Digimarc Automate, Digimarc Engage, Digimarc Recycle, and Digimarc Validate. Additionally, Digimarc has maintained a relationship with a consortium of Central Banks for over 25 years, providing technology to help deter digital counterfeiting of currency.

23. For some time, Digimarc has generated revenue through two primary markets: commercial and government. Commercial includes retailers, consumer brands, their suppliers and related solution providers, as well as media, entertainment, and other customers. Government includes the Central Banks and other government customers. During 2023, the Company generated 46% of its revenue under the long-term contracts with the Central Banks.

24. Digimarc derives its revenue primarily from software subscriptions and software development services. Subscriptions for its software products are generally sold to retailers, consumer brands, their suppliers and related solution providers. Software development services are generally provided to the Central Banks (which account for the majority of service revenue).

25. In 2022, Digimarc's total revenue of $30.2 million was roughly evenly divided between subscription revenue and service revenue, $15.2 million and $15.0 million respectively. In 2023, subscription revenue was approximately $19.0 million, and service revenue was $15.9 million.

**B. Annual Recurring Revenue (ARR)**

26. Generally, Annual Recurring Revenue or ARR refers to the predictable, subscription-driven revenue a company expects to generate each year. It is a widely used and important performance metric for businesses built on subscription or contract-based models,

including SaaS companies. Unlike one-time payments or short-term transactions, ARR captures the value of ongoing contracts and subscriptions that renew periodically, potentially offering a clearer view of a company's sustainable revenue base.

27. Digimarc began reporting ARR in Q3 2023, ended September 30, 2023, and first described the metric in its Form 10-Q dated November 7, 2023 as follows:

> We provide an ARR performance metric to help investors better understand and assess the performance of our business because our mix of revenue generated from recurring sources has increased in recent years. ARR is calculated as the aggregation of annualized subscription fees from all of our commercial contracts as of the measurement date. ARR does not have any standardized meaning and is therefore unlikely to be comparable to similarly titled measures presented by other companies. ARR should be viewed independently of revenue and deferred revenue and is not intended to be combined with, or to replace, either of those items.

28. In connection with this initial disclosure, the Company included a boilerplate warning (used verbatim by many other companies) that:

> ARR is not a forecast and the active contracts at the end of a reporting period used in calculating ARR may or may not be extended or renewed by our customers.

29. Digimarc's ARR quickly became the most important financial metric in determining its intrinsic value with Defendants frequently touting it to investors as a leading indicator of future growth. For example, in the Company's November 6, 2023 earnings call discussing Q3 2023 results, McCormack told analysts and investors:

> As mentioned during the last few earnings calls, first year bookings has become a less relevant metric as our focus is on growing our recurring and high-margin subscription revenue, and signing those customers to multi-year deals. Our decision to begin reporting our quarter-end ARR reflects our desire to provide investors transparency into the results of that focus ***as well as a greater understanding of our true underlying growth***.

30. Later, in that same call, Beck described the decision to report the metric as focusing on Digimarc's "most important growth driver," that is, "recurring commercial subscription revenue." He stated in relevant part:

> As we mentioned on previous earnings calls, ***we have been working to select a new reporting metric to replace first year commercial bookings that would provide a better indicator of our progress in growing our high-margin commercial subscription business***. As [McCormack] already mentioned, we have decided on annual recurring revenue as it's a key performance metric we are now using to run our business. We intend to report ending ARR each quarter with comparative periods ***so you can measure our progress***.
>
> We calculate ARR using the annual recurring fees stated in our sales contracts, thus mirroring the underlying economic value of these contracts. Also, ARR only includes recurring subscription fees from commercial contracts. Government contracts, service fees and non-recurring subscription fees are excluded from our reported ARR. ***The reason for this is, the most important growth driver we are all focused on is recurring commercial subscription revenue***. We have included a table within the earnings script that reports our ARR at the end of each of the last eight quarters for comparative purposes.
>
> In addition to focusing on growing our high-margin commercial subscription business, we are also focusing on making sure the payment terms in our sales contracts are consistent with traditional SaaS terms, which results in the collection of annual payments up front. I call this out because it is yet another benefit of our transition to becoming a product and platform company and allows our ARR growth to have a more immediate impact on improving cash burn.

31. In Digimarc's February 28, 2024 earnings call discussing Q4 2023 results, Beck again touted the importance of ARR as the best leading indicator for future growth. He stated, in part: "As a reminder, ***we believe ARR is the best leading indicator for future commercial subscription revenue growth.*** Subscription revenue will lag ARR growth as subscription revenue is recognized ratably over the contract term versus ARR is recognized upfront upon entering into a contract."

32. Digimarc's April 24, 2024 Proxy Statement similarly told shareholders that, "ARR growth provides ***a leading indicator of future subscription revenue growth***."

33. On Digimarc's May 2, 2024 Q1 2024 earnings call, Beck again claimed in his prepared remarks that the ARR metric is "***the best leading indicator for future commercial subscription revenue growth***."

34. Consequently, for several years prior to 2024, Digimarc's executive annual incentive plan ("AIP") for its five named executive officers (including McCormack and Beck) focused on ARR. Under the plan, ARR was defined as "a company performance metric calculated as the aggregation of annualized subscription fees from all of our commercial contracts as of the measurement date." The plan weighted the "ARR Growth" and "Improvement in Q4 Adjusted Non-GAAP Net Income" financial metrics equally (50% each) in calculating annual executive incentive compensation. For 2023, the Company paid out the maximum annual incentive compensation to its named executives, with ARR growing more than 70% that year.

35. For 2024, Digimarc scrapped the ARR Growth metric for its AIP and instead utilized a new metric, "Gross New ARR Growth," which it weighted 65%, with "Improvement in Q4 Adjusted Non-GAAP Net Income" now accounting for 35%. The Company defined "Gross New ARR" as the total additions to "Ending ARR" during the year, where Ending ARR is the "annualized subscription fees from all commercial contracts as of the measurement date," excluding service and government revenue. Put differently, while "ARR Growth" was inclusive of new customer additional and current customer losses, "Gross New ARR Growth" altogether ignores current customer losses. Unlike the "ARR Growth" metric, which is commonly utilized by public companies, "Gross New ARR Growth" is highly uncommon if not unique to Digimarc.

36. As it turned out, for 2024, total ARR *declined* 10%, while the new metric, Gross New ARR Growth, increased by 23%.

### C. Defendants Continually Promote Digimarc's Relationship with Walmart, Driving the Company's Stock Price Higher

37. One of Digimarc's most significant customers is Walmart, with which it has had a long, and at times very promising, relationship. Walmart's scale is immense. It is the world's largest retailer, with more than 4,700 stores in the United States alone. Worldwide, it operates more than 10,750 stores in 19 countries. In fiscal 2025, Walmart reported net sales of $674.5 billion. Given that scope, Digimarc's association with Walmart held the potential to significantly reshape the Company's trajectory—an opportunity that Digimarc repeatedly underscored to investors.

38. Walmart was for a long time Digimarc's largest commercial customer, with revenues second to only the Central Banks. For FY 2022, Walmart accounted for 17% of Digimarc's revenues. For FY 2023, Walmart revenues grew to 21% of total revenues. Between Q1 2023 and the end of FY 2024, Walmart represented approximately the following percentages of the Company's total revenues:

| Digimarc 10%+ Customer | FY 2024 | Q3 2024 | Q2 2024 | Q1 2024 | FY 2023 | Q3 2023 | Q2 2023 | Q1 2023 |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| Central Banks | 41% | 43% | 39% | 42% | 46% | 47% | 46% | 50% |
| Walmart | 14% | 9% | 18% | 18% | 21% | 21% | 21% | 23% |
| Add'l 10%+ Customer | 15% | 16% | 14% | 14% | - | - | - | - |

39. Although Digimarc at times asserted that its policy was to not publicly discuss specific customers, it repeatedly highlighted its Walmart contracts—including among other things contract values and the percentage of revenues attributable to Walmart—making it clear to analysts and investors when the Company was referring to Walmart. Thus, even when Defendants described a significant customer relationship or contract without specifically identifying Walmart, market analysts were not bound by those constraints and routinely identified Walmart by name.

40. Digimarc had several contracts with Walmart, including relatively small, niche contracts, such as an agreement to incorporate Digimarc's technology into Walmart's toy catalog, enabling shoppers using the Walmart mobile app to scan catalog pages and directly shop for toys.

41. At relevant times, Digimarc had two primary, multimillion dollar contracts with Walmart. The first, announced in 2019, was a contract concerning Digimarc Barcode and Walmart's private label products and thermal label products (*i.e.*, packaged fresh foods), products for what Walmart had the necessary control of packaging. The second, announced in late 2022, was a larger multiyear contract involving the expanded deployment of the Digimarc Illuminate platform.

**<u>Walmart / Digimarc Barcode Contract</u>**

42. On April 30, 2019, Digimarc and Walmart issued a press release announcing that they had launched a collaboration to apply Digimarc Barcode to fresh product thermal labels, aimed at automating markdowns, reducing food waste, improving inventory accuracy, and speeding up checkout processes.

43. On May 1, 2019, in a conference call discussing Digimarc's financial results and outlook, Beck hyped the Company's new collaboration, stating, among other things, that "[w]e view successful implementation of these programs as a starting point for large-scale enterprise transformation made possible by our platform." He stated:

> We have entered into a multi-year contract with Walmart. The contract is a Statement of Work [SOW] under our existing Master Services Agreement. The SOW is program-specific, covering private brand enhancement and thermal-label products. It is limited to Walmart stores in the US only. The agreement is effective immediately and has unlimited duration, subject to termination for convenience by Walmart.
>
> The SOW has an annual fixed fee of $3 million per year. Given the termination for convenience provision, we will book $750,000 each quarter. The first quarterly

> payment under the contract is reflected in the bookings numbers I just reported for April.
>
> From a financial perspective, Walmart represents a small share of the addressable market given how we price access to our platform. Obviously, their potential contributions to cross-side network effects is much more significant. We view successful implementation of these programs as a starting point for large-scale enterprise transformation made possible by our platform.
>
> We look forward to a long successful relationship with the world leader in retail.

44. In response to these announcements, Digimarc's stock price jumped almost 45%, from $33.10 per share on May 1, 2019, to close at $47.92 per share on May 2, 2019. Not long thereafter, on May 28, 2019, Digimarc stock would hit an intraday high of $66.50 per share, more than double the price preceding the Walmart announcements.

**Walmart Illuminate Contract**

45. On November 3, 2022, Digimarc announced a new multiyear deal with Walmart (the "Walmart Illuminate Contract"), which was in addition to the earlier, ongoing Digimarc Barcode agreement. In a conference call discussing Digimarc's Q3 2022 financial results and outlook, Beck discussed the new Walmart deal, stating:

> Bookings for the quarter included $1.2 million from a new multi-year agreement we signed in Q3 with Walmart. The new agreement provides for a minimum payment of $2.7 million in year one, and more than doubles to $5.8 million in year two. These minimum payments are incremental to the $3 million annual payments we receive under the existing agreement. We expect the remaining contract value of $7.3 million to be booked in the fourth quarter upon receiving customer acceptance.
>
> * * *
>
> Subscription revenue grew 64% in the quarter from $2.5 million to $4.1 million. The new Walmart contract provided for $1.1 million of subscription revenue during the quarter. We expect a similar quarterly revenue run rate for this contract over the next seven quarters with potential upside above the minimum payments.

