DAVID AMAN (OSB No. 962106)
AMAN LAW, LLC
14705 SW Millikan Way
Beaverton, Oregon 97003
Telephone: 503.810.0850
david@amanlawpdx.com

*Local Counsel for Plaintiffs*

[Additional counsel appear on signature page]

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| FREDERICK ULLOM, Individually and On Behalf of a Class of Similarly Situated Individuals,<br><br>                     Plaintiffs,<br><br>v.<br><br>DIGIMARC CORPORATION, RILEY MCCORMACK, and CHARLES BECK,<br><br>                     Defendants. | Case No. 3:25-cv-00779-JR<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND MOTION TO TAKE JUDICIAL NOTICE**<br><br>**REQUEST FOR ORAL ARGUMENT** |

# TABLE OF CONTENTS

**Page**

OPPOSITION TO DEFENDANTS' MOTION TO TAKE JUDICIAL NOTICE ......................... 1

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS ...................................................... 2

PRELIMINARY STATEMENT .................................................................................................. 2

PLAINTIFFS' ALLEGATIONS ................................................................................................. 5

I.      Defendants Positioned Digimarc's Value Around Its Commercial Subscription Growth and ARR Expansion ............................................................................................................. 5

II.     The Illuminate Contract Was The Cornerstone of Digimarc's Growth Strategy ............... 6

III.    Defendants Conceal the Illuminate Contract's Expiration While Recklessly Betting on a Replacement Deal to Avoid A Stock Decline ..................................................................... 6

IV.     Defendants Reveal the Illuminate Contract's Nineteen-Week-Old Expiration While Assuring Investors That a "Renewal" Contract Would Soon Be "Re-Signed" .................. 7

V.      Digimarc Abruptly Shifts Its Business Strategy After Failing to Secure an Expanded Walmart Contract by Its Undisclosed Deadline .................................................................. 8

VI.     A Major Shareholder Accuses Mccormack of Securities Fraud Over Concealment of the Illuminate Contract Lapse ................................................................................................... 8

LEGAL ANALYSIS .................................................................................................................... 9

I.      Plaintiffs Adequately Plead Material Misrepresentations and Omissions ......................... 9

        A.      August 13, 2024: Defendants Report Q2 2024 Results and Highlight Walmart While Omitting the Illuminate Contract Expiration ............................................... 9

                1.      Having Chosen to Speak, Defendants Were Obligated to Disclose Material Facts Necessary to Render Their Statements Not Misleading .................... 9

                2.      Defendants Concealed the Expiration of the Walmart Illuminate Contract and the Ongoing Replacement Negotiations .............................................. 9

                3.      Plaintiffs' Claims Are Not Based on Forward-Looking Statements ........ 14

                4.      Plaintiffs' Claims Are Not Based on False Opinions .............................. 15

                5.      Defendants' Statements Are Not Immaterial Puffery .............................. 15

B.       November 14, 2024: Defendants Report Disappointing Q3 2024 Results, Disclose the Illuminate Contract Expiration, and Assure Investors a "Transformational" Walmart "Renewal" Is Imminent............................................................................... 16

      1.       Defendants Mischaracterized the Nature of the Replacement Contract Negotiations ....................................................................................... 17

      2.       Defendants Overstated their Commitment to Closing the Contract ......... 18

      3.       Plaintiffs' Claims Are Not Based on Forward-Looking Statements ........ 19

      4.       Defendants' Statements Are Not Immaterial Puffery ............................. 20

C.       Year End 2024: Defendants Had a Duty to Update the Market About the Abrupt Shift in the Walmart Negotiations .......................................................... 21

II.    Plaintiffs Adequately Plead Scheme Liability ................................................... 22

III.   Plaintiffs' Allegations Give Rise to a Strong Inference of Scienter ............................... 23

A.       The Court Must Consider Plaintiffs' Allegations Collectively............................ 23

B.       August 13, 2024: Defendants Knew the Walmart Illuminate Contract Had Lapsed and Associated Revenue Had Disappeared............................................................ 24

C.       November 14, 2024: Defendants Mislead the Market to Counteract Their Belated, Partial Disclosures ....................................................................................... 27

D.       Year End 2024: Defendants Set a Quick Deadline to Walk Away From Negotiations ................................................................................................ 29

E.       Defendants Fail to Present a *More* Compelling Inference.................................... 30

IV.    Plaintiffs Adequately Plead Loss Causation ........................................................ 31

A.       Corrective Disclosures ................................................................................ 31

B.       Materialization of Risk ............................................................................... 34

CONCLUSION........................................................................................................ 35

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008) ...................................................................... 12, 17, 24

*Brookman v. Webtoon Entm't Inc.*,
  No. 2:24-cv-07553-CBM-RAO,
  2025 WL 3484589 (C.D. Cal. Dec. 2, 2025) ...................................................... 11

*City of Hialeah Employees' Ret. Sys. v. FEI Co.,*
  289 F. Supp. 3d 1162 (D. Or. 2018) ..................................................................... 1

*City of Miami Gen. Emps' & Sanitation Emps.' Ret. Trust v. RH, Inc.*,
  302 F. Supp. 3d 1028 (N.D. Cal. 2018) ............................................................. 19

*Constr. Laborers Pension Tr. of Greater St. Louis v. Neurocrine Biosciences, Inc.*,
  No. 07CV1111–IEG–RBB,
  2008 WL 2053733 (S.D. Cal. May 13, 2008) .................................................... 15

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005) ........................................................................................... 31

*Finnerty v. Stiefel Labs., Inc.*,
  756 F.3d 1310 (11th Cir. 2014) ......................................................................... 22

*Gebhart v. S.E.C.*,
  595 F.3d 1034 (9th Cir. 2010) ................................................................. 4, 24, 26

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
  63 F.4th 747 (9th Cir. 2023) ..................................................... 9, 14, 15, 20

*Illinois State Bd. of Inv. v. Authentidate Holding Corp.*,
  369 F. App'x 260 (2d Cir. 2010) ....................................................................... 22

*In re Alphabet, Inc. Sec. Litig.*,
  1 F.4th 687 (9th Cir. 2021) .......................................................................... 23, 25

*In re Apple Inc. Sec. Litig.*,
  No. 19-cv-02033-YGR,
  2020 WL 6482014 (N.D. Cal. Nov. 4, 2020) ............................................... 19, 29

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997) ............................................................................ 22

*In re Cutera Sec. Litig.*,
  610 F.3d 1103 (9th Cir. 2010) ................................................................... 16

*In re CV Scis., Inc. Sec. Litig.*,
  No. 2:18-cv-01602-JAD-BNW,
  2019 WL 6718086 (D. Nev. Dec. 10, 2019)............................................... 33

*In re Daou Sys., Inc.*,
  411 F.3d 1006 (9th Cir. 2005) ................................................................... 34

*In re Dermtech, Inc. Sec. Litig.*,
  No. 23-CV-1885-DMS-JLB,
  2025 WL 1618193 (S.D. Cal. June 5, 2025)............................................... 28

*In re Facebook, Inc. Sec. Litig.*,
  87 F.4th 934 (9th Cir. 2023) ......................................................... 18, 31, 32

*In re Genius Brands Int'l, Inc. Sec. Litig.*,
  97 F.4th 1171 (9th Cir. 2024) ..................................................................... 32

*In re Gilead Scis. Sec. Litig.*,
  536 F.3d 1049 (9th Cir. 2008) ................................................... 4, 31, 32, 34

*In re KeySpan Corp.*,
  No. 01 CV 5852 (ARR),
  2003 WL 21981806 (E.D.N.Y. July 30, 2003)............................................ 29

*In re Lattice Semiconductor Corp. Sec. Litig.*,
  No. CV04–1255–AA,
  2006 WL 538756 (D. Or. Jan. 3, 2006) ................................................ 28, 29

*In re Nature's Sunshine Prods. Sec. Litig.*,
  486 F. Supp. 2d 1301 (D. Utah 2007)......................................................... 28

*In re Nuvelo, Inc. Sec. Litig.*,
  668 F. Supp. 2d 1217 (N.D. Cal. 2009) ...................................................... 18

*In re Quality Sys., Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017) .............................................................. 20, 26

*In re Rigel Pharms., Inc. Sec. Litig.*,
  697 F.3d 869 (9th Cir. 2012) ..................................................................... 26

*In re Time Warner Inc. Sec. Litig.*,
  9 F.3d 259 (2d Cir. 1993) ........................................................................... 21

*In re Vivendi Universal, S.A. Sec. Litig.*,
  765 F. Supp. 2d 512 (S.D.N.Y. 2011) .................................................................... 14

*In re Zillow Grp., Inc. Sec. Litig.*,
  No. C17-1387-JCC,
  2019 WL 1755293 (W.D. Wash. Apr. 19, 2019) ............................................... 25, 27

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) ........................................................................ 1, 9, 21

*Kyung Cho v. UCBH Holdings, Inc.*,
  890 F. Supp. 2d 1190 (N.D. Cal. 2012) .................................................................. 28

*Lloyd v. CVB Fin. Corp.*,
  811 F.3d 1200 (9th Cir. 2016) .............................................................................. 31

*Longo v. OSI Sys., Inc.*,
  No. CV 17-8841 FMO (SKx),
  2021 WL 1232678 (C.D. Cal. Mar. 31, 2021) ........................................................ 25

*Lorenzo v. Sec. & Exch. Comm'n*,
  587 U.S. 71 (2019) .............................................................................................. 23

*Malouf v. S.E.C.*,
  933 F.3d 1248 (10th Cir. 2019) ............................................................................ 22

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) ................................................................................................ 9

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
  540 F.3d 1049 (9th Cir. 2008) .............................................................................. 33

*Mineworkers' Pension Scheme v. First Solar Inc.*,
  881 F.3d 750 (9th Cir. 2018) ................................................................................ 31

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*,
  320 F.3d 920 (9th Cir. 2003) .......................................................................... 24, 27

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*,
  730 F.3d 1111 (9th Cir. 2013) .......................................................................... 34, 35

