IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

FREDERICK ULLOM, individually and on behalf of a class of similarly situated individuals,

Plaintiff,

v.

DIGIMARC CORPORATION, RILEY MCCORMACK, and CHARLES BECK,

Defendants.

Case No. 3:25-cv-00779-JR

FINDINGS AND RECOMMENDATION

RUSSO, Magistrate Judge:

Defendants Digimarc Corporation ("Digimarc"), Riley McCormack, and Charles Beck move the Court take judicial notice of certain documents and pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss the amended complaint brought by plaintiffs Diamond Head Capital International Fund,

L.P. and Frederick Ullom on behalf of a class. For the reasons set forth below, defendants' motions should be granted.

**BACKGROUND**

Digimarc provides digital watermarking technology to identify and authenticate items, generating revenue primarily from software subscriptions and related services. Am. Compl. ¶¶ 19, 24 (doc. 37). McCormack and Beck are Digimarc's CEO and CFO, respectively. *Id.* ¶¶ 15-16. While Digimarc receives approximately half of its revenue from providing counterfeiting-deterrence technology to a consortium of central banks (the "Central Banks"), it has focused on expanding its commercial subscription business. *Id.* ¶¶ 22, 30. Digimarc's retail offerings include the Illuminate platform, which creates cloud-based "digital twins" of physical items and stores intelligence about those items, as well as Digimarc Barcodes, which imperceptibly embed data across product packaging surfaces, enabling faster data scanning from any angle. *Id.* ¶¶ 20-22.

One of the metrics Digimarc relied on to communicate with shareholders was the Annual Recurring Revenue ("ARR"), which Digimarc explained was calculated as the aggregation of annualized subscription fees from its commercial contracts as of the measurement date. *Id.* ¶¶ 26-27. In the company's November 2023 earnings call for Q3 2023, Beck explained to investors that because Digimarc was focused on growing its recurring, high-margin commercial subscription revenue, which Beck described as Digimarc's most important driver of growth, the ARR formula excluded government contracts. *Id.* ¶¶ 29-30. McCormack also explained that the ARR reflected Digimarc's desire to give investors transparency into that area of the business along with a greater understanding of its growth. *Id.* ¶ 29. While Digimarc communicated to investors that the ARR was the best leading indicator for future growth in commercial subscription revenue, it also

included a warning with its ARR disclosure explaining ARR was not a forecast and any contracts active at the end of a reporting period may not be extended or renewed. *Id.* ¶¶ 28, 31-33.

Walmart was Digimarc's largest commercial customer and constituted a significant percentage of its revenue. *Id.* ¶¶ 37-38. Digimarc and Walmart had a master services agreement since at least 2019. *Id.* ¶ 43. Additionally in 2019, Digimarc and Walmart announced an annual $3 million fixed fee agreement applying Digimarc's digital barcodes to packaged fresh foods. *Id.* ¶¶ 41-43. Following that announcement, Digimarc's stock price increased dramatically at least for a short time. *Id.* ¶ 44.

In November 2022, Digimarc announced a new multiyear deal with Walmart (the "Illuminate Contract"), which expanded deployment of Digimarc's Illuminate platform at Walmart. *Id.* ¶¶ 41, 45, 49. The contract provided for minimum payments of $2.7 million in the first year and $5.8 million the second year. *Id.* ¶¶ 45, 49. McCormack described the deal as Digimarc's singular focus and a top priority across the company. *Id.* ¶ 46. Following that announcement, Digimarc's stock price again experienced a spike. *Id.* ¶ 48. The Illuminate Contract expired at the end of June 2024. *Id.* ¶¶ 4, 53.

On August 13, 2024, Digimarc announced its financial results for Q2 2024, which ended June 30, 2024, and reported an ARR of $23.9 million. The total Q2 2024 revenue had increased from $8.7 million in Q2 2023 to $10.4 million, and quarterly subscription revenue increased from $4.7 million in Q2 2023 to $6.4 million. *Id.* ¶¶ 3, 51, 55, 74-75. Digimarc filed with the Securities and Exchange Commission (the "SEC") Form 8-K, signed by Beck, which quoted McCormack highlighting "exciting developments likely to have a profound impact on the second half of this year and beyond." *Id.* ¶ 74. Digimarc emphasized Walmart's expanded understanding of Digimarc technology. *Id.* ¶¶ 3, 77. In the earnings call that same day, Beck and McCormack answered analyst

questions and McCormack described Digimarc's Walmart relationship in positive terms, emphasizing Walmart's new understanding of Digimarc's potential contributions to Walmart's operations. *Id.* ¶¶ 51, 79-80, 83, 85.

On November 14, 2024, Digimarc announced its financial results for the third quarter of 2024. *Id.* ¶¶ 5, 55, 87. Digimarc reported an ARR of $18.7 million as of September 30, 2024, down from $19.6 million a year prior; disclosed that the Walmart Illuminate Contract had expired at the end of Q2 2024; and explained that the delay in resigning the Illuminate Contract had resulted in no revenue recognized or cash collected from the contract during the third quarter. *Id.* ¶¶ 55, 57, 87. In the earnings call, McCormack and Beck explained the Illuminate Contract was subject to ongoing negotiations for renewal or replacement. *Id.* ¶¶ 87-89. They added that the renewal was expected to include a large upselling, which they characterized as transformational. *Id.* ¶¶ 57, 88-89. McCormack also told investors that Digimarc was working diligently to finalize the contract, including working towards a broader contract scope. *Id.* ¶¶ 89, 92-94. At the same time, McCormack explained Digimarc had "no sacred cows," and there were other developments towards which Digimarc could be investing its resources other than the Illuminate Contract. *Id.* ¶ 97. The following day, Digimarc's stock price dropped 10%, although it rebounded within days. *Id.* ¶ 59.