46. McCormack followed up by enthusiastically hyping the Company's Walmart relationship on the call, stating, among other things, that the Walmart deal is "our singular focus" and "a top priority across our company," which included an opportunity "large enough to take us to profitability all on its own." He stated, in part:

> We made progress on many fronts in Q3, but without a doubt, the highlight of the quarter was the deal we signed with Walmart covering an expanded deployment of the Digimarc Illuminate Platform. I'm confident you all have many questions about what exactly we are doing with Walmart and what new use case will be powered by this expanded deployment of our platform capabilities. Please know that we are equally eager to discuss this incredibly exciting development, and plan to, when the time is right. Until then, there's just not a whole lot more we can say besides, stay tuned for more details in the not-too-distant-future.
>
> I do want to spend some time framing the opportunity ahead of us as best as I can. And perhaps the best way to do that is to describe the opportunity sets in terms of the Serviceable Available Markets or SAMs, which in this case refers to the size of the opportunities immediately available to us as a result of this deal with Walmart, and the Total Addressable Markets or TAMs, which refers to the size of the opportunities that exist for Digimarc beyond the scope of this deal as a result of this new use case.
>
> First, I want to touch on the SAM and the TAM for the new use case of our platform capabilities. As [Beck] mentioned, our deal with Walmart is structured so that the payment of $5.8 million in the second year is more than twice as large as the payment in the first year of the deal. It is important to note that even at the end of year two, there are still multiples of upside remaining before we reach full penetration at Walmart. Hence the SAM, as represented by full penetration of this use case at Walmart, is also multiples higher than the $5.8 million payable to Digimarc in year two of the new deal.
>
> Moving now to the TAM of this new use case, while Walmart is the largest retailer in the U.S. and the world, the deal we signed with them represents only single digit percentages of the total global opportunity for this expanded use of our platform capabilities, and hence the SAM mentioned above, which again is multiples of $5.8 million is only single digit percentages of the TAM of this new use case of our platform capabilities. For now, of course, our singular focus is delivering for Walmart; it is a top priority across our company. At the same time, it's also important to note that while not a near term focus, the opportunity to expand this use of our platform is real, and it is meaningful, with an annual recurring revenue or ARR opportunity well into the nine figures.

* * *

> Beyond the opportunity for increased platform revenue, this deal also provides expanded product opportunities. For the last few quarters, we have been discussing a new Digimarc product that will benefit from a top-down driver of product digitization demand. Our new partnership with Walmart should act as a powerful anchor for that demand. As a result of this deal with Walmart, the SAM of our soon-to-be-launched product is large. It's large enough to take us to profitability all on its own. And like the relationship between the SAM and the TAM on the platform side, the SAM for our new product at launch is also single digit percentages of its TAM. Measured in ARR, this new product's TAM is larger than the platform opportunity.
>
> Even considering the immediate and longer-term opportunities presented by the SAMs and TAMs of both our platform and our soon-to-be-launched product, we think the most exciting part of today's announcement is how much closer we've gotten to a cutting-edge technology leader. Walmart processes a mind-boggling number of products across multiple touch points every day, and is laser-focused on using technology to improve all aspects of its operations. We are a product digitization company, laser-focused on digitizing the world's products to enable true digital transformation. Our goal with this expanded partnership is quite simple: continue to win Walmart's faith in our partnership each day, because our future together will have a profound impact on the retail industry, and beyond. Walmart is a great company doing innovative things, and we're honored to be partners in their product digitization and digital transformation journey.

47. Despite Digimarc's "singular focus" on Walmart, McCormack held back specific details of the Walmart Illuminate Contract—which would have allowed investors to judge for themselves its potential upside—stating that:

> Rest assured, we're just as impatient to talk about what exactly those innovative things are as you and the world at large are to hear about them. But until we can say more in a very public way, I ask you to respect our commitment to customer confidentiality. We take it very seriously.

48. In response to these announcements, Digimarc's stock price jumped almost 30%, from \$14.65 per share on November 3, 2022, to close at \$18.95 per share on November 4, 2022.

49. On December 1, 2022, Digimarc issued a formal press release announcing the new Walmart Illuminate Contract. According to the press release, the new agreement guaranteed a

minimum payment of $2.7 million in year one, more than doubling to $5.8 million in year two, and covered the deployment of the Company's Digimarc Platform capabilities. McCormack was quoted as saying, "Walmart is a forward-thinking technology leader with an unwavering focus on customer experience. We are thrilled to expand our partnership with them and look forward to sharing more details about this expansion in the coming months."

50. On March 1, 2023, in a conference call discussing Digimarc's Q4 and FY 2022 financial results and outlook, McCormack again touted the Company's signing of the Walmart Illuminate Contract, which he called "an exciting new use case, further strengthening our relationship with the world's largest retailer."

**D. Defendants Promote New Walmart "Developments" Without Disclosing that the Walmart Illuminate Contract Had Lapsed Six Weeks Earlier**

51. On August 13, 2024, in Digimarc's Q2 2024 conference call with analysts and investors, McCormack announced purported new "developments" with the Company's Walmart relationship which he claimed were "likely to have a profound impact on the second half of this year and beyond." He described the developments as follows:

> In Q2, we provided our largest commercial customer with demonstrable proof that our technology can carry a very heavy load in this multi-signal future, resulting in two important developments that give us confidence this flywheel is likely to start spinning.
>
> First, and most immediately, we believe this customer now understands that the more items in their stores that are digitized with our technology, including items produced by national brands, the more profound the improvement to their in-store operations will be.
>
> Second, we believe this customer also now understands the value of Digimarc delivering a greater amount of the software capabilities powering their points of detection. This should ultimately increase the size and time-to-market of the "razor" component of this flywheel, not only with our initial customer, but with subsequent customers as well.

> While I cannot provide any additional details at this time, I want to emphasize two key points. First, it is difficult to overstate the importance of these developments. Second, we expect and look forward to being able to share more information soon.

52. The next day, on August 14, 2024, Needham & Company, LLC issued a research report by, among other others, Joshua Reilly (who participated in the conference call). The report summarized Defendants' discussions on the conference call including the Company's reported "developments" with its Walmart relationship and recounted the market's understanding that the Walmart Illuminate Contract remained in place. The report stated in part:

> Additional details on key strategic objectives highlighted from Q2. We highlight three key takeaways from the Q2 earnings call that support the company's long-term objectives. The three key items include 1) Walmart understanding the value of tagging all items in store, 2) Recycle has a partner/customer set to launch in 2H/24, 3) Digimarc Gift Card solution set to launch for the coming holiday season. For the Walmart opportunity, we believe it continues to progress and Walmart has become incrementally positive on tagging all items within their stores including both private label brands and national brands. As a reminder, the company has $5.8mm in ARR related to opportunity with Walmart already in place, and we expect there remains an opportunity to expand both direct and indirect revenue through suppliers. While most of the commercial agreement remains confidential, we would note management highlighting Walmart's increasing understanding of the need to tag all items is the incrementally positive data point.

53. Analysts and investors, however, were kept in the dark that—halfway through Q3 2024—the Walmart Illuminate Contract had lapsed six weeks earlier and Digimarc was no longer recognizing any associated revenue. As such, the nature and magnitude of the risk to the Walmart relationship and contract, as well as the Company's current business strategy, growth trajectory, and outlook, remained largely hidden from investors.

54. As one of Digimarc's largest shareholders later explained, "Legally, because Mr. McCormack discussed future opportunities he envisioned with [Walmart] on that same August 2024 call, he was required to disclose the loss of this contract at the same time."

**E. The Truth Gradually Makes Its Way into the Market Despite Defendants' Efforts to Create Unwarranted Market Excitement to Counteract Their Prior Misleading Statements and Omissions**

55. On November 14, 2024, after market close, Digimarc announced its financial results for Q3 2024 (ended September 30, 2024), and they were extremely disappointing. ARR *decreased* to $18.7 million from $19.6 million a year earlier, and down from $23.9 million in Q2 2024. According to the Company's press release, "The $0.9 million decrease reflects a $5.8 million decrease due to the delayed timing in the anticipated renewal of a commercial contract, partially offset by new annual recurring revenue from entry into new commercial subscription contracts and increased subscription fees on existing commercial contracts." Overall, total Q3 2024 revenue barely increased to $9.4 million from $9.0 million in Q3 2023.

56. Later that day, Digimarc held an earnings call with analysts and investors concerning its reported financial results for Q3 2024. On the call, McCormack and Beck disclosed that the Walmart contract renewal had been temporarily "delayed," teasing that the anticipated renewal would be "transformational." McCormack stated in relevant part:

> Looking back, we acknowledge Q3 revenue doesn't reflect the reality just described. The gap between what lies ahead and what lies behind has never been this large. As noted in the 10-Q that we published today, our third quarter results were impacted by the delayed renewal of a commercial contract. The financial component of this deal is meaningful as it represents a significant upsell. The strategic component will prove transformational not only to our company but also to the massive industry it will revolutionize.

57. Beck, in his prepared remarks, also chose to hype the "transformational" deal. He stated that because of the "delay" in signing, Q3 2024 financial results are not reflective of future performance, "even before considering this contract renewal is expected to include a large upsell." He stated in relevant part:

> Thank you, [McCormack], and hello, everyone. I normally begin my discussion of our financial results by providing a snapshot of our key financial metrics because I believe this overview provides useful context ahead of discussing each metric in turn. As a result of the significance of the delayed contract [McCormack] just referenced, today I'm going to forgo providing that snapshot because Q3 results are not a true representation of the state of our business.
>
> In addition to having an outsized impact on ending ARR, the delay in resigning resulted in no revenue being recognized nor cash collected from this contract during Q3. By significantly impacting some of our most important financial metrics, this delay means quarterly financial results are not reflective of our expected go-forward performance.
>
> * * *
>
> Free cash flow usage was $7.3 million for the quarter compared to $400,000 in Q3 last year. The variation year-over-year is primarily due to the timing of cash receipts from the contract we've been referencing throughout our prepared remarks. If this contract, as currently drafted, had been executed and paid within the third quarter, free cash flow would have been positive in Q3.
>
> While we are working diligently to finalize this contract in Q4, the receipt of payment will lag contract execution by standard payment terms. Even if we do not receive payment from this contract before the end of the year, we expect Q4 free cash flow usage to be significantly improved from Q3. If we do receive payment before the end of the year, we expect Q4 free cash flow to be significantly positive.