*Omnicare, Inc. v. Laborers Dist. Council Constr. Industry Pen. Fund*,
  575 U.S. 175 (2015) ....................................................................................... passim

*Oregon Public Employees Retirement Fund v. Apollo Group Inc.*,
  774 F.3d 598 (9th Cir. 2014) ................................................................................ 16

*Reese v. Malone*,
  747 F.3d 557 (9th Cir. 2014) ........................................................................................ 25

*Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*,
  845 F.3d 1268 (9th Cir. 2017) ........................................................................... 9, 13, 19

*Ronconi v. Larkin*,
  253 F.3d 423 (9th Cir. 2001) ........................................................................................ 19

*Schueneman v. Arena Pharm., Inc.*,
  840 F.3d 698 (9th Cir. 2016) ............................................................................... 9, 12, 24

*Sharenow v. Impac Mortg. Holdings, Inc.*,
  385 F. App'x 714 (9th Cir. 2010) .................................................................................. 26

*South Ferry LP, No. 2 v. Killinger*,
  542 F.3d 776 (9th Cir. 2008) ............................................................................. 25, 26, 29

*Starr v. Baca*,
  652 F.3d 1202 (9th Cir. 2011) ...................................................................................... 14

*State Tchrs. Ret. Sys. of Ohio v. ZoomInfo Techs. Inc.*,
  No. 3:24-CV-05739-TMC,
  2025 WL 3013683 (W.D. Wash. Oct. 28, 2025) ......................................................... 23

*Steamfitters Loc. 449 Pension & Ret. Sec. Funds v. Extreme Networks, Inc.*,
  No. 24-CV-05102-TLT,
  2026 WL 817221 (N.D. Cal. Mar. 23, 2026) .............................................................. 27

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ........................................................................................... 24, 27, 30

*United States ex rel. Kelly v. Serco, Inc.*,
  846 F.3d 325 (9th Cir. 2017) ........................................................................................ 23

*Westley v. Oclaro, Inc.*,
  No. C-11-2448 EMC,
  2012 WL 1038647 (N.D. Cal. Mar. 27, 2012) ............................................................ 23

*Wochos v. Tesla, Inc.*,
  985 F.3d 1180 (9th Cir. 2021) ...................................................................................... 33

*Yourish v. California Amplifier*,
  191 F.3d 983 (9th Cir. 1999) ........................................................................................ 19

**STATUTES, RULES AND OTHER AUTHORITIES**

15 U.S.C. §78u-4(b)(2) ........................................................................................................ 23

15 U.S.C. §78u-5(a) ............................................................................................................. 14

15 U.S.C. §78u-5(c)(2)(B) ................................................................................................... 14

L.R. 7-1(a)(1)(A) .................................................................................................................... 1

Securities Exchange Act of 1934 Section 20(a) [15 U.S. Code § 78t] ....................................... 35

Diamond Head Capital International Fund, L.P. and Frederick Ullom (together, "Plaintiffs") hereby oppose defendants Digimarc Corporation ("Digimarc" or the "Company"), Riley McCormack ("McCormack"), and Charles Beck's ("Beck") (together, "Defendants") Motion to Take Judicial Notice and Motion to Dismiss (ECF No. 40) ("Def. Br.").[1]

### OPPOSITION TO DEFENDANTS' MOTION TO TAKE JUDICIAL NOTICE

Plaintiffs oppose Defendants' motion for judicial notice.  As an initial matter, Defendants failed to meet and confer on this issue under L.R. 7-1(a)(1)(A).  More fundamentally, Defendants invoke some of these materials to advance their own competing factual narrative, an improper use at the pleading stage.  *See, e.g.*, Def. Br. at 5–6 n.2 (minimizing importance of the Walmart Illuminate contract); *id.* at 8 (asserting analysts' understanding); *id.* at 31 (arguing analyst did not feel misled); *see also id.* at 13–14 (alternative version of earnings call transcript).  The Ninth Circuit has squarely rejected this tactic: "If defendants are permitted to present their own version of the facts at the pleading stage—and district courts accept those facts as uncontroverted and true—it becomes near impossible for even the most aggrieved plaintiff to demonstrate a sufficiently 'plausible' claim for relief." *Khoja v. Orexigen Therapeutics, Inc*., 899 F.3d 988, 999 (9th Cir. 2018).  Although courts may, in limited circumstances, consider outside risk disclosures in evaluating forward-looking statements, that exercise is unnecessary here, where the misleading nature of Defendants' statements was apparent when made.  *See City of Hialeah Employees' Ret. Sys. v. FEI Co.,* 289 F. Supp. 3d 1162, 1172 (D. Or. 2018) (such statements not forward-looking).

Accordingly, judicial notice is inappropriate, and Defendants' motion should be denied.

---

[1] All "¶_" references are to Plaintiffs' Amended Class Action Complaint (ECF No. 37) (the "Complaint").  "Q#" refers to the Company's fiscal quarters.  Unless noted, all emphasis is added and internal quotations and citations omitted.

**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**PRELIMINARY STATEMENT**

This case arises from Defendants' scheme to conceal the expiration of Digimarc's multiyear contract with its largest commercial customer, Walmart, and their reckless gamble that they could replace it with a more significant agreement before investors punished the Company's stock price as a result. ¶2. As one of Digimarc's largest shareholders later observed in a Securities and Exchange Commission ("SEC") proxy filing, this is a "clear case of securities fraud." ¶4.

On August 13, 2024, Digimarc reported Q2 2024 results highlighting strong ARR[2] of $23.9 million and describing "profound" developments with its Walmart relationship. ¶3. At the same time, Defendants failed to disclose that the Company's Walmart contract, contributing $5.8 million to Q2 2024 ARR, expired six weeks earlier, had generated no Q3 revenue, and was the subject of uncertain replacement negotiations. *See* ¶¶4, 76(a)–(f). By touting Digimarc's impressive Q2 ARR without disclosing the $5.8 million contract's lapse, while at the same time promoting "exciting" opportunities "for the second half of this year" related to that expired agreement, Defendants presented a materially misleading picture of Digimarc's relationship with Walmart, its recurring revenue base, and the very real risks to its business momentum. ¶¶4, 53, 76(d)–(f), 79.

It was not until November 14, 2024—nineteen weeks after expiration—that Defendants were forced to acknowledge the contract's lapse while reporting disappointing Q3 2024 financial results driven by the loss of Walmart revenue. ¶5. Even then, Defendants doubled down on their bet. They assured investors that the expired Walmart contract would soon be "renewed,"

---

[2] "ARR" or annual recurring revenue is "the aggregation of annualized subscription fees from all of [Digimarc's] commercial contracts as of the measurement date" and "the best leading indicator for future commercial subscription revenue growth." ¶3.

characterizing the Q3 short fall as merely the result of a "delay" in "re-signing" the agreement. *Id.* They further teased an anticipated "large upsell," describing the prospective deal as "transformational," and urged investors not to be concerned about timing, emphasizing that the Company would "always trade time to close" for a contract with "broader scope." *Id.*

In truth, there was no "renewal" contract to "re-sign." ¶6. The parties were negotiating an entirely new agreement that effectively made any meaningful expansion of the Walmart relationship an all-or-nothing proposition. *Id.* Defendants' statements thus materially understated the risk to Digimarc's largest commercial customer relationship and its broader business strategy. *See* ¶¶6, 91(a)–(d). As of November 14, 2024, investors remained unable to assess or price the magnitude of the risks arising from the contract's expiration and the ongoing negotiations. *Id.*

Nor were Defendants really committed to "always trad[ing] time to close" for a contract with a "broader scope" as they had promised. ¶5. Within weeks, they had reversed course on the purportedly transformational deal and quietly retained consultants to explore strategic alternatives and establish a hard deadline to exit the negotiations. ¶¶6, 62. Even before the close of Q4 2024, a deadline was set and conveyed to Walmart. ¶62. Meanwhile, on the expectation of a Walmart contract "renewal" potentially with a "large upsell," Digimarc's stock price surged from $27.17 per share on November 15, 2024 to $47.26 per share on January 6, 2025. ¶¶59, 101. Still, Defendants made no effort to inform investors of their dramatic change in direction. ¶102.

Defendants' gambit collapsed on February 26, 2025, when Digimarc disclosed it was abandoning the Walmart negotiations (despite an offer by Walmart to adjust the scope of the deal), exploring strategic alternatives, and refocusing its business elsewhere. ¶7. At that point, the risks concealed by Defendants' scheme fully materialized, triggering a 43% decline in the Company's stock price and significant investor losses. ¶¶8, 116.

Defendants' motion to dismiss should be denied. *First*, Defendants claim that they had no duty to disclose the Walmart contract expiration or its ramifications. But they touted future opportunities with Walmart, while failing to disclose the lapse of the underlying $5.8 million Walmart contract which had been included in Q2 2024 ARR. This is a textbook misleading half-truth under the securities laws. Defendants had an unmistakable duty to disclose the contract's expiration and the ongoing negotiations for a replacement agreement so as not to mislead investors. *Omnicare, Inc. v. Laborers Dist. Council Constr. Industry Pen. Fund*, 575 U.S. 175, 192 (2015).

*Second*, Defendants argue that scienter is lacking because they could not have known a replacement contract would not close. But that is not what Plaintiffs allege. Defendants knew the Walmart contract had expired, understood that any expansion of Digimarc's Walmart relationship depended almost entirely on an all-or-nothing replacement agreement, and obscured the true magnitude of the associated risks to the Company. Defendants' omissions were, at minimum, "an extreme departure from the standards of ordinary care" such that the "danger of misleading buyers" was "either known to the defendant[s] or [wa]s so obvious that the[y] must have been aware of it." *Gebhart v. S.E.C.*, 595 F.3d 1034, 1041–42 (9th Cir. 2010) (defining actionable recklessness).