On February 26, 2025, Digimarc announced its 2024 yearly and fourth quarter earnings and held an earnings call. *Id.* ¶¶ 60-64. Digimarc announced it had been unable to reach an agreement with Walmart on the Illuminate Contract by Digimarc's deadline. *Id.* ¶ 62. McCormack assured that while negotiations were unsuccessful, Digimarc remained in communication with Walmart and, while any new agreement would likely require de-scoping from what had previously been imagined, it was not necessarily true that a new agreement would be less valuable. *Id.* ¶ 63.

Digimarc also announced it had engaged PricewaterhouseCoopers("PwC") for a "deep-dive engagement" and that it would engage in a reorganization and workforce reduction of about 90 employees. *Id.* ¶¶ 60-62, 100. Digimarc also hired Goldman Sachs to review strategic alternatives and consider a full range of potential options, including privatization. *Id.* ¶ 7. The following day, Digimarc's stock price fell approximately 43%. *Id.* ¶¶ 8, 65.

Plaintiffs initiated this action in May 2025 and amended the complaint in November 2025, asserting claims for violations by all defendants of § 10(b) of the Exchange Act and SEC Rule 10(b)-5 as well as violations by McCormack and Beck of § 20(a) of the Exchange Act.

**STANDARD OF REVIEW**

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) tests the sufficiency of the claims. To survive a motion to dismiss, the complaint must state 'enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). When a party brings a motion to dismiss, the court will liberally construe the complaint in favor of the plaintiff and take its allegations as true. *Rosen v. Walters*, 719 F.2d 1422, 1424 (9th Cir. 1983). However, bare assertions that are a "formulaic recitation of the elements" of a claim "are conclusory and not entitled to be assumed as true." *Ashcroft v. Iqbal*, 556 U.S. 662, 680-81 (2009). To state a plausible claim to relief, the plaintiff must allege facts in the complaint that "contain sufficient allegations of underlying facts" to support its legal conclusions. *Starr v. Bacca*, 652 F.3d 1202, 1216 (9th Cir. 2008).

In class action securities fraud cases, Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act ("PSLRA") impose heightened pleading standards in addition to Rule 12(b)(6)'s requirements. *See Nyugen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020). Rule 9(b) requires a plaintiff alleging fraud or mistake to "state with particularity the circumstances

constituting fraud or mistake." Under Rule 9(b), fraud allegations "must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong. *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 947 (9th Cir. 2023) (citation and internal quotation marks omitted). The PSLRA requires a plaintiff alleging securities fraud to "plead with particularity both falsity and scienter." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009) (citation omitted). As to falsity, the complaint must "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1).

## DISCUSSION

Defendants request the Court take notice of certain documents and argue the Court should dismiss the complaint with prejudice pursuant to Fed. R. Civ. P. 12(b)(6) because plaintiffs fail to plead any of the elements of a securities fraud claim.

### I. Judicial Notice and Incorporation by Reference

Defendants request the Court take judicial notice of a set of exhibits including (1) two analyst reports extensively referenced in the amended complaint, (2) certain Digimarc SEC filings "containing or relevant to the disclosures challenged" in the amended complaint, (3) transcripts of the earnings calls extensively discussed in the amended complaint, (4) and a presentation from Digimarc's website extensively discussed in the amended complaint. Def.s' Mot. Dismiss 1 (doc. 40).

Generally, "district courts may not consider material outside the pleadings when assessing the sufficiency of a complaint[.]" *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). There are two exceptions to that rule: (1) the incorporation-by-reference doctrine; and (2)

judicial notice under Federal Rule of Evidence 201. *Id.*

The incorporation-by-reference doctrine is a judicial creation that "treats certain documents as though they are part of the complaint itself" and "prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims." *Id.* at 1002 (citing *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998), *superseded by statute on other grounds as recognized in Abrego Abrego v. The Dow Chem. Co.*, 443 F.3d 676, 681 (9th Cir. 2006)). "[A] defendant may seek to incorporate a document into the complaint 'if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim.'" *Id.* (quoting *United States v. Ritche*, 342 F.3d 903, 908 (9th Cir. 2003)). However, "the doctrine is not a tool for defendants to short-circuit the resolution of a well-pleaded claim." *Khoja*, 899 F.3d at 1003.

Alternatively, "a court may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment." *Id.* at 999 (cleaned up). A court may judicially notice a fact "that is not subject to reasonable dispute." Fed. R. Evid. 201(b). "A fact is 'not subject to reasonable dispute' if it is 'generally known,' or 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" *Khoja*, 899 F.3d at 999 (quoting Fed. R. Evid. 201(b)(1)-(2)). Still, a court may not take judicial notice of facts that are irrelevant to resolving the pending motion. *See Ruiz v. City of Santa Monica*, 160 F.3d 543, 548 n.13 (9th Cir. 1998).