58. McCormack also had the following colloquy with a Craig-Hallum Capital Group securities analyst, Jeffrey Van Rhee ("Van Rhee") regarding why the original contract had lapsed during the negotiations on the purportedly upsell:

> <u>Van Rhee</u>: Sounds good. Great. Thanks. A couple for me. Riley, on the large customer, they've got a gap, I guess, here in the existing contract. I think you had a couple of contracts, but this one in particular was going to renew here and it looks like it didn't. How do they operate in this gap if the contract isn't renewed? Are they still using the platform? Just how does that work? And then was there not a scenario where they could have just renewed or extended the old contract, at least for this interim period?
>
> <u>McCormack</u>: Yeah. Jeff, both great questions. I get really uncomfortable talking about any individual customer. I would tell you that we do have customers that have multiple contracts with us that could be for very different things. And so if there is a gap in the contract, they lose access in between. It doesn't mean that they loss

> access to everything. It will just be whatever that contract covers. So I think that was the best I can answer your first question. And what was your second question? Was there not like a shorter-term renewal, I guess?
>
> Van Rhee: Yeah. Just an opportunity just to do an extension or some sort of short-term renewal until the new contract comes into play.
>
> McCormack: Yeah, Jeff. This is exactly what I was saying earlier in my prepared remarks, I will always trade time to close for better scope. And I would rather get a really good deal that accomplish -- that we're trying to accomplish over the next multiple years together as opposed to a quick Band-Aid. I guess it's – we're focused on a long term, Jeff, I think you know that. And I'm not afraid to take time to scope for -- take time to close for broader scope. I fully support that decision.

59. Defendants' repeated assurances that the Walmart deal had only been "delayed" and the "re-signed" contract would include a "transformation" "upsell," had their intended effect of somewhat counterbalancing the Company's disastrous quarter. On November 15, 2024, Digimarc stock closed at $27.17 per share, on heavy volume, down just 10% from the previous day's close of $30.12 per share. Within days, the stock price had rebounded.

60. On February 26, 2025, after the close of trading, Digimarc announced it had abruptly abandoned its pursuit of the transformational Walmart contract, and it would reorganize the entire Company to prioritize its authentication business for gift cards, physical anti-counterfeiting efforts, and digital fraud. As a result, it planned to reduce its workforce by up to ninety employees by the end of March. According to the Company, its reorganization would "reduce the Company's cash expenses by approximately $16.5 million on an annualized basis, and result in approximately $5.5 million of other annualized cash cost savings." For Q4 2024, the Company revealed that ARR decreased to $20.0 million from $22.3 million a year earlier. According to the Company's press release, "The $2.3 million decrease primarily reflects a $5.8 million decrease in ARR due to the expiration of a commercial contract in June 2024, partially offset by an increase in ARR from new and existing commercial contracts." Overall, total Q4

2024 revenue decreased to $8.7 million from $9.3 million in Q4 2023. For FY 2024, subscription revenue increased to $22.4 million from $19.0 million for FY 2023, "primarily reflecting higher subscription revenue from new and existing commercial contracts, partially offset by the expiration of a commercial contract in June 2024."

61. On the Company's earnings call that day, McCormack attempted to put a different gloss on Defendants' previous November 14, 2024 statements regarding the "delayed" Walmart contract, recounting:

> On our last earnings call, we stated that as a result of significant achievements in both invention and market development, the difference between what lies ahead and what lies behind had never been greater. That conviction was driven by our defining not just one, but two compelling paths to near-term profitability, while positioning ourselves to deliver dollars of free cash flow per share shortly thereafter.
>
> The first path consisted of continuing to pursue market opportunities across both identification and authentication use cases, anchored by the closure of the large deal we discussed on the Q3 call. While this was the path we felt was the most likely as of that call, we were clear to point out that the biggest risk to this deal's closure was not the customer's interest in our offering, but how much time we would be willing to give this customer to commit as there were many exciting developments in Q3 to which we could instead be allocating our resources.
>
> The second path consisted of committing our resources to these many exciting developments, which included not only incredible invention, such as significant breakthroughs in the area of copy detection, copy deterrence and tamper evidence, but also important market developments anchored by important customer and partner wins across both the physical and digital domains. Of critical importance, these technological and market developments were all in the authentication area. This provided us the opportunity to continue focusing our business by prioritizing market opportunities in a single-use case category as opposed to concurrently pursuing both categories.

62. McCormack then described the purported reasons for the shocking decision to pursue the "second path," describing an "extended" and "detailed deep-dive engagement" of PwC during which Digimarc worked with Walmart "over holiday breaks," referring to late 2024. He

stated in pertinent part:

> While there are areas of overlap in the production and support of solutions across identification and authentication use cases, there are also areas of fundamental divergence that require parallel or duplicative work.
>
> Thus, the opportunity to apply the greater level of focus was attractive, not only because it would increase the trajectory of achieving meaningful revenue in the chosen area, but also because it would allow us to reorganize the company to act with agility and speed while dramatically reducing our cash burn.
>
> Important to stress that there is absolutely no confusion we did not envision this second path as walking away from our identification use cases, including this large deal. Our identification use cases address problems that are worsening and that we are and will continue to be uniquely positioned to best solve. This second path reflected prioritization, not elimination of opportunities by addressing them sequentially instead of in parallel.
>
> In assessing these two paths, we analyze our various market opportunities using multiple lenses, including opportunity costs, which is the cost of missing upcoming important deadlines versus the risk, if any, of permanent opportunity loss from temporary deprioritization, expected revenue across horizons, quantifying time to significant revenue as a heavily weighted overlay to total addressable market, and relative contribution margins, important in its own right, but also a metric that will, will impact ultimate value per share as long as we continue to believe that the best use of free cash flow generation is share repurchases.
>
> Realizing the importance of getting this analysis right, we retained PwC to conduct an extended and detailed deep-dive engagement with the dual mandate of challenging our every assumption and bringing us heavy voice of market input spanning many participants, industries and ecosystems.
>
> This analysis allowed us to set a deadline to reach a decision on this large deal, which we then partnered with our valued customer to determine the feasibility of meeting. As has been the case during this entire engagement, they were wonderful, working with urgency and over holiday breaks in search of a way forward.
>
> They understood our position and offered to alter the scope of the engagement to provide more flexibility. They reaffirmed the expected value they believed we bring to their operations. Ultimately, however, it became clear that meeting the deadline was just not feasible, which allowed us to move forward on our second path I outlined a few minutes ago, prioritizing market opportunities in the authentication area.

63. After Digimarc's decision to walk away from the potential deal, McCormack again teased that a future Walmart deal to "achieve their bold vision" was not off the table but indicated that the original Walmart Illuminate Contract would not simply be re-signed without an upsell. He said:

> . . . I want to highlight that pursuing this second path does not mean that the opportunity to support our valued customer achieve their bold vision is dead. All the details we laid out on the Q3 call about this customer's interest in our offering still stand, as does our understanding as for why they are not currently able to commit.
>
> While we are unable to reach agreement by the deadline we set, the process was wonderfully collaborative and we remain in communication with them about potential next steps. While it is likely that any new agreement would require some de-scoping from what was originally imagined, this does not mean the dollar value of any new agreement would be less; in fact, there are reasons to believe the opposite could actually be true.
>
> I want to spend the rest of this call discussing what's ahead, but before I do, it is important to note that whatever odds one assigns to a new agreement being reached with this customer at some point in 2025 or beyond, it represents free and extremely significant upside to everything we will be discussing from here.

64. Digimarc's head-spinning strategic U-turn raised many questions including why the original Walmart Illuminate Contract could not simply be renewed and whether the Walmart Barcode Contract was now also at risk. Instead of addressing these concerns directly, Defendants again deflected and avoided providing clear answers. McCormack's colloquy with an analyst on the call included the following:

> Van Rhee: . . . On the Walmart contract, the $5.8 million ARR that lapsed in anticipation of signing of this, this transformational contract. Just want to be clear, your expectations on that $5.8 million, does that come back into play now, or is that indefinitely shelved?
>
> McCormack: Yes. So Jeff, we don't - we haven't talked about who those contracts with. But the $5.8 million contract that lapsed in Q3 of last year we were in conversations with this customer to expand that contract. And that is what we're saying on this call that, that we're still in conversations with them.

Van Rhee: Okay. Does, I mean, I'm trying to understand the comments in the, in the, in the script about churn. So there's, there's also another $3.7 million with that same customer that is referenced in the Qs and Ks. So the --

McCormack: Yes. It's a different customer that we signed a $32 million deal, I don't know, two years ago about. There were multiple. There were three products that, that customer signed up for. One of them was DRS. As Charles mentioned earlier, that rolling out that something has changed, not a result of our technology relation with the partner. So that –

Van Rhee: Right.

McCormack: That contract is, is - has lapsed. But different customers.

Van Rhee: No, no, no, no, no. There was an original Walmart contract, which was a $3.2 million ARR. And so my question was --

McCormack: So, so again, we don't talk about customers, but the - we have talked about the $3 million Walmart deal that is still in play. That's alive. We still have revenue. We - that contract that we signed for Walmart to watermark their private label contract products, it's still in force. They're still watermarking their private label contract. They – it's, you're putting me in a difficult conversation here, Jeff. I mean, I think you, you understand that. The other contract, the $5.8 million one, unrelated. Same, - we have customers that have multiple contracts with us.

Van Rhee: Yes. I mean, I get it, [McCormack]. Look, I'm not trying to be difficult, but these are, these are big contracts that you do break-out in the, in the queue with this customer and everybody knows that. So, I'm just trying to get a sense of whether or not, we should assume or, or believe that the $5.8 million and the $3.2 million are at risk. I'll leave that alone. You obviously don't want to go there. . . .

65. On this news, Digimarc's stock price fell $11.65, or about 43%, to close at $15.39 per share on February 27, 2025, on unusually heavy trading volume.

66. In reporting these developments, one prominent analyst noted that the announcements had occurred in a "fairly shocking manner." VanRhee wrote the following in his February 27, 2025 report:

In a fairly shocking manner, Digimarc is pivoting to a serial approach to opportunities as opposed to the broad range of parallel efforts, in an effort to get to FCF breakeven by Q4'25. Underpinning this shift was the inability to come to terms

with Walmart on the transformational deal referenced last quarter. This deal was presented as game-changing in all respects and was noted to be in very late stages of negotiation. At the end of the day, the parties were unable to come to agreement on the transformational deal. It is unclear whether the $5.8M ARR contract with the same customer, which was paused pending the signing of the new transformational deal, will at any point restart. It is also unclear whether the $3.2M ARR contract from the same customer in place since Q3'19 is at risk of churn/non-renewal.

### F. Ocho Investments LLC, a Large Digimarc Shareholder, Challenges McCormack's Misleading Statements to Investors and the Company's "Curious, at Best" Decision to Alter 2024 Executive Incentive Compensation

67. On March 20, 2025, Ocho Investments LLC ("Ocho"), a long-time Digimarc shareholder which owned 5.1% of its stock, that is, 1.1 million shares (acquired for approximately $26 million), sent a letter to the Board of Directors which it also announced in a press release and made available to the public online. In its letter, Ocho detailed Digimarc's poor operating performance and McCormack's earlier misleading public statements. Ocho's letter called on the Board to conduct a search for a new CEO, led by a committee of independent directors, including a new director appointed to represent the interest of the stockholders.