*Third*, although Defendants contend that loss causation is lacking, the Complaint alleges a straightforward causal chain. When Defendants belatedly disclosed the Walmart contract expiration, they continued to obscure the attendant risk by portraying its anticipated "renewal" as a mere "re-sign[ing]," with the question of scope still outstanding. When it later became clear that this was not the case and the undisclosed risks materialized, the Company's stock fell 43%. Defendants' insistence on a sustained initial stock price drop misstates the law. The Ninth Circuit does not impose such a requirement where, as here, the market initially underappreciates a partial corrective disclosure. *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1058 (9th Cir. 2008).

OPPOSITION TO MOTION TO DISMISS AND FOR JUDICIAL NOTICE                    Page 4

For these reasons, the Court should deny Defendants' motion to dismiss in its entirety.

## PLAINTIFFS' ALLEGATIONS

I.    **Defendants Positioned Digimarc's Value Around Its Commercial Subscription Growth and ARR Expansion**

Digimarc provides digital watermarking technology and generates revenue primarily from software subscriptions and related services.  ¶¶19, 23–25.

Although Digimarc maintains a government-related revenue stream through its Central Bank relationships, Digimarc's focus has been on its high-margin commercial subscription expansion and ARR growth.  ¶¶22, 27–34.  Given Digimarc's focus, Defendants rely on reported ARR to provide an "indicator of our progress in growing our high-margin commercial subscription business."  ¶30.  ARR refers to the predictable subscription-driven revenue a company expects to generate each year.  ¶26.  ARR quickly became the most important financial metric in evaluating Digimarc's future prospects with Defendants frequently touting it to investors as the "best leading indicator for future commercial subscription revenue growth."  *See* ¶¶3, 29, 31–33.[3]

Defendants' emphasis on ARR growth conveyed to investors that Digimarc's valuation depended principally on its high-margin recurring commercial subscription revenues rather than its mature Central Bank business.  *See, e.g.,* ¶¶22, 26–34, 74–75, 77; *compare* Def. Br. at 5–6 n.2, 20 n.10 (wrongly claiming Plaintiffs understate the importance of Central Bank revenues).  In fact, Beck outright dismissed the importance of the Company's government contract revenues (*i.e.*, Central Banks (¶¶23, 30)), telling investors that "the most important growth driver we are all focused on is recurring commercial subscription revenue."  ¶30.

---

[3] Digimarc buried a competing generic disclaimer in its SEC filings stating that ARR does not constitute a forecast.  ¶28; Def. Br. at 6–7.

II.    **The Illuminate Contract Was the Cornerstone of Digimarc's Growth Strategy**

Plaintiffs allege that Walmart was Digimarc's largest commercial customer and represented a substantial percentage of Company revenue. ¶¶37–38. Defendants frequently framed Digimarc's Walmart relationship as critical to its future success. *See* ¶¶43, 45–46.

In 2019, Digimarc announced an annual $3 million fixed fee agreement with Walmart to apply its "Digimarc Barcode" to fresh product thermal labels. ¶43. Digimarc called the agreement a "starting point" for potential "large-scale enterprise transformation" with its platform. *Id.*

When Digimarc announced its Walmart Illuminate agreement in November 2022, McCormack described the $5.8 million annual deal, which "cover[ed] an expanded deployment of the Digimarc Illuminate Platform," as "our singular focus" and "a top priority across our company." ¶¶45–46. He said the agreement was an "incredibly exciting development" which was "the highlight of the quarter" and "large enough to take us to profitability all on its own." ¶46. He then added, "the opportunity to expand this use of our platform is real, and it is meaningful, with an . . . ARR opportunity well into the nine figures." *Id.*

III.    **Defendants Conceal the Illuminate Contract's Expiration While Recklessly Betting on a Replacement Deal to Avoid a Stock Decline**

Plaintiffs allege the Walmart Illuminate contract expired on June 30, 2024. ¶¶4, 68. On August 13, 2024, Digimarc reported ARR of $23.9 million (including $5.8 million from the Illuminate contract) and touted "exciting" Walmart-related developments impacting "the second half of this year and beyond." ¶¶3, 45, 52, 55, 74. Defendants emphasized Walmart's expanded understanding of Digimarc's technology, claiming, "[i]t is difficult to overstate the importance of these developments." ¶¶3, 77, 79. Defendants failed to mention that these exciting opportunities related to ongoing negotiations to replace the already-expired Walmart contract. *See* ¶88.

The undisclosed lapse posed a substantial risk to Digimarc's Walmart relationship and undermined its reported ARR, business strategy, and growth trajectory. *See, e.g.*, ¶76(a)–(f). And, as of mid-Q3 2024, the Company had generated no revenue whatsoever under the expired contract. ¶¶4, 57. Rather than come clean, Defendants rolled the dice that they would be able to replace the expired agreement before investors found out and punished Digimarc's stock price. ¶¶2, 5.

## IV. Defendants Reveal the Illuminate Contract's Nineteen-Week-Old Expiration While Assuring Investors That a "Renewal" Contract Would Soon Be "Re-Signed"

On November 14, 2024, nineteen weeks after expiration, Defendants were finally forced to admit the contract's lapse when they reported disappointing Q3 2024 financial results due to the lost Walmart revenue. ¶¶5, 87. Aiming to avoid liability for any investor losses caused by their earlier nondisclosures, they worked to artificially sustain Digimarc's share price and soften the market's reaction to the June 30, 2024 lapse. *Id.*

Defendants did this by overselling the nature of the Walmart negotiations, overstating the likelihood of a near-term contract execution, and masking the magnitude of real risk to the potential new contract and the Company's relationship with Walmart. *See, e.g.*, ¶¶5, 91(a)–(d). Defendants misleadingly told investors that the expired Walmart contract would soon be "renewed" and that the Q3 2024 short fall was due to a "delay" in "re-signing" that particular contract. ¶¶87–89. They further stated that the "contract renewal was expected to include a large upsell," which they characterized as "transformational." ¶¶88–89, 92. Critically, they told investors not to worry about the delay in closing the contract since, halfway through Q4, they were still "working diligently to finalize this contract in Q4," were "focused on a long term," and will "always trade time to close" for a contract with a "broader scope." ¶¶89, 92–94.

**V.      Digimarc Abruptly Shifts Its Business Strategy After Failing to Secure an Expanded Walmart Contract by Its Undisclosed Deadline**

On February 26, 2025, Digimarc announced that it had abandoned the "transformational" Walmart deal. ¶60. Going forward, the Company would narrow its strategic focus on other areas. *Id.* Addressing the failed negotiations, McCormack acknowledged they had not just concerned the scope of a "renewed" contract, admitting Walmart had "offered to alter the scope of the engagement to provide more flexibility." ¶62. A Digimarc analyst called the Company's decision "fairly shocking," explaining that "[u]nderpinning this shift was the inability to come to terms with Walmart on the transformational deal referenced last quarter." ¶66; *see* ¶62 (Walmart's inability to meet the deadline "allowed us to move forward on our second path").

On this news, Digimarc's stock price fell $11.65 per share, or 43%, to close at $15.39 per share on February 27, 2025. ¶65.

**VI.     A Major Shareholder Accuses McCormack of Securities Fraud Over Concealment of the Illuminate Contract Lapse**

On March 20, 2025, Ocho Investments LLC ("Ocho"), a 5% Digimarc shareholder, accused McCormack of securities fraud for failing to timely disclose the Walmart Illuminate contract expiration. ¶¶67–68. Ocho later revealed that "[a] senior partner at one of the country's most recognized law firms evaluated this series of events and concluded it was a clear case of securities fraud." ¶70. Ocho also filed with the SEC a proxy statement subject to SEC Rule 14a-9 which prohibits materially false and material statements in such solicitations. ¶71. That filing stated, "[f]or over four months, [] McCormack failed to disclose to shareholders the loss of Digimarc's largest commercial customer" and "[l]egally, because [] McCormack discussed the future opportunities he envisioned with this customer on that same August 2024 call, he was <u>required to disclose the loss of this contract at the same time</u>." *Id.* (original emphasis).

**LEGAL ANALYSIS**

I.      **Plaintiffs Adequately Plead Material Misrepresentations and Omissions**

      A.      **August 13, 2024: Defendants Report Q2 2024 Results and Highlight Walmart While Omitting the Illuminate Contract Expiration**

            1.      **Having Chosen to Speak, Defendants Were Obligated to Disclose Material Facts Necessary to Render Their Statements Not Misleading**

A statement is misleading if it omits material information, thereby "giv[ing] a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017). A material omission may be shown by pointing to the defendant's silence despite a duty to disclose. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 (2011). Such a duty arises from a statement that, although not patently false, is misleading due to the omission of material information. *Orexigen*, 899 F.3d at 1008–09; *Omnicare*, 575 U.S. at 192 ("literal accuracy is not enough: [a]n issuer must as well desist from misleading investors by saying one thing and holding back another"). Notably, "companies can control what they have to disclose under [the securities laws] by controlling what they say to the market." *Matrixx*, 563 U.S. at 45. But once they choose to tout positive information, they are obligated to do so in a manner that does not mislead investors, "including disclosing adverse information that cuts against the positive information." *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016).[4]

            2.      **Defendants Concealed the Expiration of the Walmart Illuminate Contract and the Ongoing Replacement Negotiations**

Preliminarily, nowhere do Defendants dispute that, as of August 13, 2024, six weeks had

---

[4] "Falsity is subject to a particularity requirement and the *reasonable inference* standard of plausibility," which is lower than "the *strong inference* standard" for scienter. *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 766 (9th Cir. 2023) (original emphasis).

passed since the $5.8 million Walmart Illuminate contract expired (¶¶76(a), 78(a), 82(a)), that the Company had generated no revenue under that contract since then (¶¶76(b), 78(b), 82(b)), that an uncertain replacement contract was under negotiation (¶¶76(c)–(d), 78(c)–(d), 82(c)–(d)), or that these developments were material to investors (¶¶76, 78, 82). Instead, Defendants devote ten pages of briefing not to contesting the significance of these facts, but to arguing that they had no duty to disclose them or the attendant risks (¶¶76(e)–(f), 78(e)–(f), 82(e)–(f)). Def. Br. at 10–19.