Nearly all the documents at issue are relied upon in the amended complaint. Am. Compl. ¶¶ 3, 5, 7-8, 51, 55-59, 61-64, 66, 74-75, 77, 79-80, 83, 85, 87-90, 92-95, 97, 105 (doc. 37). The only documents at issue the amended complaint does not rely upon are SEC filings, which are proper subjects of judicial notice and appropriate here to understand the scope of information

available during the class period. *See Metzler Inv. GMBH*, 540 F.3d at 1064 n.7. The Court does not, however, take as true each statement made within the documents. *See Khoja*, 899 F.3d at 999; *Sigman v. Nuscale Power Corp.*, 2025 WL 1455432, at *6 (D. Or. May 21, 2025) ("This Court therefore grants the request and may consider these materials 'to understand the "total mix" of information available to investors over the class period,' . . . Without converting the motion to dismiss into a motion for summary judgment . . . This Court does not consider these documents for the truth of the matters asserted therein.") (citations omitted); *In re Nike, Inc. Sec. Litig.*, 2026 WL 892439, at *15 (D. Or. Mar. 31, 2026) ("Consideration of defendants' proffered documents is appropriate here to understand the scope of information available during the class period . . . The Court does not, however, take as true each statement made within the documents.") (citations omitted).

Defendants' request for judicial notice and incorporation by reference is granted accordingly.

## II. Motion to Dismiss

### A. Section 10(b) of the Exchange Act and SEC Rule 10b-5

Section 10(b) of the Securities Exchange Act of 1934 permits private parties to bring actions against those who have allegedly "use[d] or employ[ed], in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe[.]" 15 U.S.C. § 78j(b). To enforce § 10(b), the SEC has implemented Rule 10b-5, which makes it "unlawful for any person . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). Section 10(b) and Rule 10b-5 are coextensive, and this

Court refers to them collectively as "§ 10(b)." *See* *SEC v. Zandford*, 535 U.S. 813, 816 n.1 (2002). To prove a violation under § 10(b), "a plaintiff must allege: (1) a material misrepresentation or omission by the defendant ('falsity'); (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re Facebook*, 87 F.4th at 947 (internal quotations and citations omitted).

Plaintiffs' claims concern representations or omissions regarding Digimarc's Walmart Illuminate Contract expiration and negotiations from August 2024, November 2024, and the end of 2024. Defendants contend those statements or omissions were not materially misleading, and that plaintiffs fail to plead both scienter and loss causation. Because plaintiffs have not adequately pleaded material misrepresentation, this Court does not address the parties' arguments on scienter and loss causation.

**1. Material Misrepresentation**

"An actionable material misrepresentation or omission has two components" in securities law: first, a plaintiff "must allege a misrepresentation or a misleading omission with particularity and explain why it is misleading," and second, under "an objective standard, that misrepresentation or omission must have been material to investors." *Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1274 (9th Cir. 2017) (citations omitted). Defendants argue that none of the statements or omissions on which plaintiffs base their claims were misleading.

To determine whether a statement is misleading, courts apply the objective "reasonable investor" standard. *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 699 (9th Cir. 2021) (citation omitted). "[S]tatements and omissions are actionably false or misleading if they directly contradict

what the defendant knew at that time . . . or create an impression of a state of affairs that differs in a material way from the one that actually exists[.]" *In re Facebook*, 87 F.4th at 948 (citations and internal quotation marks omitted). "To be misleading, a statement must be capable of objective verification." *Hewlett-Packard*, 845 F.3d at 1275 (citation and internal quotation marks omitted). "Section 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information" and instead, disclosure is required "only when necessary to make statements made, in light of the circumstances in which they were made, not misleading." *See In re Alphabet*, 1 F.4th at 699 (citations and internal quotation marks omitted).

**a. August 13, 2024, Statements**

Plaintiffs assert the following statements or omissions by defendants related to Digimarc's Q2 2024 results, released August 13, 2024, were material misrepresentations.

In Digimarc's press release, filed with the SEC on Form 8-K, signed by Beck, one of the bolded subheadings was "Annual Recurring Revenue Increases 44%." Am. Compl. ¶ 74 (doc. 37). McCormack was quoted as saying "Digimarc made significant progress on multiple fronts in Q2, highlighted by three exciting developments likely to have a profound impact on the second half of this year and beyond." *Id.* Digimarc announced "Annual Recurring Revenue (ARR) as of June 30, 2024, increased to $23.9 million, and "total Q2 2024 revenue had increased to $10.4 million compared to $8.7 million for Q2 2023, and Q2 2024 subscription revenue increased to $6.4 million compared to $4.7 million for Q2 2023." *Id.* at ¶ 75.

Digimarc also posted a deck of slides to its website regarding its Q2 2024 results. *Id.* at ¶ 77. The "Business Update" section of those slides highlighted Digimarc's Q2 2024 financial

results, including an ARR of $23.9 million and commercial subscription revenue of $6.1 million. *Id.* On the same slide, Digimarc listed its business highlights from the quarter, including that its largest commercial customer, Walmart, saw that Digimarc's technology "can carry a very heavy load" and "now understands the more items digitized with our technology . . . the more profound the impact to their in-store operations will be" and "now understands the value of Digimarc delivering a greater amount of the software capabilities powering the points of detection, increasing the size and time-to-market of our platform opportunities." *Id.*

That same day, Digimarc held its earnings call for Q2 2024. *Id.* at ¶ 79. In his prepared remarks, McCormack again referenced "three developments likely to have a profound impact on the second half of this year and beyond" and explained that Digimarc had demonstrated to Walmart that its technology could "carry a very heavy load," resulting in "two important developments that give us confidence this flywheel is likely to start spinning." *Id.* He reiterated Walmart's new understanding of Digimarc's value and explained that "[t]his should ultimately increase the size and time-to-market of the 'razor' component of this flywheel," with both Walmart and subsequent customers. *Id.* He added that "it is difficult to overstate the importance of these developments." *Id.*