68. Among other things, the Ocho letter described Digimarc's "Loss of Credibility and Investors' Trust" and the "clear case of securities fraud by [] McCormack," stating as follows (original emphasis):

**4. Loss of Credibility and Investors' Trust**

Communication:
*"There are plenty of ways to lose investors' trust and goodwill, but only one way to earn them… I covenant to all of you, we'll be honest and transparent, good, bad and ugly, because it's the right thing to do and the only fair way to treat the owners of our company."*
*– [McCormack] on 4/12/21*

Results:

- Perhaps the only area where a CEO has 100% control is the honesty and transparency (or lack thereof) with which he or she communicates

- Digimarc's present CEO has confused the market by obscuring investor communications, over-promising and under-delivering on potential new sources of revenue, and failing to disclose material information to investors
- A glaring example of this was [] McCormack's recent decision to conceal the loss of the Company's largest commercial customer for 4.5 months; as outlined below, this was **<u>a clear case of securities fraud</u>** that has exposed Digimarc to securities class action lawsuits
- The resulting loss of credibility and investors' trust has severely impacted the Company's stock price, which <u>will remain "in the penalty box" as long as [] McCormack remains CEO</u>

On August 13, 2024, Digimarc hosted its 2q24 conference call, during which the Company failed to address the expiration of its largest commercial contract:

- [] McCormack's comments about the contract on that call were focused on positive interpretations of his perceived progress on this large commercial contract his contract accounted for $5.8M of ARR as of June 30, 2024, which was reported publicly on August 13, 2024 (even though, as Digimarc's 2024 10-K revealed when published in February 2025, the contract had expired in June 2024)
- Therefore, at the time of the 2q24 earnings call, [] McCormack was aware the contract had expired and Digimarc <u>had not been recognizing any revenue from this contract for the prior six-plus weeks</u>
- ARR informs investors of the Company's recurring revenue, which provides a snapshot of the current "run rate"; it was misleading to include a large commercial contract in the ARR calculation as of June 30, 2024 (even though it expired on that same day) and to discuss the potential positives of the contract on the 2q24 earnings call (while not disclosing its expiration six weeks earlier)
- A senior partner at one of the country's most recognized law firms evaluated this series of events and quickly described it as "self-evident" that the positive statements about the contract on the 2q24 conference call made the failure to disclose the expiration of the contract a "material omission", and Digimarc will be "hard-pressed to disprove" that this is a **<u>clear case of securities fraud by [] McCormack</u>**.
    - He also noted this is not just one attorney's view, considering the litigation docket against the Company and the market's reaction when the expiration and non-renewal of the contract was actually disclosed

(Original emphasis).

69. On April 15, 2025, Ocho issued a press release announcing that it was publishing its recent presentation to Digimarc's independent directors. The press release included a link to the slide presentation and stated in part:

> The presentation outlines Digimarc's poor operating and financial performance, the misalignment of executive compensation with shareholder interests, the CEO's withholding crucial information from investors, and the resulting destruction of shareholder value. The Company's stock price has declined 60% under the present CEO's leadership while the Nasdaq has increased 21% over the same time period.

70. The presentation included its claim that, "A senior partner at one of the country's most recognized law firms evaluated this series of events and concluded it was a clear case of securities fraud." The presentation also questioned the well-timed decision to abandon ARR Growth as a primary determinant of executive incentive compensation. The presentation included the following slides:





# CEO Comp Change Severely Misaligns Incentives

- In 2022 and 2023, ARR growth was the largest weight in determining Digimarc's incentive bonuses (which was nicely aligned with the most important driver of shareholder value)
- In 2024, this was inexplicably changed from ARR growth to "Gross New ARR Growth":
  - This crucial revision meant there would have been **zero impact on the CEO's compensation (despite a massive loss of shareholder value) if Digimarc were to lose 100% of its existing customers!**
  - Also, the comp committee materially lowered the bar on the growth required for executives to achieve significant bonus payments (from 42% **total** ARR growth in 2023 to 30% **gross new** ARR growth in 2024)
  - Given Digimarc's level of attrition in 2024, **the CEO would have been paid his maximum level of compensation for delivering a value-destroying -4% change in total ARR**
  - The timing of this change was **particularly detrimental as it coincided with the known, upcoming expiration of Digimarc's largest commercial contract** (which started in July 2022 and was scheduled to expire in June 2024)
- The CEO's compensation is **misaligned with the shareholder value that is created (or destroyed)**

| | CEO Comp | % Change | Alpha |
|---|---|---|---|
| 2022 | 1,916,243 | | -5% |
| 2023 | 2,350,618 | 23% | 38% |
| 2024 | 2,127,797 | -9% | -70% |

Note: Alpha is measured from the closing price one day after reporting the prior year's Q4 earnings to one day after reporting the listed year's Q4 earnings, then adjusted relative to the performance of the Nasdaq Index. This provides the best snapshot of the impact of each calendar year's fundamental performance on the stock price.

11

71. On April 17, 2025, Ocho filed a Notice of Exempt Solicitation with the SEC on Form PX14A6G urging Digimarc shareholders to vote "Withhold" on McCormack, "No" on the Company's say-on-pay, and "Withhold" on director Kathleen Kool, who had chaired the Compensation Committee. The filing repeated that McCormack's "credibility had been destroyed" since he had violated the law by withholding material information from investors. (Ocho's Form PX14A6G itself is subject to Rule 14a-9 which prohibits materially false and material statements in such solicitations). The filing stated that "[f]or over four months, [] McCormack failed to disclose to shareholders the loss of Digimarc's largest commercial customer" and "[l]egally, because [] McCormack discussed the future opportunities he envisioned with this customer on that same August 2024 call, he was <u>required to disclose the loss of this contract at the same time</u>." (Original emphasis). In sum, Ocho opined that, "<u>Digimarc shareholders deserve a CEO who communicates with clarity and transparency rather than one who withholds critical information</u>." (Original emphasis).

72. With respect to say-on-pay, Ocho's Form PX14A6G discussed the Company's decision to eliminate customer losses in setting 2024 executive bonuses by relying on Gross New ARR Growth for the first time. It noted that while "Digimarc reported a 10% decline in total ARR in 2024," it "reported 23% Gross New ARR Growth in 2024 (which exceeded its 22.5% target for this deficient metric)." Therefore, "under the 2024 compensation system, the same performance resulted in executives receiving a 71% payout on this metric (109% of the target of a 65% payout for Gross New ARR Growth)." Yet, "[u]nder the prior (more sensible) plan, this 71% payout would have been 0%, which would have reduced the executives' Annual Incentive Plan payout from 96% of target to 25% (i.e., the 2024 incentive payments were nearly 4x the level they would have been under the previous system)." "In other words, in 2024, the Company's executives received a 109% payout on this metric (and a 96% payout on its target incentive plan overall), despite the shareholders having suffered 70% stock price underperformance."

73. Ocho also again noted that the timing of the executive incentive compensation change was "curious, at best," noting that "it was implemented just months before the known, upcoming expiration of Digimarc's largest commercial contract." While the lapse of the Walmart contract "was devastating for the Company's shareholders," "because the incentive plan was changed to ignore the loss of existing customers, the executives' bonus payouts were not impacted."

## V. DEFENDANTS VIOLATED SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5

### A. August 13, 2024: Defendants Announce Digimarc's Q2 2024 Financial Results and an Important Business Update Regarding Walmart While Failing to Disclose the Walmart Illuminate Contract Expiration

74. On August 13, 2024, after market close, the Company issued a press release, which

it also filed with the SEC on Form 8-K, signed by defendant Beck, announcing "exciting developments" likely to "profound[ly] impact" Q3 2024 and Q4 2024 as well as Digimarc's financial results for Q2 2024, ended June 30, 2024. The release was titled, "Digimarc Reports Second Quarter 2024 Financial Results" with two bolded subheads, "***Annual Recurring Revenue(1) Increases 44%***" and "Subscription Gross Profit Margin(2) Expands to 89%." The release quoted McCormack as follows:

> "Digimarc made significant progress on multiple fronts in Q2, ***highlighted by three exciting developments likely to have a profound impact on the second half of this year and beyond***," said [McCormack]. "This progress provides further evidence that we believe Digimarc will not only unlock the massive total addressable markets ("TAMs") on which we are focused today, but also that new TAMs can develop incredibly rapidly based on our ability to identify and authenticate physical and digital assets where other means of identification and authentication don't work well, or don't work at all."

75. With respect to Q2 2024 results, the Company announced among other things that ***Annual Recurring Revenue (ARR) as of June 30, 2024 increased to $23.9 million*** compared to $16.7 million as of June 30, 2023. It also announced that ***total Q2 2024 revenue had increased to $10.4 million compared to $8.7 million for Q2 2023, and Q2 2024 subscription revenue increased to $6.4 million compared to $4.7 million for Q2 2023***. The press release further announced a conference call later in the day to discuss the financial results and "provide a business update."

76. The bolded and italicized statements referenced in ¶¶74-75, considered in context they were made, were materially misleading and omitted material facts necessary to make them not misleading when made. Having voluntarily chosen to speak about the "exciting developments" that were "likely to have a profound impact on the second half of this year and beyond," in connection with touting the Company's Q2 2024 ARR (the best leading indicator for future

commercial subscription revenue growth) and Q2 2024 revenue, Defendants undertook a legal obligation not to present a misleading half-truth view of Digimarc's current positioning for growth. Once they spoke, Defendants accepted a legal duty to speak the full truth and accurately inform, rather than mislead. Defendants were therefore obligated to also disclose the following highly-material facts, among others:

(a) that the Walmart Illuminate Contract which was responsible for $5.8 million in ARR had lapsed six weeks earlier without being renewed;

(b) that, beginning in Q3 2024, the Walmart Illuminate Contract would no longer contribute to reported ARR, subscription revenue, or total revenue;

(c) that Walmart and Digimarc were not engaged in negotiations to renew the expired Walmart Illuminate Contract, and that the contract would remain terminated regardless of whether a new, much more expansive agreement with Walmart was eventually reached;

(d) that the Company's near-term revenue from Walmart now depended almost entirely on obtaining a much broader new agreement, making additional future revenue from Walmart effectively an all-or-nothing proposition;

(e) that the foregoing developments created a significant undisclosed risk to Digimarc's relationship with Walmart, its largest commercial customer, as well as the Company's current business strategy, growth trajectory, and outlook; and

(f) that the foregoing developments created a significant undisclosed risk to the Company's Q3 and Q4 2024 financial results.