Defendants first claim that their August 13, 2024 disclosure of "accurate financial reports" did not create a duty to disclose the lapse of the Illuminate contract because settled law holds "companies are not required to embellish accurate financial reports with additional commentary about the future." Def. Br. at 10. Yet, the reporting of ARR and subscription revenue is only half the story. Defendants did indeed report Q2 2024 ARR of $23.9 million, $5.8 million of which was attributable to the Walmart Illuminate contract, and $6.4 million in subscription revenue. ¶¶75, 77, 81. But, they also voluntarily chose to couple these Q2 2024 financial disclosures with purported "exciting" developments and opportunities with Walmart, "likely to have a profound impact on the second half of this year and beyond." ¶74. Although investors had no way of knowing it at the time, Defendants' statements about the "profound" Walmart opportunities concerned the replacement to the Illuminate contract then under negotiation. See ¶¶55–58, 88.[5]

For example, Digimarc released the following slide of "Q2 2024 Key Takeaways":

---

[5] The developments included demonstrating to Walmart that the Company's technology can "carry a very heavy load," such that it "now understands the more items digitalized with our technology . . . the more profound the impact to their in-store operations will be" and "understands the value of Digimarc delivering a greater amount of the software capabilities powering the points of detection, increasing the size and time-to-market of our platform opportunities." ¶77. Analysts and investors understood from earlier disclosures that Defendants were referring to Walmart, Digimarc's largest commercial customer. ¶¶39, 52, 64, 81.

¶77; *see also* ¶¶74–75, 79–81.

Defendants thus assumed a duty not to present a misleading, half-truth view of Digimarc's relationship with Walmart and its positioning for growth. *See Brookman v. Webtoon Entm't Inc.*, No. 2:24-cv-07553-CBM-RAO, 2025 WL 3484589, at *3, *5 (C.D. Cal. Dec. 2, 2025) (finding material omission and rejecting defendants' argument that reporting accurate historical data cannot result in a duty to disclose). Defendants emphasized Walmart opportunities and ARR as key drivers of future performance in "the second half of this year and beyond." ¶¶74, 76–77, 79–81; *see also* ¶33 (ARR is "the best leading indicator for future commercial subscription revenue growth"). Having done so, they were required to present those opportunities in a manner that fairly conveyed their true status and attendant risks. *Omnicare*, 575 U.S. at 192 ("literal accuracy is not enough"). They did not. Defendants failed to disclose that the Illuminate contract, which was responsible for $5.8 million of Q2 2024 ARR, had expired six weeks earlier, generated no revenue

OPPOSITION TO MOTION TO DISMISS AND FOR JUDICIAL NOTICE                    Page 11

in Q3, and was the subject of ongoing replacement negotiations. *See* ¶¶4, 78(a)–(f); *Arena Pharm.*, 840 F.3d at 706 (requiring disclosure of negative information cutting against positive representations).

This principle is well illustrated by the Ninth Circuit's decision in *Applied Signal*. There, the defendants touted the strength of company's backlog, defined as "the dollar value of the work it has contracted to do but has not yet performed." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 984 (9th Cir. 2008). At the same time, they failed to disclose four customer stop-work orders that signaled a "heightened risk" that those projects would be cancelled. *Id.* at 984–85. As the Court explained, "[h]ad defendants released no backlog reports, their failure to mention the stop-work orders might not have misled anyone." *Id.* at 987. But once they chose to highlight backlog as a positive performance metric, they were required to do so in a way that did not mislead investors about its true composition and the heightened attendant risks. *Id.*

Defendants counter that they had no duty to predict that negotiations would fail and that investors understood ARR contracts are not guaranteed to renew. Def. Br. at 10–12. That misses the point. Plaintiffs do not fault Defendants for failing to forecast an outcome or for any misunderstanding of ARR. *See, e.g.,* ¶¶4, 78(a)–(f). Nor do Plaintiffs contend Defendants should have revised Digimarc's Q2 2024 results. Def. Br. at 11–12. Again, Defendants were required to disclose then-existing material facts necessary to ensure their statements were not misleading. This included not only the key contract's expiration but also that the Company's Walmart-related growth opportunities now depended almost entirely on securing a far broader, all-or-nothing replacement agreement. *See, e.g.,* ¶¶78(a)–(f).[6]

---

[6] Defendants contend the Complaint overstates the importance of the Illuminate contract. Def. Br. at 5–6 n.2. It does not. Digimarc itself directed investors away from legacy revenue streams, such

OPPOSITION TO MOTION TO DISMISS AND FOR JUDICIAL NOTICE                    Page 12

Any doubt that the market was misled is dispelled by Needham & Company's research report issued the day after Defendants' Q2 2024 conference call.  ¶¶52, 80.  Joshua Reilly, who participated in the August 13, 2024 call, wrote:

> For the Walmart opportunity, we believe it continues to progress and Walmart has become incrementally positive on tagging all items within their stores including both private label brands and national brands.  ***As a reminder, the company has $5.8mm in ARR related to opportunity with Walmart already in place***.

¶¶80–81.  That a sophisticated analyst believed the Illuminate contract was "in place" is powerful evidence that reasonable investors were given "the impression of a state of affairs that differs in a material way from the one that actually exists."  *Hewlett-Packard*, 845 F.3d at 1275.

Defendants next contend that Beck's "spontaneous" response to a question about ARR and customer churn is irrelevant because it only addressed the COE program.  Def. Br. at 13.  The question, however, was not so limited.  It began broadly: "starting off on net new ARR, can you give us some additional details on what type of customer churn [you saw] in the quarter?"  ¶83.  Nothing in that inquiry confined the discussion to COE program churn.  *Id.*  Beck responded that, because "most" of the turnover was in the COE program, customer churn was largely "behind us at this point."  ¶83.  That statement was materially misleading.  The Walmart contract that accounted for $5.8 million of $23.9 million in ARR had expired six weeks earlier, making his statement as "a misleading half-truth view of actual customer churn."  ¶84.[7]

---

as mature Central Bank revenues, as a basis for valuation, emphasizing instead its growth initiatives.  *See* ¶¶29–33.  Consistent with that framing, the Walmart Barcode contract was confined to a narrow application (fresh product thermal labels), whereas the Illuminate agreement was described by the Company as a "top priority" and its "singular focus," with an "ARR opportunity well into the nine figures."  *See* ¶¶42–43, 45–47.

[7] Beck's answer must be interpreted from the "perspective of a reasonable investor."  *Omnicare*, 575 U.S. at 186–87.  And "[i]f there are two alternative explanations, one advanced by defendant

Defendants also challenge Beck's response to a question about customer churn claiming that the colloquy does not appear relevant to Walmart.  Def. Br. at 14.  But when Beck was asked about the effect of customer churn on ARR, and he chose to again tout ARR as Digimarc's "true north" while omitting the churn of the $5.8 million Walmart contract, he misled investors "by saying one thing and holding back another."  ¶85; *Omnicare*, 575 U.S. at 192.

### 3.    Plaintiffs' Claims Are Not Based on Forward-Looking Statements

Defendants argue that their statements at ¶¶74 & 79 regarding the likelihood of the Walmart developments having an impact in the coming quarters are protected by the statutory safe harbor.  Def. Br. at 15–17.  Because Plaintiffs are not seeking to hold Defendants liable for failing to close a new Walmart deal, the safe harbor is inapplicable.  *See* 15 U.S.C. §78u-5(a) (safe harbor only applicable to forward-looking statements).  Instead, Defendants are liable for their failure to disclose the lapse of the Walmart contract six weeks earlier and the attendant risks associated with the ongoing replacement negotiations.  *See, e.g.*, ¶78(a)–(f); *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 569 (S.D.N.Y. 2011) (Def. Br. at 15) (statements are forward-looking if their "accuracy can only be verified after they are made").

Even if considered forward-looking, Defendants had actual knowledge that the Walmart contract had expired (*see* section III, below) and they did not warn that this had *already* occurred at the time.  *See Forescout*, 63 F.4th at 781 ("cautionary language is not meaningful if it discusses as a mere *possibility* a risk that has already materialized") (original emphasis).[8]

---

and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)."  *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

[8] The statutory safe harbor only provides for incorporation by reference of risk disclosures for "oral statements," which the statements in ¶74 are not.  *See* 15 U.S.C. §78u-5(c)(2)(B); *Constr.*

#### 4.      Plaintiffs' Claims Are Not Based on False Opinions

Plaintiffs are also not alleging false opinions.  Def. Br. at 18–19.  Again, it is the fact that, along with ARR, Defendants touted the Walmart opportunities—not whether the opportunities were "likely" achievable—that resulted in Defendants' duty to disclose.

Even if couched as opinions, absent qualification, the statements are actionable since the views did not "fairly align with the information in the [Defendants'] possession at the time." *Omnicare*, 575 U.S. at 188–89; *see also Forescout*, 63 F.4th at 780 ("Because the May 11, 2020, press release stated that management looked forward to closing the merger deal but omitted management's thought that Advent was perhaps seeking a different price, it is, at best, a half-truth.").  For example, while Walmart may have "now underst[ood] the value of Digimarc delivering a greater amount of the software capabilities powering the points of detection," a reasonable investor would have been shocked to learn that the Company's primary contract with Walmart was allowed to lapse six weeks earlier, Digimarc had not earned any revenue on the contract in the interim, and negotiations for a replacement contract revolved around these very same "exciting" opportunities.  *See* ¶¶4, 51, 53, 55–58, 77, 79; *see also Omnicare*, 575 U.S. at 193 (while "we believe" "can preface nearly any conclusion," "the resulting statements . . . remain perfectly capable of misleading investors").