Later in the call, an analyst asked McCormack to expound on his remarks about Digimarc demonstrating to Walmart its ability to carry a heavy load. *Id.* at ¶ 80. McCormack reiterated "the two developments," referencing Digimarc's belief that Walmart understood "the more items in their store including items produced by the national brands, the more profound the improvement in what they're trying to do will be," and the value of Digimarc "owning more of a technology stack on the razor component – on using more Illuminate capabilities to build up the points of detection." *Id.* He repeated that it was "difficult to overstate the importance of these developments." *Id.*

Beck also had an exchange with that analyst during the call, in which the analyst asked, regarding "net new ARR" if he could "just give us some additional details on maybe what type of customer churn in the quarter? Did you consider them core to the business?" and asked how the center of expertise ("COE") program impacted the net new ARR in the quarter. *Id.* at ¶ 83. Beck responded that "most of the churn was specifically related to transition of our COE program[,]" that Digimarc did not "expect to see any more customers moving in the COE program[,]" and expected "that most of that is behind us at this point." *Id.*

Beck also engaged in another exchange with a different analyst in which the analyst asked if he could "quantify on the ARR what was the actual dollar impact of that churn to customer?" and Beck, describing the ARR as "really our true north as a business," declined to provide any additional metrics as "given our scale, [other metrics] could be misleading[.]" *Id.* at ¶ 85.

**i. Financial Reporting**

Plaintiffs contend the statements made in the press release and website slides regarding Digimarc's Q2 2024 ARR and other results, "considered in the context they were made," "materially misleading and omitted material facts necessary to make them not misleading when made." *Id.* at ¶¶ 76, 78. Defendants argue the reported numbers were accurate and "companies are not required to embellish accurate financial reports with additional commentary about the future[.]" Defs.' Mot. Dismiss 10-12 (doc. 40). Defendants stated it would have been misleading to disclose that the Illuminate Contract would no longer contribute to the ARR during active negotiations to renew that contract, and further it was clear to investors that the ARR included contracts that may not renew, as evidenced by analyst questions regarding churn, because Digimarc's quarterly and annual reports explained as much. Id.

Reporting accurate historical data, as Digimarc did here, is not misleading even if the circumstances in which the company reports the data are less favorable. *See Menon v. Maxeon Solar Techs., Ltd.*, 2025 WL 1223559, at *15 (N. D. Cal. Apr. 28, 2025). However, plaintiffs argue that defendants' decision to couple those disclosures with commentary about "exciting developments likely to have a profound impact on the second half of this year and beyond," along with defendants' statements to investors that the ARR was "the best leading indicator for future commercial subscription revenue growth" obligated defendants to disclose that the Illuminate Contract had expired, was generating no revenue in Q3, and was subject to ongoing negotiations. Pls.' Resp. to Mot. Dismiss 10-12 (doc. 43). *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 192 (2015) ("[L]iteral accuracy is not enough: An issuer must as well desist from misleading investors by saying one thing and holding back another.").

Plaintiffs point to *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 984-85 (9th Cir. 2008), where the defendant company touted it's backlog, or "the dollar value of the work it has contracted to do but hasn't yet performed[,]" while not disclosing four customer stop-work orders that signaled a heightened risk those projects would be cancelled. There, the court determined that once defendants highlighted the backlog, they were required to do so in a way that would not mislead investors "as to what that backlog consisted of." *Id.* at 987.

In *Berson*, the defendants' generic disclosure offered multiple interpretations as to what work might be included and it was not clear "that what the company refers to as backlog includes work that is substantially delayed and at serious risk of being cancelled altogether." *Id.* at 985-87. Here, Digimarc's generic disclosure regarding the ARR warned investors that "ARR is not a forecast and the active contracts at the end of a reporting period used in calculating ARR may or may not be extended or renewed by our customers." Am. Compl. ¶ 28 (doc. 37). While investors

were told ARR was Digimarc's best "leading indicator for future commercial subscription growth[,]" that does not undermine that investors were clearly warned that the "active contracts at the end of a reporting period" were used to calculate the metric and those contracts "may or may not be extended or renewed[.]" *Id.* ¶¶ 28, 31-33.

Additionally, defendants' "exciting developments" comment is not enough to invoke defendants' duty to disclose additional information. Plaintiffs acknowledge "investors had no way of knowing" that the comment related to the Illuminate Contract. Pls.' Resp. to Mot. Dismiss 10 (doc. 43). "To be actionable under the securities laws, an omission . . . must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). If investors could not know that the comment was regarding the Illuminate Contract it follows that they could not have been misled by the comment as to the Illuminate Contract.

Defendants' statements in the press release and website slides regarding Q2 2024 accurately report Digimarc's Q2 ARR and express excitement regarding its relationship with Walmart as Digimarc engaged in contract renewal negotiations with Walmart. Plaintiffs have not sufficiently pleaded that those statements were misleading by omission.

**ii. Beck's Earnings Call Statements**

Plaintiffs also contend Beck's statements regarding Q2 churn in response to analyst questions during the Q2 2024 earnings call "considered in the context they were made, were materially misleading and omitted material facts necessary to make them not misleading when made." Am. Compl. ¶¶ 84, 86 (doc. 37).