77. In connection with Digimarc's Q2 2024 press release, and prior to the Company's earnings call, the Company posted a deck of slides on its website entitled "Quarterly Earnings Snapshot," "Second Quarter 2024." Among other things, in the "Business Update" section, ***the slides highlighted Digimarc's Q2 2024 financial results, including ARR*** (purportedly the leading indicator of future subscription revenue growth) ***of $23.9 million and commercial subscription revenue of $6.1 million***. On the same slide, Digimarc listed its Q2 2024 "Business Highlights," the top one being that its "***largest commercial customer***" (Walmart) was shown that the

Company's technology can "***carry a very heavy load***," such that it ***"now understands the more items digitalized with our technology . . . the more profound the impact to their in-store operations will be***" and it "***now understands the value of Digimarc delivering a greater amount of the software capabilities powering the points of detection, increasing the size and time-to-market of our platform opportunities***." This slide is reproduced below:




78. The bolded and italicized statements referenced in ¶77, considered in context they were made, were materially misleading and omitted material facts necessary to make them not misleading when made. Having voluntarily chosen to speak about Digimarc's relationship with Walmart, its "largest commercial customer," in connection with touting the Company's Q2 2024 ARR (the best leading indicator for future commercial subscription revenue growth) and Q2 2024 revenue, Defendants undertook a legal obligation not to present a misleading half-truth view of Digimarc's relationship with Walmart and current positioning for growth. Once they spoke,

Defendants accepted a legal duty to speak the full truth and accurately inform, rather than mislead. Defendants were therefore obligated to also disclose the following highly-material facts, among others:

(a) that the Walmart Illuminate Contract which was responsible for $5.8 million in ARR had lapsed six weeks earlier without being renewed;

(b) that, beginning in Q3 2024, the Walmart Illuminate Contract would no longer contribute to reported ARR, subscription revenue, or total revenue;

(c) that Walmart and Digimarc were not engaged in negotiations to renew the expired Walmart Illuminate Contract, and that the contract would remain terminated regardless of whether a new, much more expansive agreement with Walmart was eventually reached;

(d) that the Company's near-term revenue from Walmart now depended almost entirely on obtaining a much broader new agreement, making additional future revenue from Walmart effectively an all-or-nothing proposition;

(e) that the foregoing developments created a significant undisclosed risk to Digimarc's relationship with Walmart, its largest commercial customer, as well as the Company's current business strategy, growth trajectory, and outlook; and

(f) that the foregoing developments created a significant undisclosed risk to the Company's Q3 and Q4 2024 financial results.

79. Later that day Digimarc held its conference call with analysts and investors. McCormack and Beck, and the Company's Chief Legal Officer ("CLO"), represented the Company on the call. In opening the call, the CLO referred participants to "our prepared remarks and our Quarterly Earnings Snapshot [posted] in the investor relations section of our website." In prepared remarks, McCormack chose to further tout purported "developments" with Walmart which he claimed were "likely to have a profound impact on the second half of this year and beyond." He stated, in part:

> Turning now to Q2, we made significant progress on multiple fronts, highlighted by three ***developments likely to have a profound impact on the second half of this year and beyond***.

* * *

> ***In Q2, we provided our largest commercial customer with demonstrable proof that our technology can carry a very heavy load in this multi-signal future, resulting in two important developments that give us confidence this flywheel is likely to start spinning.***
>
> ***First, and most immediately, we believe this customer now understands that the more items in their stores that are digitized with our technology, including items produced by national brands, the more profound the improvement to their in-store operations will be.***
>
> ***Second, we believe this customer also now understands the value of Digimarc delivering a greater amount of the software capabilities powering their points of detection. This should ultimately increase the size and time-to-market of the "razor" component of this flywheel, not only with our initial customer, but with subsequent customers as well.***
>
> While I cannot provide any additional details at this time, ***I want to emphasize two key points. First, it is difficult to overstate the importance of these developments. Second, we expect and look forward to being able to share more information soon.***

80. Later in the call, in response to an analyst question, McCormack once again reiterated the importance of the purported developments with Walmart. He responded to a specific analyst question as follows:

> <u>Joshua Reilly, Needham</u>: Got it. That's helpful. And then you highlighted in the prepared remarks that in Q2 you demonstrated with your largest commercial customer the ability to carry a heavy load in a multi signal future. I know that you're limited with what you can discuss with this but can you just discuss or maybe from a high level explain what you were referring to maybe with this particular statement?
>
> <u>McCormack</u>: Yes. ***I would point to the two developments that I -- I mean that fact is powerful right and interesting. But what's really important is the two developments that come from that fact. First and most immediately, we believe this customer understands the more items in their store including items produced by the national brands, the more profound the improvement in what they're trying to do will be. And then secondly, the an interesting value of our owning more of a technology stack on the razor component -- on using more Illuminate capabilities to build up the points of detection.*** Outside of reiterating some work

> for what I said on the call I said I can't provide any additional details, except ***I do want to stress two things. It's difficult to overstate the importance of these developments.*** These are important, important developments and we look forward to be able to talk about it more soon.

81. The next day Needham & Company, LLC issued a research report summarizing Defendants' discussions on the conference call. The report stated in part:

> Additional details on key strategic objectives highlighted from Q2. We highlight three key takeaways from the Q2 earnings call that support the company's long-term objectives. The three key items include 1) Walmart understanding the value of tagging all items in store, 2) Recycle has a partner/customer set to launch in 2H/24, 3) Digimarc Gift Card solution set to launch for the coming holiday season. For the Walmart opportunity, we believe it continues to progress and Walmart has become incrementally positive on tagging all items within their stores including both private label brands and national brands. As a reminder, the company has $5.8mm in ARR related to opportunity with Walmart already in place, and we expect there remains an opportunity to expand both direct and indirect revenue through suppliers. While most of the commercial agreement remains confidential, we would note management highlighting Walmart's increasing understanding of the need to tag all items is the incrementally positive data point.

82. The bolded and italicized statements referenced in ¶¶79-80, considered in context they were made, were materially misleading and omitted material facts necessary to make them not misleading when made. Having voluntarily chosen to speak about developments with Digimarc's relationship with Walmart, that were "likely to have a profound impact on the second half of this year and beyond" (the importance of which was "difficult to overstate"), Defendants undertook a legal obligation not to present a misleading half-truth view of Digimarc's relationship with Walmart and current positioning for growth. Once they spoke, Defendants accepted a legal duty to speak the full truth and accurately inform, rather than mislead. Defendants were therefore obligated to also disclose the following material facts, among others:

(a) that the Walmart Illuminate Contract which was responsible for $5.8 million in ARR had lapsed six weeks earlier without being renewed;

(b) that, beginning in Q3 2024, the Walmart Illuminate Contract would no longer contribute to reported ARR, subscription revenue, or total revenue;

(c) that Walmart and Digimarc were not engaged in negotiations to renew the expired Walmart Illuminate Contract, and that the contract would remain terminated regardless of whether a new, much more expansive agreement with Walmart was eventually reached;

(d) that the Company's near-term revenue from Walmart now depended almost entirely on obtaining a much broader new agreement, making additional future revenue from Walmart effectively an all-or-nothing proposition;

(e) that the foregoing developments created a significant undisclosed risk to Digimarc's relationship with Walmart, its largest commercial customer, as well as the Company's current business strategy, growth trajectory, and outlook; and

(f) that the foregoing developments created a significant undisclosed risk to the Company's Q3 and Q4 2024 financial results.

83. Later in the August 13, 2024 call, in response to an analyst question, Beck stated, with respect to ARR customer churn in Q2 2024, that "most of that is behind us at this point." He responded to the specific analyst question as follows:

> Joshua Reilly: All right. Great. Thanks for taking my questions and nice job on developing some of these product opportunities here in the last couple of quarters. Maybe just starting off on net new ARR, can you just give us some additional details on maybe what type of customer churn in the quarter? Did you consider them core to the business? And maybe how the center of expertise program for partners impacted net new ARR in the quarter?
>
> Beck: Yes. Thanks for the question. The -- ***most of the churn was specifically related to transition of our COE program. So, as [McCormack] stated in the prepared remarks, we don't expect to see any more customers moving in the CoE program. So, we expect that most of that is behind us at this point.***

84. The bolded and italicized statements referenced in ¶83, considered in context they were made, were materially misleading and omitted material facts necessary to make them not misleading when made. Having voluntarily chosen to speak about customer churn being mostly "behind us at this point," Beck undertook a legal obligation not to present a misleading half-truth

view of actual customer churn, particularly as it relates to Digimarc's largest commercial customer. He was therefore obligated to qualify his comments so as to not mislead, including disclosing that the Walmart Illuminate Contract which was responsible for $5.8 million in ARR had lapsed six weeks earlier.

85. Also, on the August 13, 2024 call, in response to another analyst question, Beck stated that Digimarc's ARR (which Defendants stated in the press release and earlier in the conference call had increased 44% year-over-year despite being "partially offset by customer churn") is the Company's "true north as a business." He responded to the specific analyst question as follows:

> Van Rhee: Great. Thanks. A couple for me guys. ***Maybe first just can you quantify on the ARR what was the actual dollar impact of that churn to customer?***
>
> Beck: Yeah. So, Jeff, we're not providing any other metrics around ARR at this point. ***And you know, ARR is really our true north as a business providing other metrics at this point in time, just given our scale, could be misleading, and therefore, we're not going to provide them at this juncture***. We can't wait to be at the scale, where we're providing more of those metrics, like gross adds and churn, and things like that. But at this point, we're not prepared to do that.

86. The bolded and italicized statements referenced in ¶85, considered in context they were made, were materially misleading and omitted material facts necessary to make them not misleading when made. Having voluntarily chosen to speak about ARR as the Company's "true north" in deflecting a question concerning customer churn, Beck undertook a legal obligation not to present a misleading half-truth view of the significance of that ARR metric. He was therefore obligated to qualify his comments so as to not mislead, including disclosing that the Walmart Illuminate Contract which was responsible for $5.8 million in ARR had lapsed six weeks earlier.

### B. November 14, 2024: Defendants Announce Digimarc's Disappointing Q3 2024 Financial Results on the Walmart Illuminate Contract Expiration; Assure Investors That the Upcoming Walmart Renewal Will Be Transformational

87. On November 14, 2024, Digimarc issued a press release and held an earnings call with analysts and investors concerning Digimarc's reported financial results for Q3 2024, ended September 30, 2024. The press release and the earnings call script were also filed that same day with the SEC as attachments to Digimarc's Form 8-K, signed by Beck. The Company's financial results were extremely disappointing, to put it mildly. According to the press release, ARR decreased to $18.7 million from $19.6 million a year earlier, and down from $23.9 million in Q2 2024. Defendants further disclosed (for the first time) that the Walmart Illuminate Contract had expired at the end of Q2 2024, but obfuscated their earlier failure to disclose by misleadingly telling investors that the contract's "renewal" had simply been "delayed." According to the press release, "[t]he $0.9 million decrease reflects a $5.8 million decrease ***due to the delayed timing in the anticipated renewal of a commercial contract***, partially offset by new annual recurring revenue from entry into new commercial subscription contracts and increased subscription fees on existing commercial contracts." Additionally, "[s]ubscription revenue for the third quarter of 2024 increased to $5.3 million compared to $4.8 million for the third quarter of 2023, primarily reflecting higher subscription revenue from new and existing commercial contracts, ***partially offset by the delayed timing in the anticipated renewal of a commercial contract***." Overall, total Q3 2024 revenue increased to only $9.4 million, compared to $9.0 million for Q3 2023.