#### 5.      Defendants' Statements Are Not Immaterial Puffery

The statements regarding the Walmart opportunity also cannot be dismissed as immaterial corporate optimism or "puffery."  Def. Br. at 19.  Nonactionable puffing statements amount to

---

*Laborers Pension Tr. of Greater St. Louis v. Neurocrine Biosciences, Inc.*, No. 07CV1111–IEG–RBB, 2008 WL 2053733, at *10 (S.D. Cal. May 13, 2008).

nothing more than "vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers." *Oregon Public Employees Retirement Fund v. Apollo Group Inc.*, 774 F.3d 598, 606 (9th Cir. 2014) (quoting *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010)).

Far from vague puffery, Defendants specifically described the "exciting developments" likely to "profound[ly] impact" Q3 2024 and Q4 2024. ¶¶74, 76–77, 79–80. That is, Walmart "now understands the more items digitalized with our technology . . . the more profound the impact to their in-store operations will be" and "the value of Digimarc delivering a greater amount of the software capabilities powering the points of detection, increasing the size and time-to-market of our platform opportunities." *Id.* According to McCormack, "it is difficult to overstate the importance of these developments." ¶¶79–80. As investors later learned, these "exciting developments" likely to "profound[ly] impact" "the second half of this year" related to Digimarc's undisclosed negotiations to replace the critical Walmart contract. *See, e.g.*, ¶¶74, 76, 82.

**B.**  **November 14, 2024: Defendants Report Disappointing Q3 2024 Results, Disclose the Illuminate Contract Expiration, and Assure Investors a "Transformational" Walmart "Renewal" Is Imminent**

On November 14, 2024, Digimarc reported its disappointing Q3 2024 financial results and disclosed that ARR had fallen from $23.9 million to $18.7 million because the Walmart Illuminate contract (which previously contributed $5.8 million to ARR) expired *nineteen weeks* earlier. ¶87. At the same time, year-over-year total revenue remained essentially flat because of the lost Q3 Walmart revenues. *Id.* The prospective Walmart Illuminate replacement contract, which on August 13, 2024 Defendants alluded to as "exciting," was suddenly elevated to "transformational" to not just Digimarc but "the massive industry it will revolutionize." ¶¶74, 88. Moreover, because the "gap between what lies ahead and what lies behind has never been this large," investors were

told to disregard the disappointing Q3 results which were no longer "a true representation of the state of our business."  ¶¶88–89.

### 1. Defendants Mischaracterized the Nature of the Replacement Contract Negotiations

Defendants repeatedly emphasized that the "re-signing" of the Illuminate contract had only been "delayed" and the "renewed" contract was expected to include a "large upsell," thereby conveying that the terms of original Walmart Illuminate contract remained largely intact and that only the scope of an expansion remained to be finalized.[9]  *See, e.g.*, ¶¶87–90, 91(a)–(b).  Plaintiffs allege that the negotiations were not actually for a "renewal" of the original Walmart Illuminate contract that just needed to be "re-signed," but instead they concerned a different, much more expansive all-or-nothing agreement.  *See, e.g.*, ¶¶61–64, 91(a).  McCormack later confirmed as much when he acknowledged that Walmart had offered to "alter the scope" of a new deal, which Digimarc rejected.  ¶62; *see also* ¶64 (following Digimarc's decision to walk away, analyst asking whether the original $5.8 million contract would "come back into play").

Although Defendants claim "investors could judge the level of risk for themselves," reasonable investors did not then appreciate that the negotiations were not for a simple renewal.  Def. Br. at 20.  The Company's near-term revenue growth from Walmart depended almost entirely on obtaining an expanded, entirely new all-or-nothing agreement.  *See, e.g.*, ¶91(a)–(d); Def. Br. at 20; *see Applied Signal*, 527 F.3d at 987 (absent undisputed evidence putting investors on notice of the true situation, court could not find as a matter of law that the defendants' statements were

---

[9] Because the original Illuminate contract contributed $5.8 million to ARR and the "renewed" contract was expected to contribute $8 million (or more) to ARR, investors would have reasonably expected the initial value of the "re-signed" agreement to fall within this range.  *See* ¶¶52, 91, 95.

not misleading). Ultimately, Defendants' misstatements obscured the magnitude of the actual risk to Digimarc's relationship with Walmart, its largest commercial customer, as well as the Company's current business strategy, growth trajectory, and outlook. *See, e.g.*, ¶91(c)–(d); *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 949–50 (9th Cir. 2023) ("Our case law does not require harm to have materialized for a statement to be materially misleading . . . such a statement could be misleading even if the magnitude of the ensuing harm was still unknown"). Defendants were required to disclose these attendant risks to not mislead. *See In re Nuvelo, Inc. Sec. Litig.*, 668 F. Supp. 2d 1217, 1230 (N.D. Cal. 2009) (plaintiff adequately alleged omission of a material risk that could cause the failure of a drug trial).[10]

### 2.     Defendants Overstated their Commitment to Closing the Contract

Defendants' further assurances on November 14, 2024 that: (i) the delay in renewing "happened for a good reason," that is, because it "will transform a massive industry"; (ii) Defendants are focused on the "long term" and will "always trade time to close" for a contract with a "broader scope"; (iii) Defendants "run our business to maximize long-term value" and "we expect our current path to do exactly that"; and (iv) "we are working diligently to finalize this contract in Q4," were misleading in that they conveyed that negotiations on the purportedly game-changing deal were not subject to near-term time constraints. ¶¶92–94, 96–97. In fact, Defendants were not remotely that committed to the "current path" or the "long-term value" of the Walmart

---

[10] In a footnote, Defendants suggest that the agreement under negotiation was not a "different deal." Def. Br. at 21 n.12. But Plaintiffs' allegations are taken as true on a motion to dismiss, and they are entitled to all favorable inferences. *See Facebook*, 87 F.4th at 947–48; ¶¶5–6, 91; *see also* ¶62 (stating Walmart had "offered to alter the scope of the engagement to provide more flexibility"); ¶64 (analyst asking on February 26, 2025: "Just want to be clear, your expectations on that $5.8 million, does that come back into play now, or is that indefinitely shelved? . . . I'm not trying to be difficult . . . I'll leave that alone. You obviously don't want to go there.").

contract, such that investors were misled about the magnitude of the actual risk that Digimarc would walk away and/or the contract would not otherwise close.  ¶¶96(a)–(c), 98(a)–(c).

The purported transformational deal did not even survive the six weeks remaining in Q4 2024.  Almost immediately, Digimarc quietly retained PwC for an "extended and detailed deep-dive engagement" to assess entirely different strategic alternatives, including imposing a firm deadline for closing any Walmart agreement.  ¶62.  That deadline was set with striking speed: by the "holiday breaks," in late 2024, Digimarc had already presented it to Walmart "in search of a way forward."  *Id.*  The rapid pivot from touting a game-changing, industry-defining opportunity to imposing an accelerated ultimatum was a remarkable about-face.  ¶¶62, 100, 109.  Reasonable investors had quite clearly been provided an "impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]."  *Hewlett-Packard*, 845 F.3d at 1275.[11]

### 3.　　Plaintiffs' Claims Are Not Based on Forward-Looking Statements

Defendants next argue that statements that contract renewal is "expected" to include an upsell, create long term growth, and transform a massive industry are protected forward-looking statements.  Def. Br. at 22 (citing ¶¶88–90, 92–93).  Once again, Plaintiffs are not challenging

---

[11] Facts such as Defendants' omission of the contract lapse in August (¶78(a)), their November mischaracterization of the negotiations as a "renewal" and "re-signing" of the prior contract (¶91(a)), and their shockingly swift retention of PwC to set a firm deadline prior to year end (¶62), together support an inference that, as of November 14, 2024, Defendants materially overstated their commitment to closing the purportedly "transformational" deal. *See Yourish v. California Amplifier*, 191 F.3d 983, 997 (9th Cir. 1999) (close temporal proximity between an allegedly fraudulent statement or omission and a later disclosure may bolster an inference of falsity); *Ronconi v. Larkin*, 253 F.3d 423, 437 (9th Cir. 2001) (same); *see also In re Apple Inc. Sec. Litig.*, No. 19-cv-02033-YGR, 2020 WL 6482014, at *10 (N.D. Cal. Nov. 4, 2020) ("close timing between misleading statements and disclosure of inconsistent facts suggests [] that the facts existed at the time the challenged statements were made"); *accord City of Miami Gen. Emps' & Sanitation Emps.' Ret. Trust v. RH, Inc.*, 302 F. Supp. 3d 1028, 1042 (N.D. Cal. 2018).

Digimarc's later failure to close the contract.  Among other things, Defendants misled investors by conveying that the scope of any upsell was what was in doubt; not the "delayed" "re-signing" of the original contract.  ¶¶91(a)–(b), 96(a).  Because these misleading statements and omissions concerned the nature of the contract being negotiated *at the time*, they are not forward-looking. *See also* section I(A)(3), above.  In any event, Defendants had actual knowledge of the nature of the contract negotiations (section III, below) and they did not warn about the essentially all-or-nothing nature of ongoing negotiations on a new, expanded contract.  *See* ¶91(a); *Forescout*, 63 F.4th at 781 (cautionary language is not meaningful for already materialized risk).

### 4.    Defendants' Statements Are Not Immaterial Puffery

Finally, Defendants dismiss their descriptions of the Walmart contract, such as "transformational" or "long-term value," as puffery.  Def. Br. at 22.  Yet, these statements are tied to provable, concrete representations including the contract being a significant upsell from the previous contract ($5.8 million ARR), such that had it been executed in Q3 "free cash flow would have been positive," that the "contract comes with ~$8M+ of up-front billing and likely ARR," and that it is key to Walmart's "top long-term strategic initiatives" and "shorter-term KPI."  ¶¶55, 89, 90, 95.  These are not vague expressions of optimism.  Read in context, they conveyed specific facts about the deal's magnitude and importance, while obscuring the true risk to Digimarc's Walmart relationship.  *See* ¶¶91(a)–(d), 96(a)–(c); *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143 (9th Cir. 2017) (otherwise general statements are actionable when, in context, they concern specific company matters the speaker knows are materially different than represented).