In the first statement, Beck responded to an analyst question regarding "customer churn in the quarter" and the COE program's impact on ARR by addressing the COE program's impact on

churn and churn within that program. *Id.* ¶ 83. Plaintiffs argue the statement was materially misleading because the Illuminate Contract had expired at the time of the statement and by speaking to churn, Beck created the impression the Illuminate Contract remained in place. *Id.* ¶ 84; Pls.' Resp. to Mot. Dismiss 13 (doc. 43). "If there are two alternative explanations . . . both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). However, it is clear when Beck said, "most of that is behind us at this point[,]" the "that" to which he was referring was "customers moving in the COE program." Plaintiffs have not sufficiently pleaded that Beck's statement in paragraph 83 was materially misleading by omission.

In the second statement, Beck responded to an analyst question regarding "the actual dollar impact of that churn to customer" regarding ARR by describing ARR as Digimarc's "true north" and declining to provide additional metrics. Am. Compl. ¶ 85 (doc. 37). Plaintiffs contend Beck misled investors by touting ARR as Digimarc's "true north" while not disclosing the Illuminate Contract's expiration. *Id.* ¶ 86; Pls.' Resp. to Mot. Dismiss 14 (doc. 43). Beck's statement was a generic comment on the importance of not attempting to provide metrics in addition to Digimarc's established metric for commercial subscription revenue, ARR. Beck's comment did not suggest that ARR from the reporting quarter would account for churn in the time after that quarter. That is, it did not create an "impression of a state of affairs that differs in a material way from the one that actually exists." *Hewlett-Packard*, 845 F.3d at 1275 (internal citations and quotation marks omitted). Plaintiffs have not sufficiently pleaded that Beck's statement in paragraph 85 was materially misleading by omission.

**iii. Business Opportunity Statements**

Defendants also argue that many of the statements from the Q2 2024 press release, slide deck, or earnings call were not misleading statements because the PSLRA safe harbor applies or the statements were inactionable opinions or puffery. Defs.' Mot. Dismiss 14-19 (doc. 40).

**1. The PSLRA Safe Harbor**

Defendants argue that McCormack's reference to "three exciting developments likely to have a profound impact on the second half of this year and beyond," and his comment that developments "should ultimately increase the size and time-to-market of the 'razor' component of this flywheel" are forward-looking and therefore protected by the PSLRA's safe harbor provision. *Id.* 16-17; Am. Compl. ¶¶ 74, 79 (doc. 37).

The PSLRA provides a "barrier at the pleading stage in the form of a safe harbor for 'forward-looking statements.'" *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010). "A 'forward-looking statement' is any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions underlying or related to any of these issues." *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 936 (9th Cir. 2003) (citations and internal quotation marks omitted). The PSLRA's safe harbor provision, 15 U.S.C. § 78u-5(c)(1), exempts statements from liability if (1) "they were identified as forward-looking statements and accompanied by meaningful cautionary language," or (2) the plaintiff fails to allege with particularity that the "projections were made with *actual* knowledge that they were materially false or misleading." *In re Cutera*, 610 F.3d at 1112 (emphasis in original).

Plaintiffs contend the safe harbor is inapplicable because defendants "are liable for their failure to disclose the lapse of the Walmart contract six weeks earlier and the attendant risks associated with the ongoing replacement negotiations." Pls.' Resp. to Mot. Dismiss 14 (doc. 43).

However, that argument conflates falsity with forward-looking status. "Statements about the likelihood that something will happen are, by definition, forward-looking." *Sigman v. Nuscale Power Corp.*, 2025 WL 1455432, at *9 (D. Or. May 21, 2025). Plaintiffs argue that even if the statements are forward-looking, defendants knew the Illuminate Contract had expired and did not warn that this had already occurred. Pls.' Resp. to Mot. Dismiss 14 (doc. 43). "[C]autionary language is not 'meaningful' if it discusses as a mere possibility a risk that has already materialized." *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 781 (9th Cir. 2023). However, plaintiffs allege that Digimarc's ARR warning notified investors that contracts may not be extended or renewed, the risk plaintiff allege. Am. Compl. ¶ 28 (doc. 37). Additionally, plaintiffs do not allege that as of August 13, 2024, negotiations were not ongoing, that renewal was unlikely, or any other facts that would make those statements materially false or misleading. Both prongs of the safe harbor apply to McCormack's forward-looking statements in paragraphs 74 and 79.

**2. Inactionable Opinions and Puffery**

Defendants also argue some of the alleged statements are inactionable opinion statements or puffery. The statements they assert were inactionable opinions include McCormack's references to "developments likely to have a profound impact on the second half of this year and beyond," his comments that "developments should ultimately increase the size and time-to-market of the 'razor' component of this flywheel," "we believe [Walmart] now understands" the benefits of having "more items in their stores that are digitized with our technology," "we believe [Walmart] also now understands the value of Digimarc delivering a greater amount of the software capabilities powering their points of detection," and "we believe [Walmart] understands the more items in their store including items produced by national brands, the more profound the improvement in what they're trying to do will be," as well as the slide deck reference to "important

developments" relating to Walmart. Defs.' Mot. Dismiss 18 n.9 (doc. 40); Am. Compl. ¶¶ 74, 77, 79-80 (doc. 37).