88. During Digimarc's November 14, 2024 earnings call, McCormack repeatedly touted the disappointing results as a prelude to something much bigger, describing upcoming "renewal" of the Walmart Illuminate Contract as "transformational." In his prepared remarks, McCormack characterized the expiration of the Walmart Illuminate Contract as simply a "delayed

renewal" and that it was expected that the renewed contract would include a "financial component" "represent[ing] a significant upsell." He stated, in part:

> Thank you, George, and hello, everyone. Looking forward, Q3 was the most significant quarter I have witnessed since I joined the company. Invention and market development are the twin pillars upon which all future opportunities are built. In both of these critical areas, we've not only made significant progress on things underway, we also opened new areas of opportunity we previously didn't believe addressable in the near term.
>
> Looking back, we acknowledge Q3 revenue doesn't reflect the reality just described. ***The gap between what lies ahead and what lies behind has never been this large.*** As noted in the 10-Q that we published today***, our third quarter results were impacted by the delayed renewal of a commercial contract. The financial component of this deal is meaningful as it represents a significant upsell. The strategic component will prove transformational not only to our company but also to the massive industry it will revolutionize.***

89. In his prepared remarks, Beck also characterized the Q2 2024 expiration of the Walmart Illuminate Contract as simply a "delay in re-signing" which, when "renew[ed]" "is expected to include a large upsell." He stated in relevant part:

> Thank you, [McCormack], and hello, everyone. I normally begin my discussion of our financial results by providing a snapshot of our key financial metrics because I believe this overview provides useful context ahead of discussing each metric in turn. ***As a result of the significance of the delayed contract [McCormack] just referenced, today I'm going to forgo providing that snapshot because Q3 results are not a true representation of the state of our business.***
>
> In addition to having an outsized impact on ending ARR, ***the delay in re-signing*** resulted in no revenue being recognized nor cash collected from this contract during Q3. ***By significantly impacting some of our most important financial metrics, this delay means quarterly financial results are not reflective of our expected go-forward performance, even before considering this contract renewal is expected to include a large upsell.***
>
> * * *
>
> Free cash flow usage was $7.3 million for the quarter compared to $400,000 in Q3 last year. The variation year-over-year is primarily due to the timing of cash receipts from the contract we've been referencing throughout our prepared remarks. ***If this***

> ***contract, as currently drafted, had been executed and paid within the third quarter, free cash flow would have been positive in Q3.***
>
> While we are working diligently to finalize this contract in Q4, the receipt of payment will lag contract execution by standard payment terms. Even if we do not receive payment from this contract before the end of the year, we expect Q4 free cash flow usage to be significantly improved from Q3. If we do receive payment before the end of the year, we expect Q4 free cash flow to be significantly positive.

90. Later in the call, in response to an analyst question, McCormack assured investors that Walmart was fully committed to the contract renewal, stating:

> We are not only key to one of this value customers' top long-term strategic initiatives, we are also key to helping them achieve an important shorter-term KPI as well and the fact that we are instrumental that they're achieving both short-term and long-term results, is important to note.
>
> Moreover, I'm confident that this customer not only recognizes the critical role we play and align them to achieve these results, but that we are unique in being able to play this role. ***So outside of very normal and very healthy paranoia that nothing is 100% until the ink is dry, I'm not worried on the if, at least from the customer perspective.***

91. The bolded and italicized statements referenced in ¶¶87-90, considered in context they were made, were materially misleading and omitted material facts necessary to make them not misleading when made. While analysts and investors understood that there was no guarantee that the contract would close since "nothing is 100% until the ink is dry," Defendants' misleading and overly optimistic statements were neither clear nor complete, masking the true nature and magnitude of the risk to the Company and its relationship with Walmart, its largest commercial customer. Defendants misrepresented the nature and magnitude of the existing, then-current risks as follows:

(a) Defendants' statements that there had only been a "delay" in "re-signing" the "renew[ed]" Walmart Illuminate Contract and that the contract renewal would be "transformational" and was expected to include a "large upsell" (and similar statements), conveyed that the original Walmart Illuminate Contract was not in peril and would be re-signed, and that the remaining

issue was one of the scope of the "upsell." In reality, the parties were negotiating a different deal that was not merely an "upsell" to the original Walmart Illuminate Contract which just required "re-signing." With the Walmart Illuminate Contract ended, the Company's near-term revenue from Walmart now depended almost entirely on obtaining a much more expansive new agreement, making additional future revenue from Walmart effectively an all-or-nothing proposition;

(b) Defendants' assurances that the "re-signing" of the contract was merely "delayed," that it took "longer to close than all involved originally believed," that "from the customer perspective" the renewal was not at risk, and that the quarterly results did "not reflect our expected go-forward performance," among other similar remarks, conveyed that negotiations were in their final stages and that the remaining issues would not jeopardize execution of the agreement. In fact, there were significant unresolved issues remaining beyond the scope of the potential upsell, such that investors were misled about the actual magnitude of the risk that the contract would not close;

(c) the foregoing masked the magnitude of the actual risk to Digimarc's relationship with Walmart, its largest commercial customer, as well as the Company's current business strategy, growth trajectory, and outlook; and

(d) the foregoing masked the magnitude of the actual risk to Digimarc's Q4 2024 and FY 2024 financial results.

92. During Digimarc's November 14, 2024 earnings call, McCormack assured analysts and investors that, despite the delay, "[t]rading time-to-close for strategic scope is an outcome I unequivocally support," particularly because the "broad industry impact" of the agreement "led to this deal taking longer to close than all involved originally believed." He stated, in part:

> The financial component of this deal is meaningful as it represents a significant upsell. The strategic component will prove transformational not only to our company but also to the massive industry it will revolutionize.
>
> ***In fact, it is exactly this broad industry impact that has led to this deal taking longer to close than all involved originally believed. Trading time-to-close for strategic scope is an outcome I unequivocally support. We run our business to maximize long-term value, and we expect our current path to do exactly that.***
>
> ***In addition, our decision to invest a large amount of company resources in Q3 to support this deal versus other opportunities is another decision behind which I unequivocally stand, even knowing as we do now, that the expenditure of those***

> ***resources wouldn't fall in the same quarter in which the deal was signed.*** Because of the transformational nature of this deal from both a financial and strategic perspective, if it closes before our next scheduled call as we currently believe is likely, we will hold an interim call.

93. Later in the call, in response to an analyst question, McCormack downplayed the significance of the expiration of the Walmart Illuminate Contract saying that "it's important to remember that deadlines can extend for many reasons, and not all of them are bad or concerning," that in this case it "happened for a good reason," and that Defendants "are always going to be willing to trade time to close for scope" because "[i]t's the best thing to do for the long term." In doing so, he again claimed the purported upsell "will transform a massive industry." He answered the analyst question as follows:

> Thanks, Josh. Let me start off by reiterating a few things I said in my prepared remarks. ***The deal has taken longer to close than everyone involved expected, and that has happened for a good reason. It will transform a massive industry. And we are always going to be willing to trade time to close for scope. It's the best thing to do for the long term.***
>
> So the reason I highlight this, and I will answer your question more specifically. But the reason I want to highlight this ***because I think it's important to remember that deadlines can extend for many reasons, and not all of them are bad or concerning.*** But like I said, I understand why you're asking, so let me provide you some more detail.

94. McCormack was also asked why the Walmart Illuminate Contract had not been simply renewed while the parties negotiated the upsell component. He largely sidestepped the question again reiterating that "I will always trade time to close for better scope" and "I'm not afraid to take time to scope for -- take time to close for broader scope." His responses to the analysts' questions included the following:

> <u>Van Rhee</u>: Sounds good. Great. Thanks. A couple for me. [McCormack], on the large customer, they've got a gap, I guess, here in the existing contract. I think you had a couple of contracts, but this one in particular was going to renew here and it looks like it didn't. How do they operate in this gap if the contract isn't renewed?

> Are they still using the platform? Just how does that work? ***And then was there not a scenario where they could have just renewed or extended the old contract, at least for this interim period?***
>
> McCormack: Yeah. [Van Rhee], both great questions. I get really uncomfortable talking about any individual customer. I would tell you that we do have customers that have multiple contracts with us that could be for very different things. And so if there is a gap in the contract, they lose access in between. It doesn't mean that they loss access to everything. It will just be whatever that contract covers. So I think that was the best I can answer your first question. And what was your second question? ***Was there not like a shorter-term renewal, I guess?***
>
> Van Rhee: Yeah. Just an opportunity just to do an extension or some sort of short-term renewal until the new contract comes into play.
>
> McCormack: Yeah, [Van Rhee]. ***This is exactly what I was saying earlier in my prepared remarks, I will always trade time to close for better scope. And I would rather get a really good deal that accomplish -- that we're trying to accomplish over the next multiple years together as opposed to a quick Band-Aid. I guess it's – we're focused on a long term, [Van Rhee], I think you know that. And I'm not afraid to take time to scope for -- take time to close for broader scope. I fully support that decision.***
>
> * * *
>
> Matthew Collard, PCB Advisory: Hey, [McCormack]. Hey [Beck]. Thanks for taking my call here at the end. I'm walking the fine line of asking about the contract, but not putting in a position where you have to give me the standard answer. But as we prepare for the closing of this deal, hopefully, and how should we think about the upsell opportunity of it? You referenced or you used the term transformational in your prepared remarks. Is this -- should we be thinking about it in terms of the evolution of the flywheel effect that's been referenced in the past in terms of setting our expectations?
>
> McCormack: Yeah. I don't -- again, we're in negotiations, right? So I don't want to -- we got to be careful what we say. ***I don't throw away around the world transformational lightly. Charles gave some scenarios for quarterly cash flow you take a look at. But we've got to get this deal across the finish line and can't wait to when we do that, need again.***

95. As recognized by Craig-Hallum, the "scenarios for quarterly cash flow" discussed by Beck reflected that the new Walmart "contract comes with ~$8M+ of up-front billing and likely ARR."