**C.      Year End 2024: Defendants Had a Duty to Update the Market About the Abrupt Shift in the Walmart Negotiations**

On November 14, 2024, Defendants told investors that "renewal" negotiations on the Walmart Illuminate contract were active, not subject to near-term time constraints, and likely to soon culminate in an agreement. ¶¶87–90. They assured investors they would "always trade time to close for better scope" because "[i]t's the best thing to do for the long term." ¶¶92–94, 100. These statements remained "alive" in the market and conveyed that Defendants were fully committed to the "transformational" deal progressing toward completion. ¶101. They also fueled a rebound in Digimarc's stock price following disclosure of the contract's lapse, driving it from $27.17 per share on November 15, 2024 to $47.26 per share on January 6, 2025. ¶¶59, 101.

Having chosen to speak about the Walmart negotiations in a manner suggesting full commitment, a defined trajectory, and a likely outcome—particularly where those negotiations were framed as potentially transformational—Defendants assumed a duty to update those statements when their strategy and commitment abruptly shifted. *See* ¶¶88, 102; *Orexigen*, 899 F.3d at 1015 (even statements accurate when made must be updated when later-acquired information materially alters their import). That is, by year end 2024, Defendants had set a firm deadline to finalize the deal. ¶62 (deadline presented to Walmart over the holidays); ¶¶100–102; *cf. In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 268 (2d Cir. 1993) ("[W]hen a corporation is pursuing a specific business goal and announces that goal as well as an intended approach for reaching it, it may come under an obligation to disclose other approaches to reaching the goal when those approaches are under active and serious consideration.").

This case parallels *Illinois State Bd. of Inv. v. Authentidate Holding Corp.*, where the company told investors it was "very confident" that an agreement would be completed "shortly,"

creating a concrete expectation that remained "alive" in the market. 369 F. App'x 260, 263 & n.2 (2d Cir. 2010). Because it later learned that the counterparty "did not want to continue negotiations," the Second Circuit held the company had a duty to update because intervening events rendered those previous assurances misleading. *See id.* Here, Defendants did much the same thing by issuing definite assurances of their commitment to the transformational deal yet failing to disclose a sudden change in their approach thereafter. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1432–34 (3d Cir. 1997) (finding duty to update for "a fundamental change in the course the company is likely to take" which would "contain[] an implicit factual representation that remained alive in the minds of investors as a continuing representation") *Finnerty v. Stiefel Labs., Inc.*, 756 F.3d 1310, 1317 (11th Cir. 2014) (duty to update attaches to statements that contain "an implicit factual representation that remain[s] alive").

Defendants' fallback, that investors could not have been misled because Digimarc promised to provide an update when a new contract was signed, does not hold. Def. Br. at 24. The duty to update was triggered not by the absence of a final agreement, but by Digimarc's abrupt reversal of its commitment to the deal and its rapid abandonment of the process Defendants had described just weeks earlier.

## II.    Plaintiffs Adequately Plead Scheme Liability

To begin, Defendants are incorrect that Plaintiffs did not plead a distinct scheme claim. Def. Br. at 24 n.16. They clearly did. *See* ¶¶128(c), 131(a) & (c), 132–34; *see also* ¶¶2, 5, 103, 115–20. Defendants' scheme was "to cover up the lapse of Digimarc's multiyear contract with its largest commercial customer, Walmart, and their reckless gamble that the Company would be able to replace the expired contract with a more significant one before investors punished Digimarc's stock price as a result." ¶¶2; 128(c); *see Malouf v. S.E.C.*, 933 F.3d 1248, 1259 (10th Cir. 2019)

(scheme liability may rest upon failure to disclose or otherwise correct the misrepresentations of others).  Once they could no longer hide the contract's lapse, Defendants doubled down on their plan.  ¶5.  Aiming to avoid liability for potential investor losses caused by their earlier nondisclosures, they worked to artificially sustain Digimarc's share price and soften the market's reaction to the June 2024 lapse.  ¶¶5, 131(a) & (c); *see State Tchrs. Ret. Sys. of Ohio v. ZoomInfo Techs. Inc.*, No. 3:24-CV-05739-TMC, 2025 WL 3013683, at *19 (W.D. Wash. Oct. 28, 2025) (alleged misconduct including inflating company's share price and "suppressing unpleasant market data" "certainly constitutes a manipulative scheme").

Further, contrary to Defendants' suggestion, it is perfectly appropriate for these free-standing scheme liability claims to "considerabl[y] overlap" with Plaintiffs' other misstatement (Rule 10b-5(b)) claims.  *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 709 (9th Cir. 2021) (citing *Lorenzo v. Sec. & Exch. Comm'n*, 587 U.S. 71, 79–81 (2019)).  And, as shown in section III, below, Plaintiffs adequately allege Defendants' scheme was undertaken with scienter.[12]

## III.   Plaintiffs' Allegations Give Rise to a Strong Inference of Scienter

### A.      The Court Must Consider Plaintiffs' Allegations Collectively

To plead scienter, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. §78u-4(b)(2).  In the Ninth Circuit, the "required state of mind" is "a mental state that not only covers intent to

---

[12] That Defendants' arguments for dismissal of the scheme claims are undeveloped and confined to a single footnote is reason enough for the Court to reject them.  *Cf. United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325, 335 (9th Cir. 2017) (court will not consider matters "argued only in passing" in opening brief); *Westley v. Oclaro, Inc.*, No. C-11-2448 EMC, 2012 WL 1038647, at *6 (N.D. Cal. Mar. 27, 2012) (declining to address puffery argument which "was made in passing and only in a footnote").

deceive, manipulate, or defraud, but also deliberate recklessness." *Arena Pharm.,* 840 F.3d at 705. Deliberate recklessness is "an extreme departure from the standards of ordinary care" such that the "danger of misleading buyers" was "either known to the defendant or is so obvious that the actor must have been aware of it." *Gebhart*, 595 F.3d at 1041–42.

The Court must evaluate the Complaint's factual allegations "collectively," and conduct a "comparative assessment of plausible inferences, while constantly assuming the plaintiff's allegations to be true." *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 323, 326–27 (2007). A plaintiff pleads a strong inference of scienter "if a reasonable person would deem the inference of scienter cogent and *at least* as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

**B.      August 13, 2024: Defendants Knew the Walmart Illuminate Contract Had Lapsed and Associated Revenue Had Disappeared**

On August 13, 2024, when Defendants made their public statements, they knew that the Walmart Illuminate contract had lapsed six weeks earlier and was no longer generating revenue. ¶103. Defendants do not seriously argue otherwise, nor could they since these "facts were prominent enough that it would be 'absurd to suggest' that top management was unaware of them." *Applied Signal*, 527 F.3d at 989 (quoting *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp*., 320 F.3d 920, 943 n.21 (9th Cir. 2003)). Walmart was Digimarc's largest commercial customer, and Defendants repeatedly emphasized that the Illuminate contract could "take us to profitability all on its own," with potential ARR increasing "well into the nine figures." ¶¶38, 46. According to McCormack himself, the contract, which accounted for $5.8 million of $23.9 million in Q2 2024 ARR, was Digimarc's "singular focus" and "top priority." ¶¶45–46. Thus, the status of the Walmart Illuminate contract and the loss of

associated ARR were "critical to [the] business's core operations." *See South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 781 (9th Cir. 2008); *Alphabet*, 1 F.4th at 706 (considering "a senior executive's role in a company," with the "importance of the information," may make it "absurd to suggest that management was without knowledge").

Defendants not only knew of the contract's expiration; they addressed the contract and related opportunities on the August 13, 2024 earnings call. When touting "exciting" developments with Walmart that would have a "profound" impact in "the second half of this year and beyond," McCormack and Beck were plainly referring to the same opportunities underlying the undisclosed negotiations to replace the lapsed Illuminate contract. ¶¶74, 76–77, 79–80, 88–90. By addressing the contract and those opportunities (albeit cryptically), Defendants demonstrated their awareness of the nature of the ongoing negotiations for a replacement agreement. *See* ¶¶104–05; *Reese v. Malone*, 747 F.3d 557, 572 (9th Cir. 2014) (awareness inferred where defendant spoke directly on the subject); *In re Zillow Grp., Inc. Sec. Litig.*, No. C17-1387-JCC, 2019 WL 1755293, at *19 (W.D. Wash. Apr. 19, 2019) (scienter inferred where program was part of "core operations" and defendants "made various statements displaying their familiarity with the program"); *Longo v. OSI Sys., Inc.*, No. CV 17-8841 FMO (SKx), 2021 WL 1232678, at *9–*10 (C.D. Cal. Mar. 31, 2021) (scienter found where defendants publicly discussed the importance of key contract).

This inference is reinforced by a Digimarc business director's account that McCormack was a hands-on CEO who received weekly, and even daily, updates on the status of negotiations with important customers. ¶111. The director specifically confirmed McCormack's direct involvement in the Walmart negotiations.[13] *Id.*; *see* Def. Br. at 28 (allowing that this allegation

---

[13] For this reason, Defendants' reliance on cases rejecting scienter based on generalized allegations of hands-on management is misplaced. Def. Br. at 28. Defendants further contend that scienter

may "suggest[] that the CEO was engaged in negotiations"); *South Ferry*, 542 F.3d at 786 (allegations regarding "management's role" may independently satisfy scienter where they are "particular and suggest that the defendant had actual access to the disputed information").

It appears that Defendants' argument is not so much that they were unaware of the contract's expiration, but that they believed it likely that a new Walmart contract would be in place prior to Digimarc's Q3 2024 earnings announcement. *See* Def. Br. at 28 (referencing the likelihood of renewal). If so, that argument misses the point. Regardless of any perceived likelihood of renewal, the material omissions concerned the lapse itself, the resulting absence of Q3 revenue, the undisclosed negotiations over an "all-or-nothing" replacement, and the risks those circumstances created. *See, e.g.*, ¶78(a)–(f).