"For an opinion to be misleading by omission, (1) the statement must omit material facts about the defendant's inquiry into or knowledge concerning a statement of opinion, and (2) those facts must conflict with what a reasonable investor would take from the statement itself." *Sigman*, 2025 WL 1455432, at *12 (quoting *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 802 (9th Cir. 2017) (cleaned up). Plaintiffs argue the statements are actionable because the views did not "fairly align with the information in [defendants'] possession at the time," as "a reasonable investor would have been shocked to learn" that the Illuminate Contract had lapsed, Digimarc had not earned revenue on the Illuminate Contract since, and negotiations for a replacement contract regarded the same opportunities defendants were expressing excitement around. Pls.' Resp. to Mot. Dismiss 15 (doc. 43) (quoting *Omnicare*, 575 U.S. at 188-89).

Plaintiffs do not clearly dispute that the statements are opinions, and while opinion statements "remain perfectly capable of misleading investors," the opinion statements at issue here do not. *Omnicare*, 575 U.S. at 193. The facts as pled are that when defendants made the opinion statements the Illuminate Contract had expired and was not generating revenue for Digimarc, but Digimarc otherwise maintained its contractual relationship with Walmart and the two were actively negotiating a new Illuminate Contract. That circumstance does not conflict with what a reasonable investor would take from defendants' opinions regarding progress in Digimarc's relationship with Walmart, and those opinions are not actionable.

Defendants also argue that some of the statements plaintiffs contest are inactionable puffery. Those statements include McCormack's reference to "exciting developments" likely to have a "profound impact," and his comments that it was "difficult to overstate the importance" of

developments. Defs.' Mot. Dismiss 19 (doc. 40); Am. Compl. ¶¶ 74, 79-80 (doc. 37). "Puff[ery]" or "expressing an opinion rather than a knowingly false statement of fact . . . is not misleading." *Hewlett-Packard Co.*, 845 F.3d at 1275. "[T]he difference between a statement of fact and mere puffery rests in the specificity or generality of the claim." *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1053 (9th Cir. 2008). Plaintiffs contend those statements are not vague because in context they are in reference to Walmart's understanding of Digimarc's value. Pls.' Resp. to Mot. Dismiss 15-16 (doc. 43). However, McCormack's commentary regarding "exciting developments," a "profound impact," and how "difficult [it was] to overstate the importance" of recent developments simply represent his optimism about Digimarc's relationship with Walmart. Further, the statements they refer to – statements regarding what Digimarc now believes Walmart understands about Digimarc – are not objective facts, but opinion statements themselves. The statements at issue are inactionable puffery.

**b. November 14, 2024, Statements**

Plaintiffs assert the following statements or omissions by defendants related to Digimarc's Q3 2024 results, released November 14, 2024, were material misrepresentations.

In the press release attached to the Form 8-K Digimarc filed with the SEC, signed by Beck, Digimarc announced "[t]he $0.9 million decrease reflects a $5.8 million decrease due to the delayed timing in the anticipated renewal of a commercial contract, partially offset by new annual recurring revenue from entry into new commercial subscription contracts and increased subscription fees on existing commercial contracts." Am. Compl. ¶ 87 (doc. 37). The document added, "[s]ubscription revenue for the third quarter of 2024 increased to $5.3 million compared to $4.8 million for the third quarter of 2023, primarily reflecting higher subscription revenue from

new and existing commercial contracts, partially offset by the delayed timing in the anticipated renewal of a commercial contract.” *Id.*

In his prepared remarks during the earnings call, McCormack stated that “[t]he gap between what lies ahead and what lies behind has never been this large[,]” and explained that Digimarc’s “third quarter results were impacted by the delayed renewal” of the Illuminate Contract, but the “financial component of this deal is meaningful as it represents a significant upsell[,]” and “[t]he strategic component will prove transformational not only to our company but also to the massive industry it will revolutionize.” *Id.* at ¶ 88.

In his own prepared remarks, Beck explained that, while he normally began by discussing the financial results, due to “the significance of the delayed contract,” he would “forgo providing that snapshot because Q3 results are not a true representation of the state of our business.” *Id.* at ¶ 89. He added that, beyond its impact on ARR, “the delay in re-signing resulted in no revenue being recognized nor cash collected from this contract during Q3.” *Id.* Given the delay’s impact on “some of our most important financial metrics,” Beck said, “quarterly financial results are not reflective of our expected go-forward performance, even before considering this contract renewal is expected to include a large upsell.” *Id.* Regarding the potential new Illuminate Contract, he explained that “[i]f this contract, as currently drafted, had been executed and paid within the third quarter, free cash flow would have been positive in Q3.” *Id.*

In a response to an analyst question, McCormack again expressed confidence in Walmart’s recognition of Digimarc’s value and said that “outside of very normal and very healthy paranoia that nothing is 100% until the ink is dry, I’m not worried on the if, at least from the customer perspective.” *Id.* at ¶ 90.

McCormack also addressed the scope of the potential new contract with Walmart. *Id.* at ¶ 92. He explained that the deal was "taking longer to close than all involved originally believed" because of its broad industry impact, that he "unequivocally support[ed]" "[t]rading time-to-close for strategic scope," that Digimarc focused on maximizing long-term value, "and we expect our current path to do exactly that." *Id.* He noted that the decision to stand behind the decision to invest resources in the deal in Q3 as opposed to invest in other opportunities, "even knowing as we do now, that the expenditure of those resources wouldn't fall in the same quarter in which the deal was signed." *Id.*

Later in the call McCormack responded to an analyst question, similarly, explaining that "[t]he deal has taken longer to close than everyone involved expected, and that has happened for a good reason. It will transform a massive industry. And we are always going to be willing to trade time to close for scope. It's the best thing to do for the long term." *Id.* at ¶ 93. He added that he thought it was "important to remember that deadlines can extend for many reasons, and not all of them are bad or concerning." *Id.*