96. The bolded and italicized statements referenced in ¶¶92-94, considered in context they were made, were materially misleading and omitted material facts necessary to make them not misleading when made. While analysts and investors understood that there was no guarantee that the contract would close since "nothing is 100% until the ink is dry," McCormack's misleading and overly optimistic statements were neither clear nor complete, masking the true nature and magnitude of the risk to the Company and its relationship with Walmart, its largest commercial customer. McCormack misrepresented the nature and magnitude of the existing, then-current risks as follows:

(a) McCormack's statements that the delay "happened for a good reason," that is because it "will transform a massive industry," that Defendants are focused on the "long term," will "always trade time to close" for a contract with a "broader scope," that Defendants "run our business to maximize long-term value" and "we expect our current path to do exactly that," and that "we are working diligently to finalize this contract in Q4" (and similar statements), were misleading in that they conveyed that additional near-term delay in the signing of the contract was not unexpected and would not put the purportedly game-changing deal at risk. In fact, with the timing of the contract unresolved, Defendants were not as committed as they represented to the "current path" or the "long-term value" of the Walmart contract, such that investors were misled about the magnitude of the actual risk that Digimarc would walk away and/or the contract would not otherwise close;

(b) the foregoing masked the magnitude of the actual risk to Digimarc's relationship with Walmart, its largest commercial customer, as well as the Company's current business strategy, growth trajectory, and outlook; and

(c) the foregoing masked the magnitude of the actual risk to Digimarc's Q4 2024 and FY 2024 financial results.

97. In response to an analyst question, McCormack also discussed the biggest purported risk to the contract closing. He answered the analyst's question as follows:

> Joshua Reilly, Needham: All right. Well, thank you for taking my questions. Maybe just starting off here, what are the risks that we should be considering in

terms of this large commercial deal closing that's been delayed? And maybe what's your level of confidence in ultimately getting this deal closed?

McCormack: Thanks, Josh. Let me start off by reiterating a few things I said in my prepared remarks. The deal has taken longer to close than everyone involved expected, and that has happened for a good reason. It will transform a massive industry. And we are always going to be willing to trade time to close for scope. It's the best thing to do for the long term.

So the reason I highlight this, and I will answer your question more specifically. But the reason I want to highlight this because I think it's important to remember that deadlines can extend for many reasons, and not all of them are bad or concerning. But like I said, I understand why you're asking, so let me provide you some more detail.

We are not only key to one of this value customers' top long-term strategic initiatives, we are also key to helping them achieve an important shorter-term KPI as well and the fact that we are instrumental that they're achieving both short-term and long-term results, is important to note.

Moreover, I'm confident that this customer not only recognizes the critical role we play and align them to achieve these results, but that we are unique in being able to play this role. So outside of very normal and very healthy paranoia that nothing is 100% until the ink is dry, I'm not worried on the if, at least from the customer perspective.

But the -- to fully answer your question, ***the biggest risk on the if actually right as I started this call, which is there are many exciting developments in Q3, in which we could be investing on resources and this opportunity while itself really, really exciting, but just one of them. We do take our responsibility of ensuring that the company resources are always deployed in pursuit of maximizing long-term value very seriously.***

In fact, I would say that the allocation of company resources might be the single biggest conversation we have internally across the business. And while we fully appreciate the visibility we have in our valued customers business, I fully understand the reason this is taking longer to close anyone involved.

***There are no sacred cows, and we make decisions based solely on ROI.*** So I want to be clear. I bring this up not because I think it is anyway the likely outcome, but simply for you to understand that we understand our responsibility to allocate resources wisely and that includes the cost of holding important internal resources to support this or any opportunity versus deploying other areas.

> We are just simply not afraid of making tough decisions. We make them constantly and assigning these valuable resources to unlock other opportunities is a decision that while, to be clear, again, not one I expect we will need to make. It is also not one we'd be afraid to make it a situation warranted. ***Our true north is and always will be how we can create the greatest long-term value.***

98. The bolded and italicized statements referenced in ¶97, considered in context they were made, were materially misleading and omitted material facts necessary to make them not misleading when made. While analysts and investors understood that there was no guarantee that the contract would close since "nothing is 100% until the ink is dry," McCormack's misleading and overly optimistic statements were neither clear nor complete, masking the true nature and magnitude of the risk to the Company and its relationship with Walmart, its largest commercial customer. McCormack misrepresented the nature and magnitude of the existing, then-current risks as follows:

(a) McCormack's contention that the "biggest risk" to the contract was that Digimarc's allocation of resource "decisions [were] based solely on ROI" and "maximizing long-term value," greatly downplayed the actual risk and provided additional comfort to investors since the Walmart contract would purportedly "transform[]" and "revolutionize" a "massive industry," while providing "a significant upsell" to the Company that could provide an immediate "~$8M+ of up-front billing and likely ARR." In fact, even for such a potentially lucrative and "transformative" contract, Digimarc had reached its limit for trading time for scope, such that investors were misled about the magnitude of the actual risk that Digimarc would walk away and/or the contract would not otherwise close;

(b) the foregoing masked the magnitude of the actual risk to Digimarc's relationship with Walmart, its largest commercial customer, as well as the Company's current business strategy, growth trajectory, and outlook; and

(c) the foregoing masked the magnitude of the actual risk to Digimarc's Q4 2024 and FY 2024 financial results.

99. Thus, on November 14, 2024, having voluntarily chosen to speak at length about Digimarc's expired Walmart Illuminate Contract and the ongoing negotiations with Walmart,

Defendants undertook a legal obligation to speak the full truth and accurately inform, rather than mislead. Instead, Defendants doubled down and attempted to counterbalance their earlier failures to disclose—for 19 weeks—the expiration of the Walmart Illuminate Contract and the loss of its associated revenue by creating unwarranted market excitement about a virtually certain, "transformational" future contract with Walmart. The timing and nature of these assurances prevented the market from reacting fully to the expiration of the Walmart Illuminate Contract and the Company's disappointing Q3 2024 financial results.

### C. January 2025: Defendants Had a Duty to Provide an Update Regarding the Changed Status of the "Transformative" Walmart Deal Negotiations

100. McCormack later recounted that Defendants brought in PwC in late 2024 "for an extended and detailed deep-dive engagement" which helped Defendants set a hard deadline for Digimarc to reach a deal with Walmart. Digimarc and Walmart then worked with urgency "over holiday breaks" to determine whether meeting the deadline was feasible, which according to McCormack it was not. So quickly setting a hard deadline for such a game-changing deal which purportedly would fundamentally transform a massive industry, was a staggering about face. This is particularly true given that barely a month earlier (at most), in mid-November, Defendants repeatedly emphasized that they were still willing to trade time to close for strategic scope.

101. Defendants' November 14, 2024 statements concerning their willingness to be patient with respect to closing the transformational Walmart deal, as well as the statements that the Walmart Illuminate Contract renewal had only been delayed, remained alive in the minds of investors as Digimarc's stock price climbed from $27.17 per share on November 15, 2024 to a Class Period high close of $47.26 per share on January 6, 2025.

102. But these statements soon became even more materially misleading when in a matter of weeks Digimarc brought in PwC to set a hard deadline for the close of the deal, after which Digimarc was willing to walk away. As of early January 2025, at the latest, Defendants had a duty to update their previous statements to disclose this purportedly new development, and these critical risks to the so-called transformational Walmart deal, so as to not mislead.

## VI. ADDITIONAL SCIENTER ALLEGATIONS

103. In engaging in an unlawful scheme and course of conduct, making materially false and misleading statements, and in omitting material facts necessary to make their statements not misleading, Defendants acted intentionally and/or with extreme recklessness. The facts detailed above, when viewed collectively and holistically with the other allegations in this Complaint, establish a strong inference that each of the Defendants knew or recklessly disregarded that each of the statements set forth in section V, above, would be, and were, misleading to investors at the time they were made. This inference is far stronger than the alternative: that Digimarc's CEO and CFO were unaware of the status of the Company's contract with Walmart, its largest commercial customer, with which it was in the midst of negotiating an agreement which could revolutionize and transform a massive industry. In addition to the allegations above which by themselves establish a strong inference of Defendants' scienter, the following additional facts, when considered together with the totality of all circumstances alleged in this Complaint, further contribute to this already strong inference of Defendants' scienter.

104. Defendants' scienter can be inferred from the fact that they each spoke publicly and held themselves out to investors and analysts as knowledgeable about Digimarc's contracts with Walmart, such that they each had a duty to know, and in fact knew, of the undisclosed facts and related risks rendering Defendants' statements materially misleading when made.

105. Defendants' scienter can be inferred from the fact that they touted Walmart's purportedly newly found understanding of the profound impact of Digimarc's technology on its business on the Q2 2024 conference call, while at the same time withholding the fact that the Walmart Illuminate Contract had lapsed six weeks earlier.

106. Defendants' scienter can be inferred from the fact that they waited 19 weeks after expiration to disclose that the Walmart Illuminate Contract had lapsed.

107. Defendants' scienter can be inferred from the fact that when they were forced to disclose after Q3 2024 the obvious material omission of the Walmart contract lapse, they repeatedly professed that the new contract—which was in the final stages of negotiation—was just a renewal of the old contract that needed to be "re-signed," such that they downplayed their previous misconduct.

108. Defendants' scienter can be inferred from their attempt to maintain the Company's stock price in connection with disclosing the contract's lapse by only disclosing the fact (19 weeks late) in connection with overstated "good news." That is, Defendants persistently touted the expected renewal as a game changing contract that would transform an entire industry. By seeking to maintain Digimarc's stock price with these counterbalancing disclosures, Defendants tried to limit or avoid responsibility for investor losses caused by their previous material omissions.

109. Defendants' scienter can be inferred from how quickly after Defendant's November 14, 2024 conference call that the Company brought in PwC to set a hard deadline for the Walmart contract and evaluate a new strategic direction for the Company.

110. Defendants' scienter can be inferred from the fact that Digimarc's surging stock price in late 2024 and early 2025 indicated that investors believed that the Walmart contract

continued to be on track to renew at some level, yet Defendants failed to update the market regarding the dramatic change in circumstances following the Q3 2024 conference call.

111. Defendants' scienter can be inferred from their high-level positions, shareholdings, and/or access to material, adverse, nonpublic information concerning Digimarc's relationship with Walmart and the C-suite level decision to bring in PwC to set a hard deadline and evaluate a new strategic direction. Moreover, according to a Digimarc business development director who was employed for more than six years until the Q1 2025 reduction in force, and who had interactions with McCormack regarding his/her prospective deals (even though he/she directly reported to the Chief Revenue Officer ("CRO"), Tom Benton ("Benton"), who reported to McCormack), McCormack was a hands-on executive who received weekly, and even daily, updates on the status of negotiations with especially important customers. The director confirmed that McCormack and Benton were involved with the Walmart contract negotiations. The director knew generally about what was going on with Walmart by way of discussions with other personnel, as well as internal meetings. The director further confirmed the timing of PwC's engagement near the end of 2024, since he/she was asked to speak with the consultants regarding his/her knowledge of Digimarc's technology and business.

112. Defendants' scienter can also be inferred by the timing and substance of Digimarc's shift in executive incentive metrics. For 2024, the Company changed the primary financial metric for its AIP program, which sets its Named Executive Officer ("NEOs") annual bonuses. At the time, Digimarc's NEOs were: (i) McCormack (CEO and President); (ii) Beck (CFO, Treasurer, and EVP); (iii) Benton (CRO and EVP); (iv) George Karamanos (CLO, Secretary, and EVP); and Tony Rodriguez (Chief Technology Officer and EVP). The recommendation to the Compensation Committee for this change was apparently made by McCormack. According to the Company's

2025 Proxy Statement, Digimarc's "President and Chief Executive Officer makes recommendations to the Compensation Committee [regarding executive compensation] for executives other than himself whose pay is reviewed by the Compensation Committee."