By failing to disclose that the Illuminate contract had lapsed six weeks earlier—while at the same time touting Q2 2024 ARR and the Walmart-related opportunities tied to undisclosed, ongoing negotiations—Defendants engaged in "an extreme departure from the standards of ordinary care" creating a "danger of misleading buyers or sellers" that was "either known" to them or "so obvious" that they "must have been aware of it." *Gebhart*, 595 F.3d at 1041–42.[14]

---

fails absent allegations of internal reports showing that they would not "sign a new contract with Walmart." *Id.* at 25. But that misstates Plaintiffs' allegations. Nonetheless, documentary evidence is unnecessary where, as here, Plaintiffs allege Defendants' direct involvement in the underlying events. *See Quality Sys.*, 865 F.3d at 1145–46 (scienter found where defendants acknowledged that they relied on a database which allegedly contained contradictory information). Additionally, contrary to Defendants' argument, the Court should "not draw a negative inference from the absence of [insider] stock sales." *Sharenow v. Impac Mortg. Holdings, Inc.*, 385 F. App'x 714, 717 n.2 (9th Cir. 2010); Def. Br. at 27 n.18; *compare In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 884–85 (9th Cir. 2012) (absence of stock sales relevant where alleged motive was to increase value of stock options).

[14] The inference of Defendants' scienter is bolstered by Digimarc's changes to its executive incentive plan. Digimarc's incentive plan previously relied on "ARR Growth," which accounted for both new customer additions and the loss of existing customers. ¶¶34, 113. For 2024, on

### C.   November 14, 2024: Defendants Mislead the Market to Counteract Their Belated, Partial Disclosures

By the close of Q3 2024, when Digimarc was required to report its financial results, Defendants were in a bind.  The Walmart Illuminate contract expired months earlier, reducing ARR to $18.7 million from $23.9 million the prior quarter.  ¶¶55–56, 106.  Negotiations for a replacement agreement had languished, and Defendants' initial gambit had failed.  ¶¶5, 57. Defendants were well aware of this, as reflected in their detailed explanations of the purported status of those negotiations.  *See* ¶¶55–58; section III(B), above; *Zillow*, 2019 WL 1755293, at *19 (scienter supported where defendants' statements reflected familiarity with the relevant program).

Confronted with potential liability for what was described as a "clear case of securities fraud" stemming from their earlier nondisclosures, Defendants pushed forward with their scheme. ¶¶4–5, 99.  They could not credibly minimize the lapse: the Walmart Illuminate contract had been touted as the Company's "singular focus," it accounted for nearly a quarter of Q2 2024 ARR, and

---

McCormack's recommendation, Digimarc replaced this metric with "Gross New ARR Growth," which excluded customer losses entirely.  ¶¶35, 112–14.  Defendants' decision to shift to a metric that excluded customer losses at the very time Digimarc faced the expiration of the Illuminate contract which accounted for a quarter of ARR, strengthens the inference that Defendants understood from the beginning that any replacement agreement would not be a straightforward re-signing of a renewal contract.  *See* ¶¶36, 87, 112–14; *Tellabs*, 551 U.S. at 325 ("personal financial gain may weigh heavily in favor of a scienter inference"); *America West*, 320 F.3d at 944 (scienter supported where strong correlation between financial results and stock options or cash bonuses alleged via "specific, particularized allegations"); *Steamfitters Loc. 449 Pension & Ret. Sec. Funds v. Extreme Networks, Inc.*, No. 24-CV-05102-TLT, 2026 WL 817221, at *13 (N.D. Cal. Mar. 23, 2026) (scienter based upon bonuses via executive compensation program).  Defendants' reliance on cases rejecting generalized or illogical compensation-related motive theories are inapposite since the incentive plan changes here are directly tied to the upcoming contract expiration.  *See* Def. Br. at 27.  And Defendants' contention that Plaintiffs fail to allege they "knew the contract would not be renewed" again mischaracterizes Plaintiffs' allegations.  *Id.*  In any event, the argument is illogical: it insists on allegations of definitive knowledge in order to disregard the very facts from which that knowledge is reasonably inferred.

its loss drove the disappointing Q3 2024 results.  ¶¶46, 75, 76(a), 87; *compare* Def. Br. at 5–6 n.2 & 20 n.10 (now contending the Illuminate contract was not significant).  Instead, they worked to artificially sustain Digimarc's share price and soften the market's reaction to the June 2024 lapse.  ¶¶2, 5, 108; *In re Lattice Semiconductor Corp. Sec. Litig.*, No. CV04–1255–AA, 2006 WL 538756, at *19 (D. Or. Jan. 3, 2006) (motive may "add additional weight to the inference of scienter").

By the time Defendants disclosed the Walmart contract's expiration on November 14, 2024, nineteen weeks after the fact, they had elevated the prospective replacement agreement from being capable of having a "profound" impact on Walmart's "in-store operations" (on August 13, 2024), to being "transformational" for not only Walmart but the entire "massive [retail] industry."  ¶¶74, 88.  Against that backdrop, Defendants further sought to mislead the market into believing the existing contract would simply be "renewed" and needed only to be "re-signed" once the parties finalized any "broader scope."  ¶¶6, 91, 107; *In re Nature's Sunshine Prods. Sec. Litig.*, 486 F. Supp. 2d 1301, 1310 (D. Utah 2007) ("Evidence that a defendant has taken steps to cover-up a misdeed is strong proof of scienter.").  Defendants' strategically timed rhetorical escalation, coupled with their misleading statements regarding the nature of negotiations, is compelling evidence of their scienter.  *See In re Dermtech, Inc. Sec. Litig.*, No. 23-CV-1885-DMS-JLB, 2025 WL 1618193, at *10 (S.D. Cal. June 5, 2025) ("compelling" inference of scienter where subtle shifts in language rendered description of a Medicare coverage decision misleading).

The unexplained months-long delay in disclosing the lapse of the critical Walmart contract is further evidence supporting a strong inference that Defendants acted intentionally or at least recklessly.  *See Kyung Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d 1190, 1202 (N.D. Cal. 2012) (that CEO delayed issuing negative report for three months indicative of scienter); *In re KeySpan*

*Corp.*, No. 01 CV 5852 (ARR), 2003 WL 21981806, at *16 (E.D.N.Y. July 30, 2003) (that defendants delayed disclosing problems for months supports an inference of scienter).

### D.    Year End 2024: Defendants Set a Quick Deadline to Walk Away From Negotiations

Defendants' actions following their November 2024 disclosures further reinforce the strong inference of scienter.  Immediately following Defendants' assurances that they were focused on the "long term," will "always trade time to close" for a contract with a "broader scope," and were "working diligently to finalize this contract in Q4," Digimarc retained PwC for an "extended and detailed deep-dive engagement" which included considering whether to terminate the Walmart negotiations.  ¶¶96, 100–02, 109.  Before Q4 2024 even ended, Defendants had set a hard walk-away deadline, which they presented to Walmart over the "holiday breaks."  ¶62; *see Lattice*, 2006 WL 538756, at *16 (considered with other facts, later statement that is inconsistent with earlier statement contributes to an inference of scienter).  This head-spinning shift from nondisclosure to delay to abandonment supports the inference that Defendants' misleading statements were intentionally or at least recklessly made.  *See Apple*, 2020 WL 6482014, at *10 ("close timing between misleading statements and disclosure of inconsistent facts suggests that [] the facts existed at the time the challenged statements were made").

Finally, that Defendants failed to disclose this sudden reversal of Digimarc's purported long-term commitment to the Walmart deal, knowing full well that investors were actively being misled as Digimarc's stock price increased nearly 75% between November 15, 2024 and January 6, 2025, is compelling evidence of their severe recklessness.  ¶¶101, 110; *South Ferry*, 542 F.3d at 784 ("courts certainly need not close their eyes to circumstances that are probative of scienter [when] viewed with a practical and common-sense perspective").

E.     **Defendants Fail to Present a *More* Compelling Inference**

Defendants contend that the most cogent and compelling nonculpable inference is that "Digimarc accurately reported its financial results, disclosed the Illuminate Contract lapse and its financial impact, and pursued renewal negotiations in good faith before evaluating its options and pivoting to a different strategy in February 2025." Def. Br. at 29. That narrative does not hold, as it leaves key questions unanswered. Most notably, why Defendants waited *nineteen weeks* to disclose the lapse, and why, after reaffirming in mid-Q4 2024 their commitment to the long-term and "working diligently to finalize this contract in Q4," they so quickly, *during that very same quarter*, imposed an undisclosed hard deadline to abandon the supposedly "transformational" deal.

Considered collectively, Plaintiffs' allegations support an equally if not more compelling inference that Defendants concealed the expiration of the Walmart Illuminate contract as part of a reckless gamble that they could replace it with a more significant agreement before investors learned the truth and Digimarc's stock price declined. When that wager failed and disclosure became unavoidable, Defendants doubled down. To mitigate the impact of their earlier nondisclosures and sustain Digimarc's share price, they oversold their commitment to negotiations, overstated the likelihood of a near-term deal, and obscured the nature and magnitude of the risks to both the prospective contract and the Company's relationship with Walmart.

Plaintiffs have alleged a "strong inference" of scienter because the inference of Defendants' intentional misbehavior or recklessness is at least as cogent and compelling as any innocent inference that may be drawn from the facts alleged. *See Tellabs*, 551 U.S. at 324 (in weighing culpable versus nonculpable inferences, a tie goes to the plaintiff).

## IV.    Plaintiffs Adequately Plead Loss Causation

Loss causation refers to proof that "the defendant's fraud caused an economic loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 338 (2005).  "This inquiry requires no more than the familiar test for proximate cause." *Mineworkers' Pension Scheme v. First Solar Inc*., 881 F.3d 750, 753 (9th Cir. 2018).  Accordingly, "loss causation is a 'context-dependent' inquiry as there are an 'infinite variety' of ways for a tort to cause a loss." *Lloyd v. CVB Fin. Corp*., 811 F.3d 1200, 1210 (9th Cir. 2016).  Because arguments over loss causation are highly fact intensive, they are "normally inappropriate to rule on . . . at the pleading stage." *Gilead*, 536 F.3d at 1057.