An analyst also asked McCormack whether there was "a scenario where they could have just renewed or extended the old contract, at least for this interim period?" *Id.* at ¶ 94. McCormack reiterated he would "always trade time to close for better scope," he "would rather get a really good deal . . . as opposed to a quick Band-Aid," and that "we're focused on the long term[.]" *Id.* Another analyst asked how to "think about the upsell opportunity" of the potential deal, referring to McCormack's earlier use of "transformational" to describe the deal. *Id.* McCormack explained he did not want to say too much during negotiations but that he did not throw around the word "transformational" lightly, directed the analyst to quarterly cash flow scenarios, and added that "we've got to get this deal across the finish line and can't wait [until] we do that[.]" *Id.*

Another analyst asked about the risks analysts and investors should be considering around the deal, as well as for McCormack's level of confidence in closing the deal. *Id.* at ¶ 97. McCormack responded that "the biggest risk on the if . . . is there are many exciting developments in Q3, in which we could be investing on resources and this opportunity while itself is really, really exciting, but just one of them." *Id.* He added that "[w]e do take our responsibility of ensuring that the company resources are always deployed in pursuit of maximizing long-term value very seriously[,]" and went on to say that "[t]here are no sacred cows, and we make decisions based solely on ROI." *Id.*

**i. Disclosure**

Plaintiffs allege that, by mischaracterizing the nature of the contract under negotiation and overstating Digimarc's commitment to the contract, defendants masked "the true nature and magnitude of the risk to [Digimarc] and its relationship to Walmart[.]' Am. Compl. ¶¶ 91, 96, 98 (doc. 37); Pls.' Resp. to Mot. Dismiss 17-19 (doc. 43). Defendants argue that Digimarc disclosed the facts relevant for investors to judge the level of risk associated with the contract negotiations by disclosing that the Illuminate Contract had expired, negotiations were underway, and Digimarc's negotiation strategy was to hold out for the strongest deal even if that delayed execution. Defendants further contend analysts and investors understood there was a possibility of non-renewal, as well as the financial impact of losing the Illuminate Contract. Defs.' Mot. Dismiss 20-21 (doc. 40).

"[D]efendants cannot be held liable for failing to disclose something that they disclosed." *Altayyar v. Etsy, Inc.*, 242 F. Supp. 3d 161, 180 (E.D.N.Y. 2017) (citing *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 377 (E.D.N.Y. 2003) ("Even at the pleading state, dismissal is

appropriate where the complaint is premised on the nondisclosure of information that was actually disclosed.”)).

Here, defendants disclosed information adequate to avoid creating “an impression of a state of affairs that differs in a material way from the one that actually exists[.]” *In re Facebook*, 87 F.4th at 948 (citations and internal quotation marks omitted). While defendants spoke about the contract under negotiation using language like “re-signing,” “delayed,” “renewed,” and “large upsell,” they also said the delay “happened for a good reason,” and would “transform a massive industry.” Am. Compl. ¶¶ 87-89, 93 (doc. 37). McCormack said, “[t]he gap between what lies ahead and what lies behind has never been this large,” he would believe in “trading time-to-close for strategic scope,” and explained that Digimarc was “focused on a long term[.]” *Id.* at 88, 92, 94. He also told analysts and investors that “nothing is 100% until the ink is dry[.]” *Id.* at 90. A reasonable investor would understand those comments to mean that the delayed renewal of the Walmart Illuminate Contract included meaningful changes that would inherently come with increased risk.

Further, defendants did not mislead investors by overstating their commitment to the new deal. Defendants explained they believed their then-current path would maximize long-term value, that they were “working diligently to finalize this contract[.]” *Id.* at 88, 92. However, McCormack explained that he was “not worried on the if, at least from the customer perspective[,]” and “the biggest risk on the if” was “there are many exciting developments in Q3, in which we could be investing on resources and this opportunity, while itself is really, really exciting” was “just one of them[,]” and “[t]here are no sacred cows, and we make decisions based solely on ROI.” *Id.* at 90, 97. A reasonable investor would understand from defendants’ statements that Digimarc would

transition away from the contract negotiations if other resource allocation opportunities presented a better return on investment.

### ii. The PSLRA Safe Harbor

Defendants additionally argue that some of the November statements plaintiffs challenge are protected by the PSLRA safe harbor. Defs.' Mot. Dismiss 22 (doc. 40). Those statements include Beck's comment that "contract renewal is expected to include a large upsell[,]" and McCormack's statements that "we expect our current path" to create long-term growth, and the new contract "will transform a massive industry." *Id.* at 22; Am. Compl. ¶¶ 89, 92-93 (doc. 37). Those statements are forward looking and accompanied by meaningful cautionary language, including McCormack's warning that "nothing is 100% until the ink is dry" and his comments regarding other available opportunities and that Digimarc made "decisions based solely on RIO." *Id.* at 90, 97. Therefore, even if defendants had not disclosed the risk, those statements fall under the PSLRA safe harbor. Pls.' Resp. to Mot. Dismiss 20 (doc. 43).