113. Prior to 2024, "ARR Growth" was weighted 50%, with "Improvement in Q4 Adjusted Non-GAAP Net Income," in measuring the amount of bonus tied to achievement Digimarc's financial goals. Beginning in 2024, the ARR Growth metric was scrapped in favor of "Gross New ARR Growth," which was assigned a 65% weighting and which did not take into account customer losses.

114. For 2024, the old metric, total ARR Growth declined 10%, while the new metric, Gross New ARR Growth, showed a 23% increase (exceeding the 22.5% target for this metric). Under the 2023 AIP, the NEOs (including McCormack and Beck) would not have received any of the ARR Growth-related payout. However, under the new 2024 AIP, the NEOs received a 71% payout on this metric (10% of the target of a 65% payout for Gross New ARR Growth). Under the 2023 AIP, the NEOs' 71% payout would have been 0%, which would have reduced the NEOs' AIP payout from 96% of target to just 25%. In other words, the 2024 incentive payments were nearly four times the level they would have been under the 2023 AIP.

## VII. LOSS CAUSATION/ECONOMIC LOSS

115. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market, made materially false and misleading statements, and omitted to state material facts necessary in order to make their statements made not misleading. As a result of Defendants' scheme, Digimarc securities were overvalued throughout the Class Period. The nature and magnitude of the foreseeable risk to Digimarc's relationship with Walmart and the Company's Q3 and Q4 2024 financial results, as well as the risk to Company's then-current business strategy,

growth trajectory, and outlook, were hidden from investors. In sum, Digimarc's securities were riskier and thus were worth less than they appeared to be worth.

116. The revelation of the facts and circumstances that Defendants had misleadingly omitted, and the materialization of the foreseeable risks concealed by Defendants' scheme, exposed both Defendants' scheme and the overvaluation from the scheme. One measure of that inflated value was Digimarc's stock price, which fell $2.95 per share on November 15, 2024 and $11.65 per share on February 27, 2025. These price drops were caused, in part, by the market processing the implications of Defendants' scheme. The revelation of Defendants' scheme and the materialization of the foreseeable risks revealed that investors had paid more for Digimarc securities than they would have paid but for the scheme.

117. The corrective impact of the partial disclosures during the Class Period and the materialization of the foreseeable risks, however, were tempered by Defendants' continuing scheme and misleading statements and omissions. Each partial disclosure did not on its own fully remove the inflation from Digimarc's stock price. Defendants' ongoing scheme, misrepresentations, and omissions maintained the price of Digimarc stock at artificially inflated levels.

118. The economic loss suffered by Plaintiffs and the other Class members was a direct, proximate, and foreseeable result of Defendants' fraudulent scheme to artificially inflate the price of Digimarc securities and the subsequent significant decline in the value of Digimarc securities when Defendants' prior misrepresentations, omissions, and other fraudulent conduct were revealed and the concealed risks materialized.

## VIII. PRESUMPTION OF RELIANCE

119. The market for Digimarc's securities was open, well-developed, and efficient at all relevant times. As a result of the Defendants' deceptive scheme and materially false or misleading statements and material omissions, the Company's securities traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying on the integrity of the market price of such securities and on publicly available market information relating to Digimarc. Plaintiffs and Class members have been damaged thereby.

120. During the Class Period, the artificial inflation of the value of Digimarc's shares was caused by the deceptive scheme and/or the material misrepresentations and omissions alleged in this Complaint, thereby causing the damages sustained by Plaintiffs and other Class members. As alleged herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about the Company's business, operations, and prospects causing the price of the Company's securities to be artificially inflated at all relevant times. When the truth was made its way into the market and the concealed risks materialized, it drove down the value of the Company's securities, causing Plaintiffs and other Class members that had purchased the securities at artificially inflated prices to be damaged as a result.

121. At all relevant times, the market for Digimarc securities was an efficient market for the following reasons, among others:

(a) Digimarc's shares met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated, national stock market;

(b) as a regulated issuer, Digimarc filed periodic public reports with the SEC and the NASDAQ;

(c) Digimarc regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Digimarc was followed by securities analysts employed by major firms, including Needham & Company, LLC and Craig-Hallum Capital Group LLC, who wrote reports which were distributed to their sales forces and certain customers of their respective firms. Each of these reports was publicly available and entered the public marketplace.

122. Based on the foregoing, during the Class Period, the market for Digimarc securities promptly digested information regarding the Company from all publicly available sources and incorporated such information into the price of Digimarc securities. Under these circumstances, the market for Digimarc securities was efficient during the Class Period and, therefore, investors' purchases of Digimarc securities at artificially inflated market prices give rise to a class-wide presumption of reliance under the fraud-on-the-market doctrine.

123. Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## IX. CLASS ACTION ALLEGATIONS

124. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all persons who purchased or otherwise acquired Digimarc securities between August 14, 2024 and February 26, 2025, inclusive. Excluded from the Class are Defendants and members of their immediate families,

Company officers, directors, partners, and members of their immediate families, and the legal representatives, heirs, successors, assigns, owners, or managers of any of the foregoing, and any entity in which Defendants have or had a controlling interest.

125. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, there were tens of millions of Digimarc common shares outstanding which were actively traded on the NASDAQ. For example, Digimarc reported in its Q3 2024 Form 10-Q that as of November 8, 2024 there were more than 21 million shares of its common stock issued and outstanding. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds if not thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Digimarc or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

126. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

127. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

128. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the Exchange Act was violated by Defendants as alleged herein;

(b) whether statements made by Defendants misrepresented or omitted material facts about Digimarc's business, operations, and prospects;

(c) whether Defendants engaged in a scheme to defraud; and

(d) to what extent the members of the Class have sustained damages and the proper measure of damages.

129. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## X. CAUSES OF ACTION

### COUNT I

### For Violation of § 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder (Against All Defendants)

130. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

131. During the Class Period, Defendants violated § 10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

(a) employed devices, schemes, and artifices to defraud;

(b) omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchase of Digimarc securities during the Class Period.

132. Defendants engaged in a course of conduct pursuant to which they knowingly and/or recklessly engaged in acts, transactions, and practices which operated as a fraud and deceit upon Plaintiffs and the other Class members in connection with the purchase and sale of securities. Defendants also knowingly and/or recklessly made various untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed a course of business, which conduct was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members; (ii) artificially inflate and maintain the market price of Digimarc stock; and (iii) cause Plaintiffs and other Class members to purchase or otherwise acquire Digimarc stock at artificially inflated prices. In furtherance of this unlawful scheme and course of conduct, Defendants, and each of them, took the actions set forth herein.

133. During the Class Period, Digimarc stock was traded on an active and efficient market. Defendants' misconduct allowed them to artificially inflate and maintain the price of Digimarc shares throughout the Class Period. In ignorance of Defendants' scheme and the adverse facts concerning Digimarc's business, operations, financial condition, and prospects which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Digimarc stock at prices artificially inflated by Defendants' wrongful conduct and in doing so relied upon the price of the securities, the integrity of the market for the securities, and/or Defendants' statements, and were damaged thereby.

134. Digimarc's stock price declined as Defendants' scheme unraveled and the relevant truth and its impact on Digimarc's financial results and prospects entered the market through a series of partial disclosures, or through the foreseeable materialization of undisclosed risks, causing injury to Plaintiffs and Class members. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said stock, or would not have purchased, or otherwise acquired shares at the inflated prices paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Digimarc stock was substantially lower than the prices paid by members of the Class. The market price of Digimarc stock declined upon public disclosure of the facts alleged herein and the foreseeable materialization of the undisclosed risk to the injury of Plaintiffs and Class members.

135. By reason of the conduct alleged herein, Digimarc and the Individual Defendants knowingly or recklessly violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

136. As a direct and proximate result of Digimarc's and the Individual Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases or acquisitions of Digimarc stock during the Class Period.

## COUNT II

### For Violation of § 20(a) of the Exchange Act
### (Against the Individual Defendants)

137. Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

138. This Count is asserted on behalf of all members of the Class against the Individual Defendants for violations of § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

139. During the Class Period, the Individual Defendants were controlling persons of Digimarc within the meaning of § 20(a) of the Exchange Act. By reason of their stock ownership, their high-level and influential positions with Digimarc, and/or their participation in and/or awareness of the Company's operations, and/or intimate knowledge of the materially false or misleading statements and omissions of material fact in statements made by the Company or each other and disseminated to the investing public, each of these defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company and its executives, including controlling their wrongful conduct and their scheme and the content and dissemination of the various statements that Plaintiffs contend were materially false or misleading.

140. Each of these defendants was a direct participant in making, and/or made aware of the circumstances surrounding, the materially false or misleading representations and omissions during the Class Period. Accordingly, each defendant was a culpable participant in the underlying violations of § 10(b) alleged herein.

141. As set forth above, Digimarc violated § 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons of Digimarc and, as a result of their own aforementioned conduct, each of the defendants in this count is liable pursuant to § 20(a) of the Exchange Act, jointly and severally with, and to the same extent as Digimarc is liable under § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Plaintiffs and other members of the Class who purchased or otherwise acquired Digimarc securities during the Class Period at artificially inflated prices.

142. As a direct and proximate result of these defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases or acquisitions of Digimarc securities during the Class Period.

## XI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A. Determining that this action is a proper class action, certifying Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure, and designating Lead Counsel as Class Counsel;

B. Awarding Plaintiffs and other members of the Class damages together with interest thereon;

C. Awarding Plaintiffs and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, expert fees, and other costs and disbursements; and

D. Awarding Plaintiffs and other members of the Class such other and further relief as the Court deems just and proper under the circumstances.

## XII. JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED: November 26, 2025

**JOHNSON FISTEL, PLLP**

*/s/ Michael I. Fistel, Jr.*

Michael I. Fistel, Jr.
Murray House
40 Powder Springs Street
Marietta, GA 30064
Telephone: (470) 632-6000
Facsimile: (619) 363-8326
michaelf@johnsonfistel.com

**JOHNSON FISTEL, PLLP**
Jeffrey A. Berens
2373 Central Park Boulevard, Suite 100
Denver, CO 80238-2300
Telephone: (303) 861-1764
jeffb@johnsonfistel.com

***Lead Counsel for Plaintiffs and the Putative Class***

**AMAN LAW, LLC**
David Aman
14705 SW Millikan Way
Beaverton, OR 97003
Telephone: 503.810.0850
david@amanlawpdx.com

***Local Counsel for Plaintiffs and the Putative Class***

**THE SCHALL LAW FIRM**
Brian J. Schall
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone: (310) 301-3335
brian@schallfirm.com

***Counsel for Plaintiff Frederick Ullom***

**CERTIFICATE OF SERVICE**

I hereby certify that on November 26, 2025, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

*/s/ Michael I. Fistel, Jr.*
Michael I. Fistel, Jr.