### A.    Corrective Disclosures

One way to allege loss causation is to show that "when the relevant truth about the fraud began to leak out, it caused the price of stock to depreciate and thereby proximately cause[d] the plaintiff's economic loss." *CVB Fin*., 811 F.3d at 1210.  "To be corrective, the disclosure need not precisely mirror the earlier misrepresentation, but it must at least relate back to the misrepresentation and not to some other negative information about the company." *Id.*  The "ultimate issue" is "whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *Id.*

Defendants' argument that the absence of a sustained price decline on November 14, 2024 defeats loss causation misstates controlling authority.  Def. Br. at 30.  In *Facebook*, the Ninth Circuit held that loss causation can be satisfied even where the market does not immediately react because it did not fully appreciate the significance of the initial partial corrective disclosure. *Facebook*, 87 F.4th at 956 (citing *Gilead*, 536 F.3d at 1058).  There, the court found loss causation adequately pled where a June 2018 partial disclosure regarding Facebook's improper "whitelisting" did not immediately result in any stock drop despite the practice violating an FTC

consent decree and Facebook's data sharing policies.  *Facebook,* 87 F.4th at 946, 956.  The court held that allegations of a 19% stock drop nearly two months later, when the market learned the full financial consequences of the previously disclosed misconduct, were sufficient to plead loss causation at "the very early motion to dismiss stage."  *Id.* at 956; *see In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1186 (9th Cir. 2024) (citing *Facebook*, 87 F.4th at 945–46) ("Facebook's misstatements seemingly comforted the market temporarily until the truth was more fully revealed and Facebook's stock plummeted").[15]

The same principle applies here.  On November 14, 2024, when investors were first told of the Walmart contract's lapse nineteen weeks earlier, their reaction was muted because Defendants' continuing efforts to mislead prevented them from fully understanding the significance of the disclosure.  *See Genius Brands*, 97 F.4th at 1185 ("if a company is in hot water, and one of its executives makes a misstatement to avoid a price crash and causes the stock price to hold steady, that misstatement also inflated the stock's value").  Among other things, Defendants led investors to believe the old contract would soon be "re-signed" and "renewed," when really the parties were attempting to negotiate a different, much more uncertain all-or-nothing deal.  *See, e.g.,* ¶¶76(a)–(f).  These misleading statements caused Digimarc's stock price, which initially dropped 10% on heavy volume, to rebound within days.  ¶59; *Genius Brands*, 97 F.4th at 1187–88 ("shareholders allege that the company's June 22 retweet . . . was a successful effort to stanch

---

[15] In *Gilead*, the market learned in August 2003 that the FDA had issued a warning letter regarding the company's off-label marketing.  536 F.3d at 1053.  Yet, the company's stock price did not decline until October 2003, after it disclosed less-than-expected revenues.  *Id.* at 1054, 1057.  Despite this gap, the Ninth Circuit found loss causation since the August disclosure of misconduct would not necessarily trigger a stock decline where it did not contain sufficient information to significantly undermine the earlier statements.  *Id.* at 1058.

the bleeding from the unfavorable reports . . . . it is plausible that [the company's] June 22 retweet maintained its stock price at a higher level 'than it would have been' absent the retweet").[16]

Several months later, on February 26, 2025, Digimarc announced it had abruptly abandoned its Walmart contract negotiations after having communicated a hard deadline to Walmart in Q4 2024 for completion of a deal. *See* ¶¶60, 62. McCormack provided additional insight into the nature of those negotiations, revealing they were something much more than a renewal with some potential upsell. *See, e.g.,* ¶62 (stating Digimarc rejected Walmart's "offer[] to alter the scope of the engagement to provide more flexibility"). Digimarc also released disappointing Q4 2024 financial results including a $2.3 million drop in ARR "reflect[ing] a $5.8 million decrease in ARR" due to the earlier lapse and lack of a replacement contract. ¶60.

Defendants explained that because Digimarc had walked away from its "first path," the

---

[16] Although not determinative, Defendants misstate controlling law as it relates to a stock price rebound. Def. Br. at 30. A post-disclosure rebound does not always negate loss causation. In considering whether loss causation is present, the court must infer that the market understood a disclosure as corrective. *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1065 (9th Cir. 2008). A stock price rebound could, under certain circumstances, show that such an inference is unwarranted. *Id.* In *Tesla*, the court emphasized that loss causation is "contextual" and that a rapid price rebound *may*, in some circumstances, undermine an inference of loss causation; on the facts there, the rebound "refute[d] the inference" that the alleged disclosure caused the drop. *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1198 (9th Cir. 2021) (Def. Br. at 30). But *Tesla* did not involve allegations of additional misleading statements re-inflating the stock price or a later major correction. *Id.* Here, there is no question that Digimarc's stock dropped 10% in reaction to significant new information, *i.e.*, that the Walmart contract expired nineteen weeks earlier and did not generate any Q3 revenue. ¶¶55–59. Plaintiffs also provide a plausible explanation for the rebound. That is, Defendants' contention that the new contract, which just needed to be re-signed, would transform the entire retail industry. ¶56. Thus, the causal inference from the 10% drop in response to Defendants' new disclosures is not "unwarranted." *Corinthian Colleges*, 540 F.3d at 1065; *see also In re CV Scis., Inc. Sec. Litig.*, No. 2:18-cv-01602-JAD-BNW, 2019 WL 6718086, at *6 (D. Nev. Dec. 10, 2019) ("although the stock price rebounded in subsequent days, dismissal . . . is not appropriate because other events could have caused that recovery").

Walmart negotiations, it would now pursue its alternative "second path," which meant reorganizing the Company and focusing on other areas of business.  ¶¶61–62; *see also* ¶66 ("Underpinning this shift was the inability to come to terms with Walmart on the transformational deal referenced last quarter.").  This strategic pivot was a foreseeable consequence of Defendants' undisclosed and ultimately unsuccessful approach to attempting to replace the expired Walmart contract with a much broader, all-or-nothing deal.  *See* Def. Br. at 30.

In reaction to these stunning disclosures, Digimarc's stock price fell $11.65, or about 43%, to close at $15.39 per share on February 27, 2025, damaging investors.  ¶65.

Because Plaintiffs' allegations demonstrate that Defendants' misstatements and omissions were at least in part of the cause of the Digimarc's stock drop, they have adequately pleaded loss causation.  *In re Daou Sys., Inc.*, 411 F.3d 1006, 1025 (9th Cir. 2005) ("plaintiff is not required to show that a misrepresentation was the *sole* reason for the investment's decline in value in order to establish loss causation") (original emphasis); *Gilead*, 536 F.3d at 1057 ("so long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings").

### B.    Materialization of Risk

Alternatively, Plaintiffs adequately plead loss causation under a materialization of risk approach.  ¶¶116–18.  "[M]aterialization of the risk recognizes that a misstatement or omission is the proximate cause of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor." *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1120 (9th Cir. 2013).  Although the Ninth Circuit has not expressly adopted this theory, it has acknowledged that courts within this circuit apply it.  *See id.* at 1122 n.5.

Here, Plaintiffs allege that investors were kept in the dark regarding the very real risks surrounding the expired Walmart contract, including that any expansion of Digimarc's Walmart relationship now depended almost entirely on an all-or-nothing replacement agreement. *See, e.g.*, ¶¶78(a)–(f); 91(a)–(d). Thus, "[t]he nature and magnitude of the foreseeable risk to Digimarc's relationship with Walmart and the Company's Q3 and Q4 2024 financial results, as well as the risk to Company's then-current business strategy, growth trajectory, and outlook, were hidden from investors." ¶¶115; *see also* ¶¶78(a)–(f); 91(a)–(d).

Plaintiffs further allege, "[t]he revelation of the facts and circumstances that Defendants had misleadingly omitted, and the materialization of the foreseeable risks concealed by Defendants' scheme, exposed both Defendants' scheme and the overvaluation from the scheme." ¶116. That is, the concealed risks surrounding the expired contract and the nature of the replacement contract being negotiated materialized and Digimarc's stock price fell. *Id.* Because the resulting loss was clearly within the concealed "zone of risk," Plaintiffs have plausibly alleged proximate causation under this alternative approach. *Nuveen*, 730 F.3d at 1120.[17]

**CONCLUSION**

Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss in its entirety. Should the Court grant the motion, in whole or in part, Plaintiffs request they be allowed an opportunity to amend.

---

[17] Because Plaintiffs adequately plead primary §10(b) violations, Defendants' argument for dismissal of Plaintiffs' control person claims under Section 20(a) is without merit. *See* Def. Br. at 32.

DATED:  April 27, 2026                    JOHNSON FISTEL, PLLP


                                          /s/ Michael I. Fistel, Jr.
                                          Michael I. Fistel, Jr.
                                          Murray House
                                          40 Powder Springs Street
                                          Marietta, GA 30064
                                          Telephone: (470) 632-6000
                                          Facsimile: (619) 363-8326
                                          michaelf@johnsonfistel.com

                                          JOHNSON FISTEL, PLLP
                                          Jeffrey A. Berens
                                          2373 Central Park Boulevard, Suite 100
                                          Denver, CO 80238-2300
                                          Telephone: (303) 861-1764
                                          jeffb@johnsonfistel.com

                                          *Lead Counsel for Plaintiffs and the Putative Class*

                                          AMAN LAW, LLC
                                          David Aman (OSB No. 962106)
                                          14705 SW Millikan Way
                                          Beaverton, OR 97003
                                          Telephone: 503.810.0850
                                          david@amanlawpdx.com

                                          *Local Counsel for Plaintiffs and the Putative Class*

                                          THE SCHALL LAW FIRM
                                          Brian J. Schall
                                          2049 Century Park East, Suite 2460
                                          Los Angeles, CA 90067
                                          Telephone: (310) 301-3335
                                          brian@schallfirm.com

                                          *Additional Counsel for Frederick Ullom*

## CERTIFICATE OF SERVICE

I hereby certify that on April 27, 2026, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

*/s/ Michael I. Fistel, Jr.*
Michael I. Fistel, Jr.