### iii. Puffery

Defendants also contend statements including phrases like "transformational," "revolutionize," "long-term value," and making "decisions based solely on ROI" express subjective corporate optimism and are inactionable puffery. Defs.' Mot. Dismiss 22-23 (doc. 40); Am. Compl. ¶¶ 88, 92, 94, 97 (doc. 37). Plaintiffs again argue that, in context, the comments "conveyed specific facts about the deal's magnitude and importance, while obscuring the true risk to Digimarc's Walmart relationship." McCormack's statement that "[t]he strategic component will prove transformational not only to our company but also to the massive industry it will revolutionize" reads plainly as aspirational corporate optimism and is too vague for a reasonable investor to rely on. McCormack's comments that "[w]e run our business to maximize long-term

value, and we expect our current path to do exactly that," "we're focused on a long term" "[w]e do take our responsibility of ensuring that the company resources are always deployed in pursuit of maximizing long-term value very seriously," and "[o]ur true north is and always will be how we can create the greatest long-term value" are similarly "too generalized to be actionable." *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 804 (N.D. Cal. 2019) (finding similar statement was puffery) (citations omitted). The same is true for McCormack's comment that "we made decisions based solely on ROI." Even if defendants had not disclosed the risk plaintiffs alleged were omitted, the statements defendants point to here are inactionable puffery.

**c. Duty to Update**

Defendants argue there was no duty to update the market at the end of 2024 when Digimarc shifted resource allocation away from a new Illuminate contract with Walmart because §10(b) does not require instantaneous updates of all developments and, here, Digimarc had committed to provide an update upon the signing of a new contract, such that investors understood there was no new contract by the absence of an update. Defs.' Mot. Dismiss 23-24 (doc. 40). To allege that "a duty to update a forward-looking statement arose on account of an earlier-made projection," a plaintiff must argue "the projection contained an implicit factual representation that remained 'alive' in the minds of investors as a continuing representation." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1432 (3d Cir. 1997) (citations omitted). While plaintiffs make that allegation, it does not stand.

In the Q3 2024 earnings filing and call, defendants represented the contract negotiations with Walmart in a way that a reasonable investor would have understood to mean that, while nothing is certain, they were working towards an agreement that would be different in scope and terms from the Illuminate Contract, but Digimarc had other opportunities towards which they

could be allocating their resources, which created a risk to the deal. Am. Compl. ¶¶ 89-90, 97 (doc. 37). Further, McCormack said during the Q3 2024 earnings call that "if [the new contract] closes before our next scheduled call as we currently believe is likely, we will hold an interim call." *Id.* at 92. There was no misapprehension to require an update, and had there been, investors would have understood from the absence of an update that there was no new contract. Defendants did not have a duty to update regarding Digimarc's shift away from the Walmart contract negotiation.

Plaintiffs fail to adequately plead defendants made representations or omissions that "directly contradict[ed]" what they knew at the time or "create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *In re Facebook*, 87 F.4th at 948 (citations and internal quotation marks omitted).

**d. Scheme**

In their response, plaintiffs argue that they pleaded a distinct scheme claim. Pls.' Resp. to Mot. Dismiss 20 (doc. 43). Court's recognize that "the exact mechanism of the scheme is likely to be unknown to the plaintiffs, allegations of the nature, purpose and effect of the fraudulent conduct and the roles of the defendants are sufficient for alleging participation." *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1193 (D. Or. 2015) (citations and internal quotation marks omitted). Still, plaintiffs must make such allegations with particularity in accordance with Rule 9(b). *Id.*

As pleaded, it is not clear whether plaintiffs are making a distinct Rule 10b-5(a) and (c) claim. Plaintiffs reference a "scheme" throughout the amended complaint but never reference Rule 10b-5(a) or (c). They summarize the alleged scheme by alleging defendants' "scheme to cover up the lapse of Digimarc's multiyear contract with its largest commercial customer, Walmart, and their reckless gamble that [Digimarc] would be able to replace the expired contract with a more

significant one before investors punished Digimarc's stock price as a result." Am. Compl. ¶ 2 (doc. 37). Plaintiffs appear to rely on their misrepresentation allegations to fill in the scheme's details, declining to distinguish between defendants or allege their roles in the alleged scheme, or to allege specific conduct in the context of said scheme. As such, plaintiffs fail to adequately plead a scheme.

**B. Section 20(a) of the Exchange Act**

Plaintiffs bring claims under § 20(a) of the Exchange Act against McCormack and Beck. Section 20(a) of the Exchange Act assigns joint and several liability for any person who "controls any person liable" under Section 10(b). 15 U.S.C. § 78t. Controlling persons liability under § 20(a) is derivative, such that there can be no liability under § 20(a) without a primary violation under § 10(b). *See* *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. V. Align Tech., Inc.*, 856 F.3d 605, 623 (9th Cir. 2017); *Prodanova v. H.C. Wainwright & Co.*, 993 F.3d 1097, 1113 (9th Cir. 2021). Because there was no primary violation here, the motion to dismiss the plaintiffs' § 20(a) claim should be granted.

**CONCLUSION**

For the reasons above, defendants' request for judicial notice (doc. 40) and motion to dismiss (doc. 40) should be granted and a judgment prepared dismissing this case.

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment or appealable order. The parties shall have fourteen (14) days from the date of service of a copy of this recommendation within which to file specific written objections with the court. Thereafter, the parties shall have fourteen (14) days within which to file a response to the objections. Failure to timely file objections to any factual determination of the Magistrate Judge will be considered as a waiver of a party's

right to de novo consideration of the factual issues and will constitute a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to this recommendation.

DATED this 23rd day of June, 2026.

/s/ Jolie A. Russo
Jolie A. Russo
United States Magistrate Judge